UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
(216) 566-5500
Alan R. Lepene, Esq. (Ohio Bar # 0023276)
Robert C. Folland, Esq. (Ohio Bar # 0065728)
Sean A. Gordon, Esq. (Ohio Bar # 0074243)
-and-
RAVIN GREENBERG PC
101 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 226-1500
Howard S. Greenberg, Esq. (HSG8559)
Stephen B. Ravin, Esq. (SR7074)
Brian L. Baker, Esq. (BB4569)
*Co-Attorneys for Debtors and Debtors-in-Possession, GEO Specialty Chemicals Inc. and GEO Specialty Chemicals Limited*

| In Re: GEO Specialty Chemicals, Inc., et al, Debtors. | Chapter 11<br>Case No.: 04-19148 (MS)<br>(Jointly Administered)<br>Hearing Date: |
|---|---|

**DISCLOSURE STATEMENT WITH RESPECT TO THIRD MODIFIED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF GEO SPECIALTY CHEMICALS, INC. AND GEO SPECIALTY CHEMICALS LIMITED, DEBTORS**

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE THIRD MODIFIED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF GEO SPECIALTY CHEMICALS, INC. AND GEO SPECIALTY CHEMICALS LIMITED, DEBTORS (THE "PLAN"). THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF GEO SPECIALTY CHEMICALS, INC. OR GEO SPECIALTY CHEMICALS LIMITED IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN GEO SPECIALTY CHEMICALS, INC., OR GEO SPECIALTY CHEMICALS LIMITED.

**TABLE OF CONTENTS**

ARTICLE I INTRODUCTION .......... 1

ARTICLE II OVERVIEW OF THE PLAN .......... 3

A. General Structure of the Plan .......... 4
B. Summary of Treatment of Claims and Interests Under the Plan .......... 5

ARTICLE III PLAN VOTING INSTRUCTIONS AND PROCEDURES .......... 17

A. Notice to Holders of Claims and Interests .......... 17
B. Voting Rights .......... 18
C. Solicitation Materials .......... 18
D. Voting Procedures, Ballots and Voting Deadline .......... 19
E. Special Notice Concerning Voting. .......... 20
F. Confirmation Hearing and Deadline for Objections to Confirmation .......... 22

ARTICLE IV GENERAL INFORMATION CONCERNING THE DEBTORS .......... 22

A. Overview of Business Operations .......... 22
B. GEO's Acquisition History .......... 23
C. Overview of GEO's Products and Markets .......... 24
D. Management and Employees .......... 28
E. Capital Structure of the Company .......... 36
F. Summary of Assets .......... 39
G. Historical Financial Information .......... 39
H. Events Leading to Commencement of the Chapter 11 Case .......... 40

ARTICLE V CHAPTER 11 CASE .......... 41

A. Continuation of Business; Stay of Litigation .......... 41
B. First Day Orders .......... 41
C. Retention of Professionals .......... 42
D. Official Appointment of Creditors Committee .......... 42
E. Authorization to Use Cash Collateral. .......... 42
F. Postpetition and Postconfirmation Funding. .......... 43
G. Other Material Matters To Be Addressed During the Chapter 11 Case .......... 47
H. Plan Process. .......... 49

ARTICLE VI SUMMARY OF THE PLAN OF REORGANIZATION .......... 49

A. Overall Structure of the Plan .......... 50
B. Joint Treatment .......... 50
C. Classification and Treatment of Claims and Interests .......... 51
D. Reservation of Rights Regarding Claims .......... 64
E. Allowed Claims, Distribution Rights and Objections to Claims. .......... 64

F. Disposition of Executory Contracts and Unexpired Leases. .......... 67
G. Revesting of Assets; Release of Liens; Effective Date Restructurings .......... 70
H. Post-consummation Corporate Structure, Management and Operation. .......... 70
I. Confirmation and/or Consummation. .......... 72
J. Releases, Discharge, Injunctions, Exculpation and Indemnification. .......... 74
K. Preservation of Rights of Action .......... 79
L. Retention of Jurisdiction .......... 80
M. Amendment, Alteration and Revocation of Plan .......... 82
N. Plan Implementing Documents .......... 82

ARTICLE VII CERTAIN RISK FACTORS TO BE CONSIDERED .......... 83

A. General Considerations .......... 83
B. Certain Bankruptcy Considerations .......... 83
C. Claims Estimations .......... 84
D. Conditions Precedent to Consummation .......... 84
E. Inherent Uncertainty of Financial Projections .......... 84
F. Certain Risk Factors Relating to Securities to be Issued Under the Plan. .......... 85
G. Competition .......... 86
H. Raw Materials / Production .......... 86
I. Market Conditions .......... 86
J. [Intentionally Omitted]. .......... 86
K. Environmental .......... 86
L. Reliance On Key Personnel .......... 87
M. Unfunded Pension Liability and Asset Rate of Return .......... 88
N. Risks Related to Foreign Operations .......... 88
O. Leverage .......... 88
P. Litigation .......... 89
Q. Adverse Publicity .......... 89
R. Certain Tax Considerations .......... 89

ARTICLE VIII APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS .......... 90

A. Offer and Sale of New Securities Pursuant to the Plan: Bankruptcy Code Exemption From Registration Requirements .......... 90
B. Subsequent Transfers of New GEO Common Stock .......... 90

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 92

A. Certain U.S. Federal Income Tax Consequences of the Plan .......... 92

ARTICLE X FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS .......... 99

A. Feasibility of the Plan .......... 99
B. Acceptance of the Plan .......... 100

C. Best Interests Test ........ 100
D. Liquidation Analysis ........ 101
E. Valuation of the Reorganized Debtors ........ 102
F. Financial Projections ........ 103
G. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation ........ 107
H. Confirmation Without Acceptance of All Impaired Classes: the "Cramdown" Alternative ........ 108

ARTICLE XI ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........ 109

A. Alternative Plan(s) of Reorganization ........ 109
B. Liquidation Under Chapter 7 or Chapter 11 ........ 109

ARTICLE XII THE SOLICITATION; VOTING PROCEDURES ........ 110

A. Parties in Interest Entitled to Vote ........ 110
B. Classes Entitled to Vote to Accept or Reject the Plan ........ 110
C. Solicitation Order ........ 111
D. Waivers of Defects, Irregularities, Etc. ........ 111
E. Withdrawal of Ballots; Revocation ........ 111
F. Special Instructions for Holders of Bondholder Unsecured Claims ........ 112
G. Voting Rights of Disputed Claimants ........ 112
H. Further Information; Additional Copies ........ 112

# TABLE OF APPENDICES

| | |
|---|---|
| Appendix A | Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of GEO Specialty Chemicals, Inc and GEO Specialty Chemicals Limited, Debtors |
| Appendix B | Pro Forma Financial Projections |
| Appendix C | Corporate Structure Chart |
| Appendix D | Historical Financial Information |
| Appendix E | Liquidation Analysis |
| Appendix F | Post-Effective Date Corporate Structure Chart |
| Appendix G | Employment Agreement with George P. Ahearn |
| Appendix H | Employment Agreement with William P. Eckman |
| Appendix I | Employment Agreement with Terry L. Guckes |
| Appendix J | Schedule of Key Vendors |
| Appendix K | Schedule of Executory Contracts with Cure Amounts to be Assumed |
| Appendix L | Schedule of Executory Contracts to be Rejected |

# DISCLOSURE STATEMENT WITH RESPECT TO THIRD MODIFIED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF GEO SPECIALTY CHEMICALS, INC. AND GEO SPECIALTY CHEMICALS LIMITED, DEBTORS

## ARTICLE I

## INTRODUCTION

GEO Specialty Chemicals, Inc. ("GEO") and GEO Specialty Chemicals Limited ("GSCL", and together with GEO, the "Debtors") submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), for use in the solicitation of votes on their Third Modified Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code dated November 8, 2004 (the "Plan"). A copy of the Plan is attached as Appendix A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and reorganization under Chapter 11, significant events that have occurred during the Chapter 11 case and the anticipated organization, operations and financing of the Debtors upon successful emergence from Chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

By order dated on or about November 22, 2004, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of holders of Claims against, or Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan; and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement or the summary of the Disclosure Statement and Section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement or the summary of the Disclosure Statement, the Plan and all exhibits hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such

plan are entitled to vote on the plan. In the Debtors' cases, only Claims in Classes 4, 5, 6, 7, 8, and 9 are impaired by and entitled to receive a distribution under the Plan, and only the holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims in Classes 1, 2, and 3 are unimpaired by the Plan, and the holders thereof are conclusively presumed to have accepted the Plan. Claims or Interests in Classes 10, 11, and 12 which receive nothing under the Plan, are deemed to have rejected the Plan and the holders of Claims or Interests in each of such Classes are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS: All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, statements relating to the following: financial projections; the scope, timing and completion of the current restructuring, the Plan and bank financing; debt and equity market conditions; the cyclicality of GEO's industry; current and future industry conditions; the potential effects of such matters on GEO's business strategy, results of operations or financial position; the adequacy of GEO's liquidity; and the market sensitivity of GEO's financial instruments. These forward-looking

statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from GEO's expectations or what is expressed, implied or forecasted by or in the forward-looking statements include: developments in the Chapter 11 Case; motions filed or actions taken in connection with the bankruptcy proceedings; adverse developments in the timing or results of GEO's business plan (including the time line to emerge from Chapter 11); the timing and extent of changes in commodity prices and global economic conditions; a decline in demand for GEO's products; the loss of sales revenue due to competitive products and pricing pressures; GEO's inability to maintain operating costs at competitive levels; GEO's inability to obtain raw materials at acceptable prices, in a timely manner and on acceptable terms; federal and state regulatory developments; any increase in GEO's financial leverage; GEO's ability to attract or retain high quality employees; and operating hazards attendant to the industry. Additional factors that could cause actual results to differ materially from what is expressed, implied or forecasted by or in the forward-looking statements are stated herein in cautionary statements made in conjunction with the forward-looking statements or are included elsewhere in this Disclosure Statement.

Except with respect to the pro forma financial projections set forth in Appendix B annexed hereto (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not undertake any obligation to, and do not intend to, update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof. Moreover, the Projections are based on assumptions that, although believed to be reasonable by the Debtors, may differ from actual results.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THE HOLDERS OF CLAIMS IN CLASSES 4, 5, 6, 7, 8, 9, and 10. THE DEBTORS URGE SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

## ARTICLE II

## OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms

and provisions of the Plan, <u>see</u> <u>Article VI</u> of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors, based upon a joint plan structure. The Plan designates eleven (11) Classes of Claims and one (1) Class of Interest. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Debtors believe that the Plan presents the best means currently available for their emergence from Chapter 11.

A. <u>General Structure of the Plan</u>. The Plan is structured as a joint plan, pursuant to which each individual Claim against either or both Estates shall be deemed to be a single Claim against both Estates, any Proof of Claim filed against one or both of the Debtors shall be deemed to be a single Claim filed against both Estates, and all duplicate Proofs of Claim for the same Claim filed against both Debtors shall be expunged. Claims are treated generally in accordance with the priorities established under the Bankruptcy Code, although special treatment is provided to certain trade creditors who are deemed by the Debtors to be crucial to the Debtors' post-confirmation business operations and who agree to extend trade credit to the Debtors post-confirmation on acceptable terms.

The following is an overview of certain material terms of the Plan:

- The Debtors will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of Chapter 11 for the benefit of their creditors, customers, suppliers, employees and communities.

- Holders of Administrative Claims, including super priority claims incurred in connection with debtor in possession financing provided to the Debtors under that certain Debtor In Possession Revolving Credit Agreement dated March 31, 2004, as such facility may be amended, supplemented, or otherwise modified (the "DIP Facility"), Priority Tax Claims and Other Priority Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the holders of such claims.

- Allowed Secured Claims ("Prepetition Secured Lender Claims") held by the Debtors' senior secured lenders (the "Prepetition Secured Lenders") under that certain Amended and Restated Credit Agreement, dated as of May 31, 2001, among GEO, Deutsche Bank Trust Company Americas (f/k/a Bankers Trust Company), as administrative agent (the "Prepetition Secured Lender Agent") Solomon Smith Barney, Inc. as syndication agent, U.S. Bank National Association, as documentation agent, and the lending institutions parties thereto, and related documents, agreements and instruments, including any interest rate hedge agreements (the "Prepetition Secured Credit Agreement") will be paid in full.

- Holders of GEO's 15% Senior Notes due February 1, 2008 (the "15% Senior Notes") will receive 5% Subordinated PIK Notes in the face amount of $6,100,000.00 (the "New PIK Notes") to be issued at a discount corresponding to the value, as a percentage of their Claims, as is provided to the holders of GEO's 10 1/8% Senior Subordinated Notes due 2008, Series A (the "10 1/8% Notes") through the distribution of New GEO Common Stock.

- Holders of GEO's 10 1/8% Notes (the "Bondholder Unsecured Claims") will receive a specific number of shares of New GEO Common Stock, the value of which will approximate 44% of their Claims.

- Allowed general unsecured claims held by trade creditors who are designated by the Debtors as being crucial to the Debtor's business operations post-confirmation and who agree to extend trade credit to the Debtors post-confirmation for a period of not less than 12 months on terms and pricing acceptable to the Debtors (the "Key Continuing Trade Vendors") shall receive payment of their claims in full in twelve (12) equal monthly installments, in the aggregate amount of their claims.

- Holders of allowed general unsecured claims, other than Key Continuing Trade Vendors, shall receive a lump sum cash payment in an amount equal to 44% of their claims.

- Old Equity Interests will be cancelled pursuant to Section 4.4 of the Plan.

- The Reorganized Debtors will obtain secured financing in a principal amount of not less than $125 million to refinance the DIP Facility, pay administrative and priority claims, provide cash payments to certain prepetition creditors, pay transaction costs, and fund working capital and general corporate purposes of the Reorganized Debtors following their emergence from Chapter 11.

B. Summary of Treatment of Claims and Interests Under the Plan. The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. For certain Classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the amount of Allowed Claims in each Class and the value ascribed to the New GEO Common Stock to be issued under the Plan.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtors have not yet reviewed and fully analyzed all Proofs of Claim filed in the Chapter 11 Case, and some claims are presently disputed by the Debtors. Estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records and of certain Proofs of Claim, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated.

The reorganization value of the Reorganized Debtors is assumed for the purposes of the Plan to be between approximately $165 million to $205 million, with a midpoint value of $185

million. The implied range of equity values for the Reorganized Debtors approximates $50 million to $90 million, with a midpoint value of $70 million. There will be a distribution of 5 million shares upon consummation of the Plan.

The foregoing valuations are based on numerous assumptions, including, among other things, an assumption that the operating results projected for the Reorganized Debtors will be achieved in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. The valuation assumptions also consider, among other matters, (a) market valuation information concerning certain publicly traded securities of certain other companies that are considered relevant, (b) certain general economic and industry information considered relevant to the businesses of the Reorganized Debtors and (c) such other investigations and analysis deemed necessary or appropriate.

***The valuation assumptions are not a prediction or reflection of post-confirmation trading prices of the new GEO common stock. Such securities may trade at substantially lower or higher prices because of a number of factors, including, but not limited to, those discussed in Article VII*. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

| Class Description | Treatment Under Plan |
|---|---|
| Administrative Claims<br><br>Estimated Allowed Claims: Approximately $6.9 million | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses or commissions for services rendered after the commencement of the Chapter 11 Case, (b) Professional Fee Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under 28 U.S.C. §§1930(e) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (f) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code, and (g) DIP Facility Claims.<br><br>Under the Plan, except as otherwise provided for therein, and subject to the requirements of Sections 12.1 through 12.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes |

| Class Description | Treatment Under Plan |
|---|---|
| | payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder will have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.<br><br>Under the Plan, each holder of an Allowed DIP Facility Claim will receive, on the later of the Effective Date or the date on which such DIP Facility Claim becomes payable pursuant to any agreement between the Debtors and the holder of such DIP Facility Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim, (i) Cash equal to the full amount of such Allowed DIP Facility Claim, or (ii) such different treatment as to which the Debtors and such holder will have agreed upon in writing.<br><br>Pursuant to the Plan, Adequate Protection Claims held by Prepetition Secured Lenders under any post-petition Cash Collateral Orders will be deemed to have been satisfied in full by payments made pursuant to the Cash Collateral Orders. Any replacement or other Liens created under such Orders will terminate and will have no further force and effect as of the Effective Date.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

| Class Description | Treatment Under Plan |
| --- | --- |
| Priority Tax Claims<br><br>Estimated Allowed Claims: Approximately $300,000.00 | Priority Tax Claims are Claims of governmental units for taxes that are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Under the Plan, each holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder will have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 1, Other Priority Claims<br><br>Estimated Allowed Claims: Approximately $4,000.00 | Class 1 consists of all Other Priority Claims against the Debtors, which are Claims entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>The Plan provides that on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such other different treatment as to which the applicable Debtor and such holder will have agreed |

| Class Description | Treatment Under Plan |
|---|---|
| | upon in writing.<br><br>Other Priority Claims are Unimpaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 2, Prepetition Secured Lender Claims<br><br>Estimated Allowed Claims: Approximately $100.5 million in principal plus fees and expenses permitted under the Prepetition Secured Credit Agreement and such amount, if any, in unpaid accrued interest as may be determined by the Bankruptcy Court | Class 2 consists of Prepetition Secured Lender Claims, which are Secured Claims arising under the Prepetition Secured Credit Agreement as of the Petition Date.<br><br>Under the Plan, the holders of Prepetition Secured Lender Claims, in full satisfaction, settlement, release and discharge of and in exchange for such Prepetition Secured Lender Claims, will receive on the Distribution Date, through the Prepetition Secured Lender Agent, their Pro Rata share, in the aggregate, of approximately $100.5 million in principal plus fees and expenses permitted under the Prepetition Secured Credit Agreement and such amount, if any, in unpaid accrued interest as may be determined by the Bankruptcy Court.<br><br>Pursuant to the Plan, the Prepetition Secured Lenders will receive the distributions provided for Prepetition Secured Lender Claims in full satisfaction, settlement, release and discharge of and in exchange for all Claims arising under the Prepetition Secured Credit Agreement.<br><br>Prepetition Secured Lender Claims are Unimpaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 3, Citibank Secured Claims<br><br>Estimated Allowed Claims:<br><br>Approximately $600,000.00 (disputed) | Class 3 consists of Citibank Secured Claims, which are Secured Claims of Citibank, N.A. arising under that certain International Swap Dealers Association, Inc. Master Agreement, dated as of November 16, 2001 entered into by and between Citibank, N.A. and GEO.<br><br>The Debtors presently dispute the Citibank Secured Claim. At such time as a Final Order is entered determining the amount of the Citibank Secured |

| Class Description | Treatment Under Plan |
|---|---|
| | Claim, there will be paid to the holder of the Citibank Secured Claim cash in an amount equal to such claim.<br><br>The holders of Citibank Secured Claims will receive the distributions provided for Citibank Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under that certain International Swap Dealers Association Inc. Master Agreement, dated as of November 16, 2001 entered into by and between Citibank, N.A. and GEO.<br><br>If deemed allowed, Citibank Secured Claims are Unimpaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery (if allowed): 100% |
| Class 4, Other Secured Claims<br><br>Estimated Allowed Claims:<br><br>Approximately $200,000.00<br><br>(The actual amounts of Allowed Claims for Class 4 could materially exceed or could be materially less than the estimated amounts shown herein). | Class 4 consists of Other Secured Claims, each of which shall be placed in one or more subclasses hereunder, which are Secured Claims arising prior to the Petition Date against any of the Debtors, other than a Prepetition Secured Lender Claim.<br><br>The Plan provides that on the Effective Date, at the option of the Reorganized Debtors, either (A) the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim will be reinstated in accordance with the provisions of 11 U.S.C. § 1124(2), *provided*, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be required to be reinstated in order for a Claim to be considered reinstated; (B) each holder of an Allowed Other Secured Claim shall (I) retain the Liens securing such Allowed Other Secured Claim and (II) receive deferred Cash payments totaling at least the |

| Class Description | Treatment Under Plan |
|---|---|
| | amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property; (C) the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim; or (D) each holder of an Allowed Other Secured Claim shall be paid in full on the Effective Date.<br><br>Other Secured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Subclass 4(i), Interlogistics Secured Claim<br><br>Estimated Allowed Claims: Approximately $105,000.00 | Subclass 4(i) consists of the Secured Claim of Interlogistics S.A. against either GEO or GSCL.<br><br>Under the plan, the holder of the Interlogistics Secured Claim shall, at the option of the Reorganized Debtors, receive the treatment specified in Section 4.3(a)(i)(A), (B), (C), (D) of the Plan as summarized above with respect to Class 4, Other Secured Claims.<br><br>The Interlogistics Secured Claim is Impaired. The holder of such Claim is, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Subclass 4(ii), Mechanics Lien Secured Claims | Subclass 4(ii) consists of Secured Claims of certain creditors who have filed and perfected mechanics liens that are not subject to avoidance in accordance with the provisions of Section 546(b) of the Bankruptcy Code. Under the Plan, the holders of Mechanics Lien Secured Claims shall, at the option of the Reorganized Debtors, receive the treatment specified in Section 4.3(a)(i)(A), (B), (C), (D) of the Plan as summarized above with respect to Class 4, Other Secured Claims.<br><br>The Mechanics Lien Secured Claims are impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

| Class Description | Treatment Under Plan |
|---|---|
| | |
| Class 5, 15% Senior Note Unsecured Claims<br><br>Estimated Allowed Claims: Approximately $6.1 million | Class 5 consists of 15% Senior Note Unsecured Claims, which are Claims that arise out of or relate to a certain Note Purchase Agreement, dated as of August 27, 2003 (the "Prepetition Note Purchase Agreement"), whereby GEO issued to Charter Oak Partners and Charter Oak Partners, L.P. (together, "Charter Oak") the 15% Senior Notes.<br><br>Holders of 15% Senior Note Unsecured Claims will be issued on the Distribution Date the New PIK Notes, maturing on the sixth anniversary of the Effective Date. The New PIK Notes will be subordinate to the prior payment in full in cash of all indebtedness for borrowed money of reorganized GEO. Upon bankruptcy or liquidation of Reorganized GEO, the holders of the New PIK Notes will be entitled to receive only the accreted amount of the New PIK Notes, which shall initially be a percentage of the face amount, corresponding to the implied value of the New GEO Common Stock being issued under the Plan to the holders of GEO's 10 1/8% Notes due 2008, Series A (estimated at 44%), and which accreted amount shall increase to 100% of face amount in equal installments to maturity. The New PIK Notes will not be subject to mandatory redemption, except to the extent described below. Optional redemption will be permitted but only if the full face amount of the New PIK Notes is paid, with accrued interest. The only events of default under the New PIK Notes will be a bankruptcy filing or liquidation by Reorganized GEO, or the failure to pay PIK interest when due. All exercise of remedies by the holders of the New PIK Notes will be blocked until payment in full in cash of all senior debt of Reorganized GEO.<br><br>If all or virtually all of the equity of Reorganized GEO is sold for a purchase price per share that provides holders of the 10 1/8% Notes with aggregate proceeds at least equal to the face amount of such 10 1/8% Notes then, to the extent the New PIK Notes may be paid in full in cash at face value plus accrued interest without reducing the recovery of such 10 1/8% Notes below such face amount, the |

| Class Description | Treatment Under Plan |
|---|---|
| | New PIK Notes will become due and payable and be entitled to be paid at the time of such change of control in cash at such face value plus accrued interest.<br><br>15% Senior Note Unsecured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 44% of the face value of the 15% Senior Notes |
| Class 6, Bondholder Unsecured Claims<br><br>Estimated Allowed Claims:<br><br>Approximately $127.7 million | Class 6 consists of Bondholder Unsecured Claims which are Claims arising from or relating to the 10 1/8% Notes.<br><br>Each holder of an Allowed Bondholder Unsecured Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Bondholder Unsecured Claim, will receive on the Distribution Date its Pro Rata share of New GEO Common Stock (subject to dilution as set forth in Section 6.6(c) of the Plan).<br><br>Bondholder Unsecured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 44% |
| Class 7, Key Continuing Vendor Claims<br><br>Estimated Allowed Claims:<br><br>Approximately $2.4 million<br><br>(The actual amounts of Allowed Claims for Class 7 could materially exceed or could be materially less than the estimated amounts shown herein). | Class 7 consists of Key Continuing Vendor Claims, which are Claims of those Persons that the Debtors designate as Key Vendors that also make the Key Continuing Vendor Election. The Key Continuing Vendor Election is defined in the Plan as the election by a Key Vendor to receive treatment in Class 7 on account of its unsecured Claim and undertake the obligations set forth in Section 4.3(e) of the Plan.<br><br>Under the Plan, each Allowed Key Continuing Vendor Claim will be Allowed in the amount set forth in the Schedule of Key Vendors attached to this Disclosure Statement as Appendix J, and only in such amount. Any other unsecured Claim that is, or otherwise could have been, asserted by the holder of such Key Continuing Vendor Claim will be |

| Class Description | Treatment Under Plan |
|---|---|
| | disallowed. Each Key Continuing Vendor will receive payment in full (without interest) of its Allowed Key Continuing Vendor Claim in twelve (12) equal monthly installments, such payments to commence on the Distribution Date and continuing on the first Business Day of each month following the month in which the Distribution Date occurs, provided, however, that if a Key Continuing Vendor is in default of its obligations under Section 4.3(d) of the Plan and has not yet cured such default at the time a payment under Section 4.3(d) of the Plan comes due, Reorganized GEO may withhold such payment until the date that the Key Continuing Vendor cures such default (at which time the payment shall be made); provided, however, that if the Key Continuing Vendor fails to cure such default within 30 days following the date of such default, such payment shall be forfeited. By making the Key Continuing Vendor Election, each Key Continuing Vendor is deemed to agree: (i) that the aggregate amount of its unsecured Claims against the Debtor is correctly set forth in the Schedule of Key Vendors filed as an Exhibit to this Disclosure Statement; and (ii) that for twelve (12) months following the Effective Date ("Key Vendor Program Period"), such Key Continuing Vendor will (A) provide Reorganized GEO the longer of (x) 30-day unsecured credit terms or (y) the normal and customary terms and conditions on which the Key Continuing Vendor provided trade credit to GEO during the one-year period preceding the Petition Date (such trade credit not to be supported by letters of credit, deposits, or other credit enhancements), and (B) offer pricing to Reorganized GEO that is at least as favorable to Reorganized GEO as pricing offered by the Key Continuing Vendor to its other customers whose purchases are similar in quantity and terms of sale.<br><br>Key Continuing Vendor Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

| Class Description | Treatment Under Plan |
| --- | --- |
| Class 8, General Unsecured Claims<br><br>Estimated Allowed Claims:<br><br>Approximately $4.4 million<br><br>(The actual amounts of Allowed Claims for Class 8 could materially exceed or could be materially less than the estimated amounts shown herein). | Class 8 consists of General Unsecured Claims against GEO or GSCL that are not Secured Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, Bondholder Unsecured Claims, Key Continuing Vendor Claims, GEO Gallium Intercompany Claims, Intercompany Claims, 15% Senior Note Unsecured Claims, or Non-Compensatory Damages Claims.<br><br>The Plan provides that on the Distribution Date each holder of an Allowed General Unsecured Claim will receive a lump sum cash payment on the Distribution Date in an amount equal to 44% of such holder's Claim.<br><br>General Unsecured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 44% |
| Class 9, GEO Gallium Intercompany Claim<br><br>Estimated Allowed Claim:<br>Approximately $ 2.2 million | Class 9 consists of the GEO Gallium Intercompany Claim. Under the Plan, the holder of the GEO Gallium Intercompany Claim will receive a cash payment in an amount equal to fifty percent (50%) of its Allowed Claim, such amount to be recovered by Reorganized GEO as part of a reorganization of GEO Gallium.<br><br>The GEO Gallium Intercompany Claim is Impaired. The holder of such Claim is, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 50% |
| Class 10, Intercompany Claims<br><br>Estimated Allowed Claims:<br>Approximately $393,000.00 | Class 10 consists of Intercompany Claims (other than the GEO Gallium Intercompany Claim), which are Claims, arising prior to the Petition Date against either of the Debtors by the other Debtor or by a non-Debtor subsidiary or affiliate of a Debtor but only to the extent that such affiliate is a direct or indirect subsidiary of GEO.<br><br>Under the Plan, subject to the Restructuring Transactions as set forth in Section 6.3 of the Plan, no holder of an Intercompany Claim will receive or |

| Class Description | Treatment Under Plan |
| --- | --- |
| | retain any property under the Plan on account of such Claim and all Intercompany Claims will be discharged as of the Effective Date.<br><br>Holders of Intercompany Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| Class 11, Non-Compensatory Damages Claims<br><br>Estimated Allowed Claims: Approximately $0.00 | Class 11 consists of Non-Compensatory Damages Claims which are comprised of any Claim against any of the Debtors, for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including any such claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise).<br><br>Under the Plan, the holders of Non-Compensatory Damages Claims will not receive or retain any property under the Plan on account of such Claims. All Non-Compensatory Damages Claims will be discharged as of the Effective Date.<br><br>Non-Compensatory Damages Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| Class 12, GEO Interests | Class 12 consists of GEO Interests which are collectively, all equity interests in GEO, including, without limitation, the Old GEO Common Stock, the Old GEO Common Stock Warrants, together with |

| Class Description | Treatment Under Plan |
|---|---|
| | any warrants, conversion rights, rights of first refusal, causes of action, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in GEO, and any contracts, subscriptions, commitments, or agreements pursuant to which a party was or could have been entitled to receive shares, securities, or other ownership interests in GEO as of the Petition Date.<br><br>Under the Plan, all GEO Interests of any kind, including without limitation, the Old GEO Common Stock, the Old GEO Common Stock Warrants or any warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests.<br><br>GEO Interests are Impaired and will receive no distribution under the Plan. The holders of such Interests are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## ARTICLE III

## PLAN VOTING INSTRUCTIONS AND PROCEDURES

A. Notice to Holders of Claims and Interests. Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims to make an informed judgment whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT OR THE SUMMARY DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE

BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES AND SCHEDULES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, or the approved summary, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan. Following distribution of this Disclosure Statement, the Debtors and all other parties in interest shall be entitled to solicit votes to accept or reject the Plan.

B. Voting Rights. Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by the plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In this Chapter 11 Case, under the Plan, only holders of Claims in classes 4, 5, 6, 7, 8, 9, and 10 are entitled to vote on the Plan. Claims and Interests in other Classes are either unimpaired and their holders are deemed to have accepted the Plan, or they are receiving no distributions under the Plan and their holders are deemed to have rejected the Plan.

Notwithstanding the foregoing, only holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim which is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be allowed on a provisional basis, for purposes only of voting on the Plan. If your Claim is contingent, unliquidated or disputed, you will receive instructions for seeking temporary allowance of your Claim for voting purposes, and it will be your obligation to obtain an order provisionally allowing your Claim.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are holders as of the voting record date of November 23, 2004 (the “Voting Record Date”).

C. Solicitation Materials. In soliciting votes for the Plan pursuant to this Disclosure Statement or the approved summary, the Debtors, through their voting agent The Trumbull Group (the "Voting Agent"), will send to holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"),

(c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim who is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

By Overnight Delivery:
GEO SPECIALTY CHEMICALS, INC.
C/O THE TRUMBULL GROUP
4 GRIFFIN ROAD NORTH
WINDSOR, CT 06095
TELEPHONE: 860-687-3949

By U.S. Mail:
GEO SPECIALTY CHEMICALS, INC.
C/O THE TRUMBULL GROUP
P.O. BOX 721
WINDSOR, CT 06095
TELEPHONE: 860-687-3949

D. Voting Procedures, Ballots and Voting Deadline. After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

With respect to Bondholder Unsecured Claims, special voting instructions apply to beneficial owners, nominees of beneficial owners and securities clearing agencies. Those special instructions will accompany the ballot provided to holders of Bondholder Unsecured Claims. Those instructions may be different from the general instructions contained herein. In the event of an inconsistency, the special instructions that accompany the ballot should be followed.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN WEDNESDAY, DECEMBER 15, 2004 AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

By Overnight Delivery:
GEO SPECIALTY CHEMICALS, INC.
C/O THE TRUMBULL GROUP
4 GRIFFIN ROAD NORTH
WINDSOR, CT 06095

By U.S. Mail:
GEO SPECIALTY CHEMICALS, INC.
C/O THE TRUMBULL GROUP
P.O. BOX 721
WINDSOR, CT 06095

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE COUNTED AS AN ACCEPTANCE. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

THOMPSON HINE LLP
3900 KEY CENTER, 127 PUBLIC SQUARE
CLEVELAND, OHIO 44114-1291
TELEPHONE: (216) 566-5500
ATTENTION: Renee L. Davis, Esq.

For further information and general instruction on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

E. Special Notice Concerning Voting.

1. Releases with Respect to Holders of Claims that Vote to Accept the Plan.

(a) Releases from Holders of Claims that Vote to Accept the Plan. PURSUANT TO THE PLAN, EACH HOLDER OF A CLAIM THAT AFFIRMATIVELY VOTES IN FAVOR OF THE PLAN WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS,

OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES AGAINST (I) THE DEBTORS' NON-DEBTOR SUBSIDIARIES, (II) THE PREPETITION SECURED LENDERS, THE PREPETITION SECURED LENDER AGENT, THE CREDITORS COMMITTEE (BUT NOT ITS MEMBERS IN THEIR INDIVIDUAL CAPACITIES), THE INDENTURE TRUSTEE AND THEIR RESPECTIVE PRESENT AGENTS OR PROFESSIONALS, AND (III) ANY OF THE DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS SERVING IMMEDIATELY PRIOR TO THE EFFECTIVE DATE, THOSE OF DEBTORS' DIRECTORS, OFFICERS AND EMPLOYEES DESIGNATED ON EXHIBIT C TO THE PLAN, AND ANY OF THE DEBTORS' PRESENT AGENTS OR PROFESSIONALS (INCLUDING ANY PROFESSIONALS RETAINED BY THE DEBTORS), (ALL OF THE FOREGOING BEING REFERRED TO COLLECTIVELY AS THE "CLAIMHOLDER RELEASES") IN CONNECTION WITH OR RELATED TO THE DEBTORS, THE CHAPTER 11 CASE, OR THE PLAN (OTHER THAN THE RIGHTS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREUNDER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS OR THE REORGANIZED DEBTORS, THE CHAPTER 11 CASE, OR THE PLAN, PROVIDED, HOWEVER, THAT AN AFFIRMATIVE VOTE IN FAVOR OF THE PLAN SHALL NOT RELEASE (A) ANY PERSON (OTHER THAN THE DEBTORS) FROM ANY CONTRACTUAL OBLIGATION OWED TO THE HOLDER OF A CLAIM, INCLUDING WITHOUT LIMITATION, OBLIGATIONS UNDER PROMISSORY NOTES, GUARANTEES, OR SIMILAR INSTRUMENTS, WHETHER RELATED TO THE DEBTORS OR OTHERWISE, AND (B) THOMPSON HINE LLP FROM ANY CLAIMS THAT MAY BE ASSERTED BY CHARTER OAK PARTNERS AND/OR CHARTER OAK CAPITAL PARTNERS, L.P.

Creditors may have independent claims against one or more of the Claimholder Releasees. The Debtors have no actual knowledge of any such claims, but cannot warrant to creditors that they do not exist. Since a vote in favor of the Plan will release whatever creditor claims do exist, if any, against Claimholder Releasees, creditors should consult their own counsel for information and advice as to whether any such claims exist and the value or merit of any such claims. If a creditor does not wish to give the releases contemplated under the Plan, then the creditor should vote to reject the Plan. Any party in interest may object to the proposed third party release provisions. The Debtors have the

burden of proof at the Confirmation Hearing to satisfy the applicable standards for third party releases.

(b) Releases in Favor of Holders of Claims that Vote to Accept the Plan. EACH OF THE CLAIMHOLDER RELEASEES WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES WHATSOEVER TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS OR THE REORGANIZED DEBTORS, THE CHAPTER 11 CASE, OR THE PLAN, AGAINST EACH HOLDER OF A CLAIM THAT AFFIRMATIVELY VOTES IN FAVOR OF THE PLAN. THE FOREGOING RELEASE DOES NOT COVER AVOIDANCE ACTIONS UNDER SECTIONS 544, 547, 548, 549, 550 AND 553 OF THE BANKRUPTCY CODE WHICH ARE RESERVED UNDER THE PLAN AND MAY BE PURSUED BY THE REORGANIZED DEBTORS. SEE ARTICLE VI.J.2, INFRA.

F. Confirmation Hearing and Deadline for Objections to Confirmation. Pursuant to Section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for December 20, 2004, at 12:00 noon, Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim. Any such objection must be filed with the Bankruptcy Court on or before December 15, 2004, at 4:00 p.m. Eastern Time. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## ARTICLE IV

## GENERAL INFORMATION CONCERNING THE DEBTORS

A. Overview of Business Operations. GEO was formed as an Ohio corporation in 1992. GSCL was formed in 1999 as a limited liability company in the State of Ohio and is a wholly owned subsidiary of GEO. GEO commenced business in 1993. GEO develops, manufactures and markets a wide variety of specialty chemicals. GEO manufactures over 300 products sold to major industrial customers for such diverse end-use applications as water treatment, wire and cable, industrial rubber, oil and gas production, coatings, construction, and electronics. GSCL operates two sales offices in the United Kingdom and one sales office in France and performs certain administrative services for GEO.

GEO manages its products within three primary operating groups: specialty additives, performance chemicals and electronic chemicals. Specialty additives are primarily chemical components that improve the properties of customers' products. GEO is a leading U.S. producer of a number of specialty additives that are used in a variety of construction, oil field, coating,

wire and cable, and industrial rubber applications. Specialty additives represented approximately 64% of GEO's total net sales for the year ended December 31, 2003.

Performance chemicals are primarily products used by customers to enhance the productivity of their operations and decrease their operating costs. GEO's performance chemicals consist principally of chemicals used in the water treatment and oil well stimulation markets. GEO is a leading U.S. producer and marketer of several performance chemicals sold in these markets. Performance chemicals represented approximately 26% of GEO's total net sales for the year ended December 31, 2003.

GEO's electronic chemicals group was created after its 1999 acquisition of a gallium extraction and purification business from Rhodia Chimie S.A. The electronic chemicals group consists of sales of virgin gallium to various sectors of the electronics market for applications in telecommunications and optoelectronics. These sales represented approximately 4% of GEO's total net sales for the year ended December 31, 2003.

In addition to specialty additives, performance chemicals and electronic chemicals, GEO has supplied numerous raw materials and intermediates to Cognis Corporation under a supply agreement. It continues to supply finished products used in the paper industry under a long-term supply agreement with ONDEO Nalco Company. GEO also produces by-products, which it sells in the merchant market, and raw materials for internal consumption.

B. GEO's Acquisition History. GEO was formed by George P. Ahearn and William P. Eckman to build, primarily through acquisitions, a specialty chemical business targeted in strategic markets. GEO's initial acquisition occurred on February 3, 1993 with the purchase of Rhone-Poulenc, Inc.'s Gulf Coast aluminum sulfate business, a manufacturer and supplier of paper processing chemicals and processed clays located in the Southeastern United States, for $3.6 million. On July 15, 1994, GEO acquired the assets of Courtney Industries, Inc., a manufacturer of aluminum-based chemicals used in water treatment and industrial applications, for $5.1 million. The acquisition of Courtney Industries also provided GEO with complementary products to its existing aluminum sulfate business. On June 30, 1995, GEO purchased the customer list relating to the dry aluminum sulfate business of Rhone-Poulenc, Inc. for an aggregate $375,000. GEO acquired seven plants comprising the business and assets of the aluminum sulfate business of Cytec Industries Inc. on December 5, 1996 for $7.3 million. The acquisition of Cytec Industries further improved GEO's position in the aluminum sulfate market and expanded its network of strategically located plants in the Southeastern United States.

On March 25, 1997, GEO purchased from Henkel Corporation (the applicable divisions of which are now known as Cognis Corporation) two modern ISO 9002 certified manufacturing plants located in the United States and involved in the development, manufacture and supply of specialty paper chemicals and construction and process additive chemicals, for $54.2 million. Through the Henkel acquisition, GEO became one of the most diversified specialty chemical suppliers to the paper industry with over 200 products. The Henkel acquisition also provided GEO with over 100 products sold to the construction, oil and gas, and ceramic industries.

On July 31, 1998, GEO acquired substantially all of the assets of the TRIMET Technical Products Division of Mallinckrodt Inc. (now Tyco), for approximately $61.1 million. As a result

of the acquisition of TRIMET, GEO became the leading global supplier of dimethylolpropionic acid, marketed under the brand name DMPA®, and trimethylolethane, marketed under the brand name TRIMET®, specialty chemicals used primarily in the production of specialty paints and coatings.

On September 8, 1999, GEO acquired a gallium extraction and purification business from Rhodia Chimie S.A. for the French franc equivalent of approximately $23.3 million. The acquired business provides various grades of gallium to the electronics market for applications in telecommunications and optoelectronics. The acquisition included a gallium purification facility in Salindres, France and a gallium extraction facility in Stade, Germany. As part of the acquisition, GEO was also granted a three-year option to acquire a dormant gallium extraction facility near Pinjarra, Australia. GEO exercised the option in September, 2002 for $1.4 million. GEO plans to keep the Australian facility in its dormant status until the global demand for gallium strengthens.

On April 15, 2001, GEO sold to ONDEO Nalco Company (Nalco) certain assets of its Paper Chemicals business for $9.5 million in cash (including subsequently earned performance related consideration of $1.0 million) and the assumption of certain liabilities associated with the Paper Chemicals business. As part of the transaction, GEO entered into a supply agreement with Nalco, pursuant to which GEO produces specific coating products for a period of five years after the divestment.

On May 31, 2001, GEO acquired from Hercules Incorporated substantially all the assets, net of certain liabilities, of Hercules' Peroxy Chemicals division for $ 93.1 million. The acquired business provides various grades of organic peroxide products derived primarily from cumene. These organic peroxide additives are used as crosslinking agents in the making of insulation for medium and high voltage wire and cable and as both a curing agent and crosslinking agent for industrial rubber used in high performance applications. As part of the acquisition, GEO purchased manufacturing facilities in Gibbstown, New Jersey and Franklin, Virginia. The acquired business is the sole producer of cumene-based organic peroxides in the United States.

C. Overview of GEO's Products and Markets

The following table shows on a pro forma basis GEO's principal operating groups by product line, primary end-markets and as a percentage of sales for the years 2000, 2001 and 2002. The pro forma sales percentages assume that the Hercules acquisition and Nalco disposition were each effected on January 1, 2000.

| | | | Percentage Of Sales | | | |
|---|---|---|---|---|---|---|
| Operating Group | Product Line | Primary End-Markets | 2000 | 2001 | 2002 | 2003 |
| Performance Chemicals | Aluminum and Clay Products | Pulp & Paper, Water Treatment, Oil Field | 24.7 % | 24.0 % | 24.9 % | 27.1 % |
| Specialty Additives | Naphthalene Sulfonate Condensates/Other Chemicals | Construction, Oil Field | 19.9 | 21.8 | 25.2 | 23.0 |
| | Polyols | Coatings | 14.9 | 10.8 | 11.7 | 15.0 |
| | Organic Peroxides | Wire and Cable, Industrial Rubber | N/A | 11.2 | 20.2 | 19.5 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Specialty Additives | | | 34.8 | 43.8 | 57.1 | 57.5 |
| Electronic Chemicals | Gallium | Electronics | 20.2 | 15.0 | 2.8 | 3.6 |
| Other (1) | | | 20.3 | 17.2 | 15.2 | 11.8 |
| Total | | | 100 % | 100 % | 100 % | 100 % |

1. The Performance Chemicals Group

Water Treatment: The U.S. specialty chemical water treatment market is comprised of two parts: industrial water treatment and municipal water treatment. The industrial water treatment market uses specialty chemicals primarily to purify water for manufacturing processes, since the use of untreated water results in low product quality and accelerated equipment degradation. The municipal water treatment market uses specialty chemicals primarily to purify water sources into a consumable form.

Within the specialty chemical water treatment industry, GEO markets flocculants and coagulants. GEO's flocculants and coagulants are used in the paper formation process and the treatment of pulp and paper mill wastewater. Flocculants and coagulants remove suspended matter from water and are essential to the treatment of industrial processing water, wastewater and drinking water. Coagulants are used to achieve primary separation of fine particles. Flocculants are added after the primary coagulant to cause the separated particles to clump together and settle out more rapidly.

2. The Specialty Additives Group

(a) Construction: GEO competes primarily in two parts of the construction industry: concrete additives and plaster board.

(i) Concrete Additives: GEO's naphthalene sulfonate condensates and the other specialty chemicals that it sells in this segment of the construction market are used as additives to increase the strength and workability of concrete. These products also improve the ability of concrete to withstand deterioration due to temperature variations and corrosive agents. Major markets for these products include roadway construction and repair and residential and commercial construction. GEO markets approximately 30 products in this market.

(ii) Plaster Board: GEO's naphthalene sulfonate condensates and the other specialty chemicals that it sells in this segment of the construction market are used to shorten the drying time and expedite the manufacture of plaster board. Demand for GEO's products in this market is primarily a function of the level of residential and commercial construction.

(b) Coatings: Concentrated in the United States, Western Europe and Japan, the global market for paint and coating chemicals is split primarily into two

applications: construction, particularly new home construction, and consumer durables, including motor vehicles, home furnishings, outdoor equipment and household appliances. Demand for paint and coating chemicals is largely a function of construction expenditures, motor vehicle production and general consumer spending.

In addition, environmental concerns have resulted in increased demand for more environmentally-friendly water-based paints and coatings and the specialty chemicals used in their production. This increase has been most pronounced in the construction industry, where most household paints now use water-based paint and coatings. In the 1990s, the shift towards water-based paints and coatings spread to the consumer durables sector and other industrial sectors as well, resulting in continued growth in the paint and coating chemicals market.

Within the specialty paint and coating chemicals market, GEO manufactures and supplies two products: DMPA® and TRIMET®.

(i) DMPA®. GEO's DMPA® is used in the production of such products as wood varnishes, leather coatings, adhesives and automotive parts.

(ii) TRIMET®. GEO's TRIMET® product is used in the production of such products as: automotive finishes, where it improves gloss and hardness; outdoor equipment, where ultra-violet resistance is enhanced; and decorative finishes for home furnishings, where it improves water resistance. TRIMET® is also used as a surface treatment in the production of can coatings and architectural paints.

(c) Oilfield: The North American oilfield chemical market uses many specialty chemicals for cementing, stimulation and production. Demand for oilfield specialty chemicals is a function of exploration expenditures, oil and gas production and crude oil and gas prices. Within the oilfield specialty chemicals market, GEO markets approximately 25 products in the following major areas: cementing, stimulation and production.

(i) Cementing. In the cementing market, GEO's naphthalene sulfonate condensates are used to enhance the physical properties of cement used for well casings. GEO's naphthalene sulfonate condensates allow for improved handling of cement, resulting in reduced energy requirements for pumping at greater depths.

(ii) Stimulation. GEO manufactures calcined clay and bauxite used as an intermediate in the manufacturing of clay proppants. Clay proppants are used in the stimulation of oil and natural gas wells.

(iii) Production. GEO also manufactures its naphthalene sulfonate condensates for oil production. These products are used primarily to facilitate the de-watering of crude-oil.

(d) Wire and Cable: GEO's organic peroxide products, primarily dialkyl peroxides, sold primarily under the DI-CUP® and VUL-CUP® brand names, are used to crosslink polymers in making the insulation for medium and high voltage wire and cable. These additives provide greater thermal stability at elevated temperatures during power transmission and thus enhance the life-span of the insulation on the power cable. The wire and cable end market represents approximately 50% of GEO's sales of organic peroxides.

(e) Industrial: GEO's organic peroxides, again primarily dialkyl peroxides, are sold under the brand names DI-CUP®, VUL-CUP® and ECHO® and are used mostly as crosslinking and vulcanizing agents for high performance rubber and plastic used in automotive parts, especially under-the-hood hoses and belts. Industrial rubber and plastic applications account for approximately 40% of GEO's sales of organic peroxides, with the majority ultimately being used in automotive parts.

3. The Electronic Chemicals Group

As a result of its 1999 acquisition of Rhodia's gallium business, GEO is a leading producer of virgin gallium, which is used primarily in integrated circuits and chips for mobile telephones, wireless communications and optoelectronics (light emitting diodes).

4. Facilities

The Debtors operate multiple facilities in 15 states in the U.S. and in three countries, and, as of the Petition Date, employed approximately 400 persons. The majority of Debtors' employees are involved in production and operations, with the balance engaged in administration, research and development, sales, customer service, and clerical work. The following table sets forth the location of each of GEO's facilities and offices and the major product(s) produced at and/or function of each location:

| **Location** | **Products Manufactured and/or Function** |
|---|---|
| Allentown, Pennsylvania | DMPA®, TRIMET®, formaldehyde and calcium formate |
| Ambler, Pennsylvania | Sales, Purchasing, Research and Development, Administration |
| Baltimore, Maryland | Aluminum chlorohydrate, aluminum chloride solutions and polyaluminum chloride |
| Bastrop, Louisiana | Aluminum sulfate – liquid, dry and anhydrous, rubidium salts, aluminum chloride, aluminum chlorohydrate and polyaluminum chloride |
| Cedartown, Georgia | Over 200 formulated products |
| Chattanooga, Tennessee | Aluminum sulfate |
| Cheltenham, England | Administration and Sales |
| Cleveland, Ohio | Corporate Headquarters |
| Coosa Pines, Alabama | Aluminum sulfate |

| | |
|---|---|
| Counce, Tennessee | Aluminum sulfate |
| Demopolis, Alabama | Aluminum sulfate |
| DeRidder, Louisiana | Aluminum sulfate |
| Franklin, Virginia | Bis-peroxide |
| Gibbstown, New Jersey | Dicumyl peroxide and hydroperoxides |
| Georgetown, South Carolina | Aluminum sulfate |
| Harrison, New Jersey | Calcium stearate and defoamers |
| Lafayette, Indiana | Finance |
| Lake Charles, Louisiana | Sodium aluminate |
| Little Rock, Arkansas | Calcined bauxite and kaolin |
| London, England | Administration and Sales |
| Monticello, Mississippi | Aluminum sulfate |
| Naheola, Alabama | Aluminum sulfate |
| Ogelthorpe, Georgia | Environmental Compliance and Administration |
| Paris, France | Administration and Sales |
| Plymouth, North Carolina | Aluminum sulfate |
| Savannah, Georgia | Sodium aluminate |

D. Management and Employees

1. Board of Directors. GEO's Board of Directors (the "Board" or the "Board of Directors") oversees the Company's management, reviews its long-term strategic plans and exercises direct decision making authority in key areas. Set forth below is information with respect to GEO's Board members:

- *George P. Ahearn*, Chairman of the Board, has been a director, President and Chief Executive officer of GEO since 1993.
- *William P. Eckman*, has been a director, Executive Vice President, Chief Financial Officer, Treasurer, and Secretary of GEO since 1993.
- *Anthony J. Dowd* has been a director of GEO since 2002.
- *George W. Rapp, Jr.* has been a director of GEO since 1997.
- *A. Elliott Archer* has been a director of GEO since 1997.

GEO's employee directors do not receive any compensation for services performed as directors or for meeting attendance. Non-employee directors of GEO, other than Anthony J. Dowd, receive compensation of $10,000.00 per year, with no additional fees for attendance at Board or committee meetings.

2. Executive Officers and Key Employees. Set forth below is information with respect to the Company's executive officers and key employees:

- **George P. Ahearn** has been President, Chief Executive Officer and Director of GEO since its inception in 1993. Prior to that time, Mr. Ahearn was President and Chief Operating Officer of Hall Chemical Company, a maker of specialty metal-based chemicals. Prior to that, Mr. Ahearn was employed for 28 years by Exxon Corporation and Exxon Chemical, holding various executive positions including Division Manager of Exxon Chemical's Energy Chemicals Business and Worldwide Manager of Exxon Chemical's Specialty Chemicals Technology Organization. Mr. Ahearn was also a founder, owner and director of Pharmaceutical Fine Chemicals, S.A., a Luxembourg fine chemicals company built through acquisition. Mr. Ahearn divested his interest in Pharmaceutical Fine Chemicals, S.A. when the business was sold to DLJ Merchant Banking Fund Group, an affiliate of Donaldson Lufkin & Jenrette Securities Corporation, in September 1997. Mr. Ahearn was formerly a director of Chemtech Industries of St. Louis, Missouri, President of SSC Industries of Atlanta, Georgia, and a director of The Flood Company of Hudson, Ohio, a privately held company in the coatings and wood stains and preservatives business. In 2001 he was selected Entrepreneur of the Year for Northeast Ohio, in a competition sponsored by Ernst & Young, CNN, and USA Today and was recognized by the Governor of Ohio for his accomplishments. Mr. Ahearn received his B.A. in chemistry from the City University of New York and M.S. and Ph.D. in chemistry from Rutgers University.

- **William P. Eckman** has been Executive Vice President, Chief Financial Officer, Treasurer, Secretary and Director of GEO since its inception in 1993. Prior to that time, Mr. Eckman was involved in acquisitions, joint venture development, product management and strategic planning for Exxon Chemical's specialty chemical business in Latin America and Mexico. Mr. Eckman was also a corporate treasurer for Exxon Chemical Americas with responsibility for Latin America. Mr. Eckman also served in the Controller's department at Exxon Chemical's Baton Rouge, Louisiana plant. Mr. Eckman was a founder and owner of Pharmaceutical Fine Chemicals, S.A. and a director of certain of its affiliates. Mr. Eckman divested his interest to DLJ Merchant Banking Fund Group in September 1997. Mr. Eckman received his B.A. in business administration from Marian College and M.B.A. and economics degrees from New York University. Mr. Eckman also pursued doctoral level studies in international economics at the University of Paris. Mr. Eckman is a trustee of Marian College.

- **Edward M. Freshman** has been Director of Corporate Development since he joined GEO Specialty Chemicals in 1998. Five acquisitions and one divestment were completed during that period. Prior to that, Mr. Freshman held various positions over 17 years with Ferro Corporation that included: Corporate Budget Director, North American Corporate Marketing Manager, and Business Manager for Polymer Additives. Mr. Freshman spent 7 years with Petrochemicals, Inc. where he held positions of Corporate Marketing and Sales Manager and Product Manager for Plastic Additives. Rounding out his career with technical positions with Robintech Corp., Mr. Freshman was Director of Quality Control and Manager of Technical Services and Group Leader and Development Chemist for Allied Chemical Corp. Mr. Freshman has a BS degree in Plastics Technology from The University of Massachusetts - Lowell. Mr. Freshman is a graduate of the Quality College and has taken courses from Penn State and Wharton School of Business.

- **Jorge J. Tena**, the present Plant Manager for the Gibbstown New Jersey manufacturing site, has occupied various positions in the organization since 1974. Mr. Tena has a Chemical Engineering degree from New York University. Mr. Tena has also completed postgraduate studies in Business Administration. In addition, since 2000 he has been Manager of Corporate Services and as such he reports to the CEO on matters of Safety, Environmental, Engineering and Quality programs. The purchasing director also reports to Mr. Tena. During the early nineties, Mr. Tena was a member of the Paper Coatings Business Management Team and traveled extensively in Central and South America in support of the Paper Business. Mr. Tena was the Plant Manager for the Harrison New Jersey manufacturing site.

- **Dennis S. Grandle** has been Vice President, Aluminum Products of GEO since 1996. Mr. Grandle has over 30 years of experience in the chemical and oil industries, primarily at Exxon Chemical, where he worked in the specialty chemicals area in sales and product management, both in the United States and overseas. Mr. Grandle also has considerable overseas experience with ARAMCO in oil field chemicals. Mr. Grandle received his B.S. in chemistry from the University of California.

- **Terry L. Guckes** has been Vice President, Electronic Chemicals since June 2001. Prior to joining GEO, Mr. Guckes was a corporate officer and business development executive

with OMG, Inc. where he was involved with several acquisitions and joint ventures related to specialty metals and specialty chemicals. Mr. Guckes is a Director of The Flood Company of Hudson, Ohio. Mr. Guckes has more than 30 years of experience in the specialty chemicals and the oil and gas industries. In addition to his tenure with OMG, he has worked for the Lubrizol Company, W.R. Grace and Exxon-Mobil. Mr. Guckes received his B.S.E. degree in chemical engineering from Princeton, his Ph.D. in chemical engineering from the University of Wisconsin, and his M.B.A. from the University of Pennsylvania.

- **Robert S. Zacker** has been Vice President, Paint & Coatings since April 2004 and, prior to that, had been Senior Vice President, Specialty Additives. Prior to that, Mr. Zacker was Vice President/General Manager, TRIMET Products since July 1998 and General Manager of the TRIMET facility in Allentown, Pennsylvania since 1996. From 1981 to 1996, Mr. Zacker held various positions with Mallinckrodt Chemical, Inc., including Process Engineer, Regional Sales Representative, Senior Product Engineer, Production Supervisor and Plant Manager. Mr. Zacker received his B.S. in chemical engineering from Clemson University.

- **Frank Murphy** has been Vice President, Construction & Industrial since April 2004. Prior to that, he served as Marketing Manager, Director of Marketing and Director of Marketing and Sales for the Specialty Additives Division since joining the company in 2002. Prior to GEO, Mr. Murphy held positions as Production Manager for Milliken and Co., Sales Representative for Nalco Chemical Co., and a wide variety of positions for Ethyl Corporation, including Strategic Planning Manager, Product Manager, Worldwide Marketing Manager, Global Business Manager and Senior Purchasing Manager. Mr. Murphy also served as a Vice President of Sales for a start up eCommerce venture. Mr. Murphy received a B.S. in Chemical Engineering from the University of Florida and his M.B.A. from Duke University.

- **Steve Einolf** has been Vice President, Rubber & Plastics since April 2004 and prior to that, had been the Senior Marketing Manager of Rubber & Plastics. Mr. Einolf joined GEO in May of 2001 as the Vice President & General Manager of Peroxy Chemicals Business as part of GEO's purchase from Hercules Incorporated. Prior to joining GEO Mr. Einolf held positions of Plant Manager at the Gibbstown, NJ peroxide plant from 1991 to 1996 and Strategic Business Unit Manager Peroxy

Chemicals/President Hercules-Sanyo joint venture from 1996 to 2001. Mr. Einolf has 28 years of experience in the Chemical industry, mostly at Hercules in manufacturing and business management. Mr. Einolf received his B.S. Chemical Engineering degree from the University of Delaware.

3. Employees/Labor Relations. As of the Petition Date, the Company employed approximately 400 employees in 15 states and 3 foreign countries. A majority of GEO's employees are involved in production and operations, with the balance engaged in administration, research and development, sales and customer service. A portion of GEO's workforce is unionized and covered by collective bargaining agreements. The unionized employees at the Allentown, Bastrop and Baltimore facilities are represented by the International Chemical and United Food and Commercial Workers, AFLCIO, those located at the Cedartown facility by the United Food Workers, those located at the Georgetown facility by the United Paper Allied International Chemical Energy Workers International, those located at the Chattanooga facility by the United Steel Workers of America and those located at the Gibbstown facility by the Independent Union of Delaware Valley Chemical Workers. In Europe, GEO has approximately 9 employees at its Salindres, France plant and 16 employees at its Stade, Germany plant. Most of the employees at these European sites are part of national labor unions. GEO believes that its relationship with its employees is excellent. GEO has experienced no work stoppages at any of its facilities since its inception in 1993.

4. Compensation and Benefits.

(a) Prepetition Pension Plans. The Debtors sponsor two (2) defined benefit pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461. The defined benefit pension plans cover certain current and former employees at Debtors' Allentown and Cedartown facilities. Subject to the rights of the Reorganized Debtors to terminate or amend such plans after the Effective Date, the Debtors will continue the defined benefit pension plans. As part of the continuation of the defined benefit pension plans, subject to any such termination or amendment, the Reorganized Debtors intend to meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation ("PBGC"), and administer and operate the defined benefit pension plans in accordance with their terms and ERISA. Because the defined benefit pension plans will remain ongoing through the restructuring, the PBGC's claims for unfunded benefit liabilities did not arise and accordingly, are not discharged. Upon the Effective Date, the claims filed by PBGC shall be deemed withdrawn. Nothing in the Plan is intended to release or discharge any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the defined benefit pension plans. Neither PBGC nor any of the defined benefit pension plans will be enjoined or precluded from enforcing such liability as a result of the Plan.

(b) Prepetition Retention Plan. Several months prior to the filing of its chapter 11 petition, the Company initiated a Retention Plan in connection with its commencement of certain prepetition restructuring initiatives. The purpose of the Retention Plan was to ensure that the Company would be able to rely on the services of its most essential employees (the "Key Employees") during this period. The Retention Plan provided for retention bonuses to be paid to a select group of nineteen (19) key employees. The Retention Plan has been superseded by the Key Employee Retention Plan approved by the Court on May 24, 2004, as discussed in Section 4(c) below.

(c) Key Employee Retention Plan. The Debtors' postpetition Key Employee Retention Plan (the "KERP Plan") was designed to address the heightened uncertainties facing the Debtors' employees as a result of the commencement of the Debtors' bankruptcy proceedings. On May 6, 2004, the Debtors filed with the Bankruptcy Court a motion for an Order approving the KERP Plan, and further requesting approval of the assumption of certain employment agreements (the "KERP Motion"). On May 24, 2004, the KERP Plan and the assumption of the employment agreements was approved by the Bankruptcy Court. The KERP Plan has the following components:

(i) Retention Bonuses: The KERP provides that Retention Bonuses will be paid to certain Key Employees. The Retention Bonuses are payable in two installments and are contingent upon the achievement of a confirmed plan of reorganization. The five basic categories of the thirty-two Key Employees who are eligible for Retention Bonuses based on a percentage of annual salary are as follows:

| **Category of employee** | **Number of employees in category** | **KERP Retention Bonus as % of salary** |
|---|---|---|
| Corporate—Directors (Non Board Member) and Managers | 7 | 20-30% |
| Operations—Vice Presidents | 4 | 30-38.5% |
| Operations—Senior Sales and Marketing | 8 | 20-30% |
| Operations—Senior | 4 | 20-40% |

| | | |
|---|---|---|
| Technology and Technical Positions | | |
| Operations—Other Senior Managers | 9 | 20-30% |
| **Total** | **32** | |

Over time, over three quarters of the Key Employees who would be eligible to receive Retention Bonuses may earn a bonus of between twenty and thirty percent of their annual base salaries. The remaining eligible employees may earn a maximum Retention Bonus of between thirty-five and forty percent of their annual base salaries. Because their specific employment agreements, subject to certain modifications, have been assumed by the Debtors (see Section 4(c)(iii) below), the Debtors' President and Chief Executive Officer, George P. Ahearn; the Debtors' Executive Vice President and Chief Financial Officer, William P. Eckman; and the Debtors' Vice President of Electronic Chemicals Business, Terry L. Guckes, are not eligible to receive Retention Bonuses under the KERP.

Under the KERP, fifty percent of the Retention Bonus is payable upon the Effective Date and the remaining fifty percent is payable three months after the Effective Date. The thirty-two Key Employees who are eligible to receive Retention Bonuses under the KERP must be actively employed by GEO on the relevant payout dates in order to receive their retention payments. The total cost to the Reorganized Debtors if all of the Retention Bonuses are earned and paid is $807,498.00.

Over half of the eligible Key Employees under the KERP were paid a small retention bonus in January 2004 under the prepetition Retention Plan. Those employees who received a retention bonus as part of the prepetition Retention Plan will receive fifty percent of the net Retention Bonus (after deducting the January 2004 payment) under the KERP upon the Effective Date. The remaining fifty percent would then be payable three months after the Effective Date. As a condition to participation in the KERP, any eligible employee is also required to waive any claim he or she might have under the prepetition Retention Plan or any other prepetition retention program.

The KERP's Retention Bonus provisions provide that the Debtors retain a discretionary bonus pool of $100,000.00 to be awarded by the Debtors' President and Chief Executive Officer to rank and file employees

as necessary to reward extraordinary individual efforts and to prevent key defections.

(ii) Merit Based Pay Increases: Under the KERP, the Debtors also implemented discretionary, merit-based pay increases averaging four percent per employee for all employees, other than those covered by collective bargaining agreements, and excluding the Debtors' President and Chief Executive Officer and Executive Vice President and Chief Financial Officer. The Debtors calculate the maximum financial impact of the Merit-Based Pay Increases for the remainder of 2004 to be approximately $223,250.00.

(iii) Assumption of Employment Agreements: On May 24, 2004, the Bankruptcy Court granted the Debtors request for approval of assumption of various prepetition employment agreements entered into with five employees of GSCL in Europe (collectively the "European Employment Agreements")), and prepetition employment agreements which were entered into with the Debtors' President and Chief Executive Officer, George P. Ahearn; the Debtors' Executive Vice President and Chief Financial Officer, William P. Eckman; and the Debtors' Vice President of Electronic Chemicals Business, Terry L. Guckes (collectively, the "Employment Agreements").

The assumption of the contracts in Europe and the retention of the five European employees was necessary to retain the vital services those employees provide in sustaining GSCL's European operations.

Each of the Employment Agreements with Messrs. Ahearn, Eckman and Guckes contains specific severance provisions and each was entered into prepetition with the expectation that such provisions were necessary and appropriate to ensure the Debtors' continued retention of the officers in question. Each of the Employment Agreements also contains a non-competition provision that prohibits the officer from competing with the Debtors during any period that severance benefits are being paid. Assumption of the Employment Agreements ensured essential continuity of management throughout the reorganization process. The assumption of the Employment Agreements was necessary to continue severance protection for the three affected officers as an incentive for them to continue their active leadership of the Debtors.

In addition to the continued payment of base salary, the affected officer is also entitled to participate in the Debtors' employee benefit plans for the specified severance period. The contracts also provide for certain discretionary salary increases and bonus compensation for the three officers, provided, however, that prior to the Debtors' emergence from Chapter 11 pursuant to a confirmed plan of reorganization, no additional salary, bonus or other compensation will be paid by the Debtors pursuant

to the contracts absent Court approval, except for those increases in salary or benefits that may be implemented for all employees of the Debtors in the ordinary course. Copies of the three officers' Employment Agreements the Debtors assumed with the Bankruptcy Court's approval are attached hereto as Appendices G, H and I, respectively.

The Employment Agreements provide for the following severance benefits, payable upon discharge by the Company other than for cause:[1] (i) continued payment of base salary for up to twenty-two months (such benefit being subject to monthly reduction for each month of continued employment but in no event fewer than twelve months) for the President and Chief Executive Officer; (ii) continued payment of base salary for up to twenty-four months (subject to reduction beginning in March 2006 but in no event fewer than twelve months) for the Executive Vice President and Chief Financial Officer; and (iii) continued payment of base salary for up to twelve months for the Vice President of Electronic Chemicals Business.

(d) Postconfirmation Compensation and Benefits. After the Effective Date, the Debtors intend to continue to provide compensation and benefits consistent with those historically offered. Under the Plan, except to the extent (i) previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date, or (ii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iii) previously terminated, or (iv) as provided in subsection 7.5 of the Plan, all compensation and benefit programs of the Debtors, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan. Nothing contained in the Plan is intended to modify the existing terms of such compensation and benefit programs, including, without limitation, the Debtors' rights of termination and amendment thereunder.

Nevertheless, future compensation and benefit decisions will be made by the Board of Directors of Reorganized GEO. Depending upon such decisions, there is no assurance that key employees will continue in the employ of the Reorganized Debtors.

E. Capital Structure of the Company

1. Prepetition Equity. The beneficial ownership of GEO's Common shares as of the Petition Date is set forth in the following table:

[1] In the case of Terry Guckes, Senior Vice President of Electronic Chemicals Business, the severance benefit is also payable upon voluntary resignation resulting from the Company's breach of specified obligations under the Employment Agreement.

| Name and Address of Beneficial Owner | Beneficial Ownership of GEO's Common Shares | |
|---|---|---|
| | Number of Shares | Percent |
| Charter Oak Partners<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 85.198 | 62.72% |
| Charter Oak Capital Partners, L.P.<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 21.420 | 15.77% |
| GEO Chemicals, Ltd.<br>3201 Enterprise Parkway, Suite 490<br>Cleveland, Ohio 44122 | 25.994 | 19.14% |
| George P. Ahearn<br>3201 Enterprise Parkway, Suite 490<br>Cleveland, Ohio 44122 | 2.146 | 1.58% |
| George W. Rapp, Jr.<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 0.608 | 0.45% |
| Paul E. Roughan<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 0.211 | 0.16% |
| A. Elliott Archer<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 0.178 | 0.13% |
| Anatole G. Penchuk<br>10 Wright Street, Suite 210<br>Westport, Connecticut 06880 | 0.080 | 0.06% |
| Directors and executive officers as a group (4 persons) | 28.926 | 21.30% |

For purposes of the Plan, GEO's common stock has been classified as GEO Interests and is treated in Class 12.

2. Material Prepetition Debt Obligations.

(a) The Prepetition Secured Credit Agreement. Pursuant to the Prepetition Secured Credit Agreement, the Prepetition Secured Lenders made loans and advances to GEO, issued letters of credit for the account of GEO and

provided other financial accommodations to or for the benefit of the Debtors. As of the Petition Date, the aggregate principal amount due and owing under the Prepetition Secured Credit Agreement was approximately $100,550,000. There is a dispute between the Debtors and the Prepetition Secured Lenders as to the amount, if any, of accrued and unpaid interest owed under the Prepetition Secured Credit Agreement. The Debtors believe that the Prepetition Secured Lenders intend to claim that they will be owed as of the Effective Date approximately $2,569,000 in interest pursuant to a 2% “payment in kind” (“PIK”) interest provision in the Prepetition Secured Credit Agreement and approximately $1,676,000 in default interest pursuant to a provision in the Prepetition Secured Credit Agreement that provides for default interest at the rate of 2% per annum. The Debtors dispute the claims of the Prepetition Secured Lenders with respect to the PIK interest and the default interest.

As security for the obligations owed to the Prepetition Secured Lenders under the Prepetition Secured Credit Agreement, the Debtors entered into various security agreements, pledge agreements and mortgages, pursuant to which the Debtors granted to the Prepetition Secured Lender Agent security interests in and liens on all or substantially all of the Debtors' real and personal property. The obligations with respect to the Prepetition Secured Credit Agreement are referred to in the Plan as Prepetition Secured Lender Claims and are treated in Class 2.

(b) GSCL Guaranty: Pursuant to that certain Amended and Restated Subsidiary Guaranty (as amended prior to the Petition Date, the "Prepetition Guaranty"), dated as of May 31, 2001, GSCL agreed to guarantee all of GEO's Prepetition Obligations under the Prepetition Secured Credit Agreement. To secure the obligations owed to the Lenders under the Prepetition Secured Credit Agreement and GSCL's obligation under the Prepetition Guaranty, the Debtors entered into various security agreements, pledge agreements and mortgages, pursuant to which the Debtors granted to the Agent security interests in and liens on all or substantially all of the Debtors' real and personal property. The obligations with respect to the GSCL Guaranty are included within the Prepetition Secured Lender Claims under the Plan and are treated in Class 2.

(c) 15% Senior Notes: Pursuant to the Prepetition Note Purchase Agreement, GEO issued to Charter Oak the 15% Senior Notes due February 1, 2008. The 15% Senior Notes did not provide for amortization of principal prior to maturity. As of the Petition Date, GEO was in default of its obligations under the 15% Senior Notes, and the aggregate amount due and owing was approximately $6,608,320, consisting of unpaid principal, accrued and unpaid interest, fees and other expenses (the "Prepetition Senior Note Obligations"). The obligations with respect to the 15% Senior Notes are referred to in the Plan as The 15% Senior Note Unsecured Claims and are treated in Class 5.

(d) 10 1/8 Notes: Pursuant to that certain indenture dated as of July 31, 1998 (the "Prepetition Indenture") between GEO and JP Morgan Chase (f/k/a Chase Manhattan Trust Company, National Association), as indenture trustee (the

"Indenture Trustee"), GEO issued the 10 1/8% Notes in an aggregate principal amount of $120,000,000. As of the Petition Date, the aggregate amount due and owing on the 10 1/8% Notes was approximately $127,670,636, consisting of unpaid principal, accrued and unpaid interest, fees and other expenses (the "Prepetition Senior Subordinated Obligations"). The obligations with respect to the GEO 10 1/8% Notes are referred to in the Plan as Bondholder Unsecured Claims and are treated in Class 6.

(e) Litigation Claims. The Debtors are involved in claims, litigation, administrative proceedings, and certain environmental proceedings, including the case discussed below.

(i) CitiGroup Litigation. In late 2001, GEO entered into two separate interest rate swap agreements with Citibank, N.A ("Citibank"). In January 3, 2003, Citibank terminated both interest rate swaps and determined that GEO owed Citibank approximately $615,000. In June 2003, Citibank filed suit against GEO in the District Court for the Southern District of New York seeking $615,000, plus interest and attorneys' fees. GEO counterclaimed for $2,000,000, plus interest and attorneys' fees, claiming Citibank had wrongfully terminated the interest rate swaps. Following discovery and motions for summary judgment, the court ruled that Citibank was entitled to terminate the interest rate swaps in January of 2003, but did not grant it judgment because of GEO's claim that the actions taken by Citibank in terminating the interest rate swap agreements constituted a breach of the covenants of good faith and fair dealing. Trial was set for July 2004 on that issue, but the action was automatically stayed by the intervening bankruptcy filing by GEO. No further action has been taken by either party in this matter in the District Court.

F. Summary of Assets. The Debtors have filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include real property, cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory and other items of personal property. The Schedules provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed during business hours in the offices of the Clerk of the Bankruptcy Court or the Debtors' counsel. Information as to the Debtors' assets is also available in the balance sheets included in the financial data attached hereto as Appendix D and in the liquidation analysis attached hereto as Appendix E.

G. Historical Financial Information. Attached as Appendix D are the unaudited financial statements for GEO for the three and six months ended June 30, 2004 and unaudited financial statements for the fiscal year ended December 31, 2003. The financial data as of June 30, 2004, has been reviewed by the Company's outside accountants but has not been audited. The financial data as of December 31, 2003 has been reproduced from the audited financial statements for the fiscal year ended December 31, 2003, but, due to its inclusion in this

Disclosure Statement, is considered unaudited under applicable accounting rules. In preparing their financial statements, the Company has followed the accounting directives as set forth in the American Institute of Certified Public Accountants' Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."

H. Events Leading to Commencement of the Chapter 11 Case. Commencing in 2001 and continuing through the end of 2003, GEO, like many companies in the chemical industry, experienced reduced customer demand as a result of a weakening U.S. economy and rising raw material costs. These challenging market conditions materially and adversely affected GEO's operations and caused a significant tightening of its liquidity. In addition to these generally applicable conditions, GEO's was affected by two adverse situations specific to its businesses. The first was the collapse of the semiconductor industry, especially as it related to wireless telecommunications. When expected growth in the semiconductor industry in 2001 and 2002 failed to occur, there was a collapse in the market price of gallium and a dramatic reduction of cash flow from GEO's electronic chemicals group. The second circumstance – the acquisition of Union Carbide, one of GEO's largest customers, by The Dow Chemical Company – had a lesser, though still material, adverse impact. GEO's organic peroxides business suffered financially when its highly profitable long-term sales contract with Union Carbide was renegotiated by Dow following Dow's acquisition of Union Carbide.

GEO's poor financial performance in 2002 and 2003 lead to amendments to the Prepetition Secured Credit Agreement in April 2002 and 2003 in which covenant levels were restructured, access to the Company's revolving credit facility was decreased and restricted, and interest rates were increased. GEO subsequently struggled to comply with the amended terms of the Prepetition Secured Credit Agreement and in August of 2003 it missed, for the first time, a semi-annual interest payment on the 10 1/8% Notes. It was during the 30-day grace period following this curable default that Charter Oak invested in the 15% Senior Notes, the proceeds of which were used solely to make the semi-annual interest payment on the 10 1/8% Notes, and the Prepetition Secured Lenders also agreed to a further amendment of the Prepetition Secured Credit Agreement. The investment by Charter Oak in the 15% Senior Notes permitted GEO to make the interest payment on the 10 1/8% Notes prior to the expiration of the applicable grace period and thus avoid an Event of Default under the Prepetition Indenture.

During the latter half of 2003, GEO experienced very poor financial results which caused the Company, once more, to be at risk of failing to comply with the new covenants contained in the Prepetition Secured Credit Agreement. Due to reduced liquidity resulting from its weak financial performance, GEO was not in a position to comply with the minimum cash requirements after giving effect to the next scheduled bond interest payment due on the 10 1/8% Notes as required by the Prepetition Secured Credit Agreement. Despite GEO's best efforts to find a solution to its liquidity problems, it was unable to pay the interest due on the 10 1/8% Notes, within the 30-day grace period following February 1, 2004. This failure to pay interest resulted in an Event of Default under the Prepetition Indenture and, as a result, the Indenture Trustee accelerated the maturity of the Prepetition Senior Subordinated Obligations. The Event of Default under the Prepetition Indenture caused an Event of Default under the Prepetition Secured Credit Agreement and the Prepetition Guaranty. This sequence of events caused GEO to file for bankruptcy on the Petition Date.

## ARTICLE V

## CHAPTER 11 CASE

A. Continuation of Business; Stay of Litigation. The Debtors filed their petitions for relief under Chapter 11 of the Bankruptcy Code on March 18, 2004. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents Creditors from obtaining an unfair recovery advantage while the reorganization is ongoing.

B. First Day Orders. On the first day of the Chapter 11 Case, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day orders obtained in this Chapter 11 Case are typical of orders entered in other substantial Chapter 11 cases across the country. Such orders authorized, among other things:

- joint administration of the Debtors' bankruptcy cases;
- interim use of cash collateral (as further discussed below);
- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date on an interim basis;
- continuation of the Debtors' investment practices on an interim basis;
- payment of employees' prepetition compensation, benefits and expense reimbursement amounts on an interim basis;
- honoring of certain prepetition customer obligations and continuation of certain customer programs on an interim basis;
- payment of certain prepetition portions of tax obligations owing to federal, state and local governmental entities on an interim basis;

- provision of adequate assurance of payment to utility companies to avoid discontinuation of utility services.

C. Retention of Professionals. The Debtors are represented in the Chapter 11 Case by Thompson Hine LLP ("Thompson Hine") and Ravin Greenberg PC ("Ravin Greenberg"). The Debtors obtained financial advisory services from CIBC World Markets ("CIBC"), restructuring advisory services from Conway Del Genio Gries & Co. ("CDG"), and the auditing, tax and reorganization services of Deloitte & Touche LLP ("Deloitte"). Finally, The Trumbull Group was authorized to provide claims, noticing and balloting services to the Debtors. The Debtors have also retained a number of other professional firms to assist them in the ordinary course of their businesses.

D. Official Appointment of Creditors Committee. On March 29, 2004, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"), pursuant to Section 1102(a) of the Bankruptcy Code. The current members of the Creditors Committee are: Airlie Opportunity Fund, L.P., J.P. Morgan Trust Company, Oppenheimer & Co., Inc., South Jersey Gas Company, Delphi Petroleum, Inc., and Senvest International, LLC. The Creditors Committee has retained Otterbourg Steindler Houston & Rosen ("OSHR") and Duane Morris LLP as its counsel and Houlihan Lokey Howard & Zukin ("HLHZ") as its financial advisor. The expenses of members of the Creditors Committee and the fees and expenses of the professionals serving on behalf of the Creditors Committee are entitled to be paid by the Debtors, subject to approval by the Bankruptcy Court.

E. Authorization to Use Cash Collateral.

1. Cash Collateral of Prepetition Secured Lenders. The cash the Debtors had on hand as of the Petition Date, and substantially all cash received by the Debtors during the Chapter 11 Case, to the extent of perfected liens thereon, constituted "cash collateral" of the Prepetition Secured Lenders. Cash collateral is defined in Section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, . . . other cash equivalents... . and . . . proceeds, products, ... rents or profits of property subject to a security interest. . ." 11 U.S.C. § 363(a). Under the Bankruptcy Code, the Debtors are prohibited from using, selling or leasing cash collateral unless either the appropriate creditors(s) consent or the Bankruptcy Court, after notice and a hearing, authorizes such action. The Prepetition Secured Lender Agent and the Debtors, subject to Bankruptcy Court approval, entered into a stipulation for the Debtors' use of cash collateral to fund the administration of the Debtors' estates and continued operation of their businesses. By final order dated May 5, 2004, the Debtors obtained authority from the Bankruptcy Court to enter into such stipulation, as modified pursuant to the Bankruptcy Court's order, to use cash collateral for working capital and general corporate purposes and to pay costs and expenses related to the Chapter 11 Case (the "GEO Cash Collateral Order").

F. Postpetition and Postconfirmation Funding.

1. DIP Facility. Recognizing the need to have sources of working capital and financing available to meet their needs post-petition in connection with the operation of their businesses, the Debtors negotiated a debtor-in-possession financing agreement with Deutsche Bank Trust Company Americas, as lender and administrative agent and certain of the Debtor's pre-petition lenders under the Prepetition Secured Credit Agreement (the "DIP Lenders"), pursuant to which the DIP Lenders agreed to provide up to $15 million of post-petition financing (the "DIP Financing") in accordance with the terms of a post-petition revolving credit agreement (the "DIP Credit Agreement"). The Bankruptcy Court entered its final order authorizing the DIP Financing and approving the terms of the DIP Credit agreement on May 5, 2004 (the "Final DIP Financing Order"). Pursuant to the terms of the Final DIP Financing Order and the DIP Credit Agreement, the DIP Lenders were granted, subject to certain carve-outs, (i) super-priority administrative expense claims for all loans, advances and other obligations owed by the Debtors to the DIP Lenders under the DIP Credit Agreement, such super-priority administrative expense claims being accorded priority over all administrative expense claims and unsecured claims against the Debtors, and (ii) perfected post-petition security interests and liens on all of the assets of the Debtors (other than avoidance actions), such security interests and liens being accorded priority over all other pre-petition and post-petition liens and security interests, other than pre-petition liens and security interest that were senior to the pre-petition liens and security interests held by the Prepetition Secured Lenders under the Prepetition Secured Credit Agreement. As of the date of the approval of this Disclosure Statement, the outstanding balance owed to the DIP Lenders under the DIP Credit Agreement was approximately $1,100,000.

2. Exit Financing. The Plan contemplates, as the principal means for its implementation, that the Debtors will obtain a post-confirmation credit facility with a five-year term in the aggregate amount of $125 million, subject to being increased under certain circumstances to $130 million (the "Exit Facility"). The proposed lenders under the Exit Facility (the "Exit Lenders") are Merrill Lynch Global Investment Series – Income Strategies Portfolio, Debt Strategies Fund, Inc., Senior High Income Portfolio, Inc., Master Senior Floating Rate Trust, Floating Rate Income Strategies Fund, Inc., Floating Rate Income Strategies Fund II, Inc. (collectively, the "Merrill Entities"), Stanfield Capital, Airlie Opportunity Fund, Quadrangle Debt Recovery Income Fund Master Ltd., and QDRF Master Ltd. One or more of the Merrill Entities, or their affiliates, and Airlie Opportunity Fund are holders of 10 1/8% Notes.

The proceeds from the Exit Facility will be used to repay the DIP Facility and the Prepetition Secured Lender Claims in full and to make other required payments under the Plan as well as to provide a source of working capital for the Debtors once they emerge from Chapter 11. On November 5, 2004, the Bankruptcy Court entered an order approving commitment letters for the Exit Facility executed by GEO and the Exit Lenders on September 30, 2004 and authorizing the payment of a 2% commitment fee (subject to adjustment set forth below) to the Exit Lenders. The material terms of the proposed Exit Facility as set forth in the commitment letters are as follows:

- **Amount and Term of Exit Facility.** The Exit Facility will consist of a five-year term facility (the "Term Facility") in an aggregate amount of up to $125 million, at least $10 million of which, on the Closing Date (as defined in the Commitment Letters), shall be segregated into a cash collateral account available for working capital purposes, subject to conditions to be agreed. Alternatively, the Exit Facility can be structured to consist of a Term Facility in an aggregate amount of up to $115 million and a five-year revolving credit facility (the "Revolving Credit Facility") in an amount of not less than $10 million and, if requested by GEO and agreed by the Exit Lenders, up to $15 million (the loans thereunder, the "Revolving Credit Loans") of which none of the Revolving Credit Facility shall be drawn on the Closing Date. The Exit Lenders under the Term Facility shall determine whether the Term Facility will provide for the making of term loans or the purchase of term notes (collectively, the "Term Loans/Notes" and, together with the Revolving Credit Loans, the "Loans/Notes").

- **Intended Use of Proceeds.** The proceeds of the Exit Facility will be used by the Debtors to refinance existing bank debt and fund fees and expenses (up to a maximum of $115 million) payable upon emergence of the Debtors from bankruptcy, and for general working capital purposes.

- **Interest.** Interest will be charged under the Exit Facility at the rate of the sum of three-month LIBOR plus 8½%, to be paid on the last day of each interest period. Post-default interest shall accrue at any time during the continuance of a default at a rate 2% above the otherwise applicable rate. Interest on the Revolving Credit Facility (if established) will be agreed at the time such Revolving Credit Facility is established.

- **Amortization and Maturity.** The Term Loans/Notes shall be made in a single drawing (or purchase) on the Closing Date and will be payable on the fifth anniversary of the Closing Date. The Revolving Credit Facility (if established) shall be available on a revolving basis during the period commencing after the Closing Date and ending on the fifth anniversary thereof.

- **Commitment Fee.** GEO will be charged a Commitment Fee equal to 2% of the amount of the aggregate commitments earned upon execution of the Commitment Letters by GEO and payable to the Exit Lenders on the earlier of the Closing Date and the date upon which the commitments of the Exit Lenders expire or are terminated; provided, however, that if the Exit

Facility is consummated or the commitments expire or are terminated other than by reason of GEO consummating an alternative exist financing proposal, then the amount of the Commitment Fee will be reduced to 1% of the amount of the aggregate commitments. The Revolving Credit Facility (if established) will be subject to a commitment fee after the Closing Date at a rate to be agreed.

- **Guarantees.** The Exit Facility will be guaranteed by each of GEO's direct and indirect domestic subsidiaries.

- **Security for Exit Facility.** The Exit Facility will be secured by a perfected first priority security interest in all tangible and intangible assets (including, without limitation, intellectual property, real property and all capital stock of each direct and indirect domestic, and $66^{2}/3$% of the voting capital stock of each first-tier foreign, subsidiary), subject to exclusions for assets where the Exit Lenders determine that the costs of obtaining a lien are excessive in relation to the value of the security to be afforded. Subject to terms and conditions to be agreed, the Exit Lenders will consider allowing the Revolving Credit Facility (if established) to be entitled to priority with respect to proceeds of the lien on receivables and inventory.

- **Payment of Expenses, Indemnification Obligations, and Out-of-Pocket Expenses.** In connection with the Exit Facility, GEO will pay (a) all Expense Obligations and Indemnification Obligations as defined in and referred to in the Commitment Letters and (b) all out-of-pocket expenses of the Exit Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term Loans/Notes or the definitive documentation. GEO will also fund an advance of $100,000 to Milbank, Tweed, Hadley & McCloy, LLP, special counsel to the Exit Lenders in connection with the Exit Facility ("Special Counsel"), payable within one (1) business day of the Commitment Letter Approval Date (as defined in the Commitment Letters), which advance may be applied by Special Counsel to pay such expenses.

- **Indemnification.** Under the Commitment Letters, GEO agrees to indemnify and hold harmless the Exit Lenders and their respective affiliates, associated and related entities, and each of their directors, officers, partners, members, managers, shareholders, employees, agents, representatives and assignees, including affiliates thereof (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities or

other expenses which arise out of or in any way relate to or result from the Commitment Letters, the Term Sheet attached thereto, or the Exit Facility, and GEO agrees to reimburse (on an as-incurred monthly basis) each Indemnified Party for reasonable legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise), but excluding therefrom all expenses, losses, claims, damages and liabilities that are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party or the breach by such Indemnified Party of its obligations thereunder.

- **Alternative Financing.** The terms of the Commitment Letters and the Term Sheet attached thereto will not limit GEO's ability to discuss alternative exit financing plans received on an unsolicited basis from any person if such discussions are determined in good faith by GEO to be necessary to fulfill its fiduciary duties and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of the Commitment Letters.

- **Unsecured Creditor Participation Opportunity.** Unsecured creditors of the Debtors on a record date to be agreed, shall (subject to minimums to be agreed and to requirements necessary to permit the placement of the Exit Facility to qualify under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act")) be entitled, pursuant to an election to be made in conjunction with voting on the Plan to assume on a ratable basis up to 50% of the commitments of the Exit Lenders under the Commitment Letters.

- **Equity Participation.** As additional consideration for making (or purchasing) the Term Loans/Notes, the Exit Lenders and unsecured creditors participating in the Term Facility shall receive on the Closing Date, 15% of the common stock of reorganized GEO (on a fully-diluted basis) to be shared ratably among such Exit Lenders and unsecured creditors in accordance with their Term Loans/Notes.

- **Exit Lender Approval of Plan and Disclosure Statement.** The Plan and the Disclosure Statement shall be filed by the Debtors on or before November 1, 2004 and shall be in form and substance satisfactory to the Exit Lenders (including, in the

case of the Plan, with respect to the treatment provided for each class thereunder).

- **Approval of Disclosure Statement, Confirmation of Plan, and Approval of Exit Facility Definitive Documents.** The Bankruptcy Court shall approve the Disclosure Statement by the entry of one or more orders satisfactory in form and substance to the Exit Lenders and to Special Counsel on or before December 1, 2004. The Bankruptcy Court shall confirm the Plan and the Bankruptcy Court shall approve the definitive documentation with respect to the Exit Facility by the entry of one or more orders satisfactory in form and substance to the Exit Lenders and to Special Counsel on or before January 15, 2005.

G. Other Material Matters To Be Addressed During the Chapter 11 Case. In addition to developing its Plan of Reorganization, the Debtors have addressed, or will address, a number of other matters in preparation for emergence from Chapter 11. Among these matters are the following:

1. Executory Contracts and Unexpired Leases

(a) Disposition of Contracts and Leases. Pursuant to Section 365 of the Bankruptcy Code, the Debtors may choose to assume, assume and assign or reject executory contracts and unexpired leases of real and personal property, subject to approval of the Bankruptcy Court. As a condition to assumption, or assumption and assignment, unless otherwise agreed by the non-Debtor party, the Debtors must cure all existing defaults under the contract or lease, and must provide adequate assurance of future performance of the contract or lease. If the contract or lease is rejected, any resulting rejection damages are treated as prepetition unsecured claims. Generally, and with certain exceptions, postpetition obligations arising under a contract or lease must be paid in full in the ordinary course of business. The Debtors' Plan provides that each Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party unless such contract or lease (i) was previously assumed or rejected by such Debtor, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of any pending motion to assume or reject filed by one of the Debtors on or before the Confirmation Date.

(b) Extension of Time to Assume or Reject Unexpired Leases. Given the size and complexity of the Chapter 11 Case, the Debtors were unable to complete their analysis of all nonresidential real property leases during the time limitation prescribed by Section 365(d)(4) of the Bankruptcy Code. By order entered on June 9, 2004, the Bankruptcy Court extended the time by which the

Debtors must assume or reject leases of nonresidential property through and including Confirmation of the Plan.[2]

2. Pending Litigation and Automatic Stay. From time to time, the Debtors are involved in litigation. As a result of the commencement of the Chapter 11 Case, pursuant to Section 362 of the Bankruptcy Code, all litigation pending against the Debtors has been stayed. Except for those matters described below, no requests have been made for relief from the automatic stay.

(a) May 24, 2004: Motion for Relief from Stay re: 2003 Toyota Forklift Truck, Used Toyota Forklift Truck, 1998 Toyota Forklift, 2003 Toyota Forklift Truck, filed by Toyota Motor Credit Corporation. Settled by Stipulation and Bankruptcy Court approval on July 25, 2004, by Consent Order.

(b) August 17, 2004, Motion for Relief from Stay re: Setoff of Pre Petition Debts filed by Ronald L. Glick on behalf of SNF Holding Company.

(c) September 1, 2004, Motion for Relief from Stay re: Personal Injury Claim filed by Vincent A. D'Agostino on behalf of Oscar Lee Walley and Dorothy Walley.

3. Claims Process. In Chapter 11, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form. Once established, the claims are either allowed or disallowed. If allowed, the claim will be recognized and treated pursuant to the plan of reorganization. If disallowed, the creditor will have no right to obtain any recovery on or to otherwise enforce the claim against the debtor.

(a) Schedules and Statements. On May 17, 2004, the Debtors filed their schedules of liabilities (as amended, the "Schedules"), as well as their schedules of assets and executory contracts and their statements of financial affairs. The Schedules set forth the Claims of known Creditors against each of the Debtors as of the Petition Date, based upon the Debtors' books and records. On July 6, 2004, the Debtors filed certain amendments to the Schedules. The Debtors reserve the right to further amend their Schedules during the remaining pendency of the Chapter 11 Case.

(b) Claims Bar Date. By operation of Local Bankruptcy Rule 3003-1 of the United States Bankruptcy Court for the District of New Jersey, September 2, 2004 at 4:00 p.m. EST was established as the Bar Date for filing Proofs of Claim against the Debtors by those Creditors required to do so.

In compliance with procedures approved by the Bankruptcy Court, the Debtors, through Trumbull, acting as claims agent, provided timely notice of the

[2] The extension period does not apply to the nonresidential property lease of OTR Property (Lake Point Office Division), which was extended until November 15, 2004. A motion to further extend the assumption/rejection deadline for this particular lease was filed with the Bankruptcy Court on October 15, 2004.

Bar Date by mail. In addition, the Debtors published notice of the Bar Date in the Wall Street Journal and the Newark Star Ledger.

(c) Claims Objection Process. Proofs of Claim aggregating over 800 in number have been filed against the Debtors. If the Debtors do not object to a Proof of Claim by the deadline established in the Plan, the Claim asserted therein will be deemed Allowed and will be treated pursuant to the Plan. As appropriate, the Debtors may seek to negotiate and settle disputes as to Proofs of Claims as an alternative to filing objections to the Proofs of Claim.

H. Plan Process.

1. Extension of Exclusive Periods. Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a Chapter 11 case during which a debtor has the exclusive right to propose a plan of reorganization (the "Exclusive Proposal Period"). In addition, Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor proposes a plan within the Exclusive Proposal Period, it has the remaining balance of 180 days after the commencement of the Chapter 11 case to solicit acceptances of such plan (the "Exclusive Solicitation Period"). During the Exclusive Proposal Period and the Exclusive Solicitation Period, plans may not be proposed by any party in interest other than the debtor. Under Section 1121(d) of the Bankruptcy Code, the Exclusive Proposal Period and the Exclusive Solicitation Period may be extended for cause.

By order dated July 12, 2004, the Bankruptcy Court extended the Exclusive Proposal Period for an additional 120 days, to and including November 13, 2004. The Debtors filed their plan of reorganization on November 1, 2004. Thus, the Debtors continue to have the exclusive right to seek confirmation of their plan of reorganization until January 12, 2005 or such later date as the Bankruptcy Court may establish upon motion of the Debtors.

## ARTICLE VI

## SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO

THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

A. Overall Structure of the Plan. Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) certain Interests will receive no recovery. On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash, securities and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

B. Joint Treatment. The Plan is a joint plan of reorganization, pursuant to which, except as otherwise provided in the Plan, (i) all Claims against each Estate shall be deemed to be Claims against both Estates, any proof of claim filed against one or both of the Debtors will be deemed to be a single claim filed against both Estates, and all duplicate proofs of claim for the same claim filed against more than one Debtor will be deemed expunged; (ii) except as otherwise provided in the Plan, no distributions under the Plan will be made on account of

Claims based upon intercompany obligations by and against the Debtors; (iii) all Claims based upon prepetition unsecured guarantees by one Debtor in favor of the other Debtor (other than guarantees existing under any assumed executory contracts or unexpired leases) will be eliminated, and no distributions under the Plan will be made on account of Claims based upon such guarantees; and (iv) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors will be treated as one entity so that, subject to the other provisions of Section 553, prepetition debts due to either of the Debtors may be set off against the prepetition debts of the other Debtor. Joint treatment will not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan; joint treatment will have no effect on valid, enforceable and unavoidable liens, except for liens that secure a Claim that is eliminated by virtue of such joint treatment and liens against collateral that are extinguished by virtue of such joint treatment; and joint treatment will not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of joint treatment. Joint treatment will not affect the obligation of each of the Debtors, pursuant to Section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as a particular Chapter 11 case is closed, dismissed or converted.

C. Classification and Treatment of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to Section 1123(a)(1), do not need to be classified). The Debtors also are required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and accordingly the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority of such Claims and Interests and the fair value of the Debtors' assets. In view of the deemed rejection by Classes 10, 11, and 12, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, Section 1129(b) of the Bankruptcy Code permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Section X.H. Although the Debtors believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1. Treatment of Unclassified Claims under the Plan.

(a) Administrative Claims. An Administrative Claim is defined in the Plan as a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses or commissions for services rendered after the commencement of the Chapter 11 Case, (b) Professional Fee Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under 28 U.S.C. §. 1930, (e) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (f) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code, and (g) DIP Facility Claims. The Debtors have estimated that the amount of Allowed Administrative Claims payable as of the Effective Date of the Plan will be $6.9 million, including ordinary course operational expenses, Professional Fee Claims, fees payable under 28 U.S.C. §. 1930, reclamation Claims, and Cure costs. Through November 18, 2004, the Debtors have paid $3,477,246 in fees of professionals retained by the Debtors and $1,217,808 in fees of professionals retained by the Committee.

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case will be paid by the Reorganized Debtors.

All requests for payment of an Administrative Claim (other than as set forth in Sections 4.1(a), 12.1 and 12.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than forty-five (45) days after the Effective Date. Unless the Debtors object to an Administrative Claim within sixty (60) days after receipt, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors object to

an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by a Debtor in the ordinary course of business.

All final requests for payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4) or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel and other necessary parties-in-interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

Both Reorganized Debtors may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

Under the Plan, except as otherwise provided for therein, and subject to the requirements of Sections 12.1 through 12.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such other different treatment as to which the applicable Debtor and such holder will have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

Pursuant to the Plan, a DIP Facility Claim is a Claim arising under that certain Debtor In Possession Revolving Credit Agreement dated March 31, 2004, as such facility may be amended, supplemented, or otherwise modified, among GEO, as debtor-in-possession and as borrower (the DIP Lenders), and Duetcshe Bank Trust Company Americas, as lender and administrative agent (the "DIP Facility Agent"), for and on behalf of itself and the other DIP Lenders. The DIP Facility Claims will be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Case. Each holder of an Allowed DIP Facility Claim will receive, on the later of the Effective Date or the date on which such DIP Facility

Claim becomes payable pursuant to any agreement between the Debtors and the holder of such DIP Facility Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim, (i) Cash equal to the full amount of such Allowed DIP Facility Claim, or (ii) such different treatment as to which the Debtors and such holder will have agreed upon in writing.

Pursuant to the Plan, Adequate Protection Claims held by any of the Debtors' Prepetition Secured Lenders will be deemed satisfied in full by payments made pursuant to the GEO Cash Collateral Order. Any replacement or other Liens created under such Order will terminate and will have no further force and effect as of the Effective Date.

(b) Priority Tax Claims. The Plan defines Priority Tax Claims as Claims of governmental units for taxes that are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on income or gross receipts that meet the requirements set forth in Section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of Section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries or commissions that are entitled to priority under Section 507(a)(3) of the Bankruptcy Code, to the extent that such taxes meet the requirements of Section 507(a)(8)(D), (v) excise taxes of the kind specified in Section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F) of the Bankruptcy Code and (vii) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G) of the Bankruptcy Code. The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be $150,000.00.

Under the Plan, each holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such other different treatment as to which the applicable Debtor and such holder will have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

2. Treatment of Classified Claims and Interests under the Plan.

(a) Class 1, Other Priority Claims. Under the Plan, Other Priority Claims are defined as Claims against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such other different treatment as to which the applicable Debtor and such holder will have agreed upon in writing.

(b) Class 2, Prepetition Secured Lender Claim. Under the Plan, a Prepetition Secured Lender Claim is defined as a Secured Claim arising under the Prepetition Secured Credit Agreement as of the Petition Date.

The holders of Prepetition Secured Lender Claims, in full satisfaction, settlement, release and discharge of and in exchange for such Prepetition Secured Lender Claims, will receive on the Effective Date through the Prepetition Secured Lender Agent, their Pro Rata share of Cash, in an amount equal to the principal amount of such Claim plus such amount, if any, in unpaid accrued interest as may be determined by the Bankruptcy Court. The amount of any unpaid accrued interest claimed by the holders of Prepetition Secured Lender Claims shall be held in escrow pending a determination by the Bankruptcy Court of the amount owed.

Pursuant to the Plan, all Liens held as security for the Prepetition Secured Lender Claims will be terminated as of the Effective Date.

Distributions to holders of Prepeititon Secured Lender Claims are conditioned on (i) the holding of the Claim as of the Distribution Record Date pursuant to Section 8.7(b) of the Plan and (ii) the making of appropriate withholding tax and reporting arrangements as provided in Section 8.9 of the Plan.

(c) Class 3, Citibank Secured Claims. Class 3 consists of Citibank Secured Claims, which are Secured Claims of Citibank, N.A. arising under that certain International Swap Dealers Association, Inc. Master Agreement, dated as of November 16, 2001 entered into by and between Citibank, N.A. and GEO. The Debtors presently dispute the Citibank Secured Claim. At such time as a Final Order is entered determining the amount of the Citibank Secured Claim, if

any, there will be paid to the holder of the Citibank Secured Claim cash in an equal amount of such claim.

The holders of Citibank Secured Claims will receive the distributions provided for Citibank Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under that certain International Swap Dealers Association Inc. Master Agreement, dated as of November 16, 2001 entered into by and between Citibank, N.A. and GEO.

(d) Class 4, Other Secured Claims. Other Secured Claims are Secured Claims arising prior to the Petition Date against either of the Debtors, other than a Prepetition Secured Lender Claim. A Secured Claim is a Claim that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code. The amount of a Secured Claim is equal to the value of the Claim holder's interest in the Estate's interest in such property or in the case of a Claim subject to setoff, the amount subject to setoff; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim. Claims secured by valid mechanic's liens would be considered Other Secured Claims under the Plan. The Debtors estimate that Other Secured Claims will be Allowed in the aggregate amount of $200,000.00.

The Plan provides for alternative treatments of Other Secured Claims, at the option of the Reorganized Debtors, depending upon the nature and amount of the Other Secured Claim, as follows:

- First, the Reorganized Debtors may elect that the legal, equitable and contractual rights of a holder of an Allowed Other Secured Claim be "Reinstated". As used in the Plan, the term "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable or contractual rights to which the holder of such Claim is entitled; provided, however,

that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be required to be reinstated in order for a Claim to be considered reinstated.

- Second, the Reorganized Debtors may elect that a holder of an Allowed Other Secured Claim retain the liens securing such Allowed Other Secured Claim and receive deferred Cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property.

- Third, the Reorganized Debtors may elect that the collateral securing such Allowed Other Secured Claim be surrendered to the holder of such Allowed Other Secured Claim.

- A final option is that a holder of an Allowed Other Secured Claim be paid in full on the Effective Date.

The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Case will be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to Other Secured Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements governing such Claim until such Allowed Claim is paid in full. Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

If the Debtors elect the first or second treatment options described above, which do not result in full satisfaction of an Allowed Other Secured Claim on an immediate basis, the liens securing the Allowed Other Secured Claim will continue in effect until the Claim is satisfied in full.

Each holder of a Claim in Class 4 that affirmatively votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors' non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors

Committee (but not its members in their individual capacities), the Indenture Trustee and their respective present agents or professionals, and (iii) any of the directors, officers and employees of the Debtors serving immediately prior to the Effective Date, those of Debtors' directors, officers and employees designated on Exhibit C of the Plan, and any of the Debtors' present agents or professionals (including any professionals retained by the Debtors) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan. Each of the Claimholder Releasees will be deemed to forever release, waive and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter Case, or the Plan, against each holder of a Claim that affirmatively votes in favor of the Plan.

(e) Subclass (4)(i), Interlogistics Secured Claim. The Plan defines the Interlogistic Secured Claim as a claim of Interlogistics S.A. against either GEO or GSCL.

The Plan provides that the holders of the Interlogistics Secured Claim will, at the option of the Reorganized Debtors, receive the same treatment specified above for Other Secured Claims in Class 4.

(f) Subclass (4)(ii), Mechanics Lien Secured Claims. Subclass 4(ii) consists of Secured Claims of certain creditors who have filed and perfected mechanics' liens that are not subject to avoidance in accordance with the provisions of Section 546(b) of the Bankruptcy Code.

The Plan provides that holders of Mechanics Lien Secured Claims will, at the option of the Reorganized Debtors, receive the same treatment specified above for Other Secured Claims in Class 4.

(g) Class 5, 15% Senior Note Unsecured Claims. Class 5 consists of 15% Senior Note Unsecured Claims, which are Claims that arise out of or relate to the 15% Senior Notes.

Holders of 15% Senior Note Unsecured Claims will be issued on the Distribution Date 5% Subordinated PIK Notes in the face amount of $6,100,000.00 (the "New PIK Notes"), maturing on the sixth anniversary of the Effective Date. The New PIK Notes will be subordinate to the prior payment in full in cash of all indebtedness for borrowed money of reorganized GEO. Upon

bankruptcy or liquidation of Reorganized GEO, the holders of the New PIK Notes will be entitled to receive only the accreted amount of the New PIK Notes, which shall initially be a percentage of the face amount, corresponding to the implied value of the New GEO Common Stock being issued under the Plan to the holders of GEO's 10 1/8% Notes due 2008, Series A (estimated at 44%), and which accreted amount shall increase to 100% of face amount in equal installments to maturity. The New PIK Notes will not be subject to mandatory redemption, except to the extent described below. Optional redemption will be permitted but only if the full face amount of the New PIK Notes is paid, with accrued interest. The only events of default under the New PIK Notes will be a bankruptcy filing or liquidation by Reorganized GEO, or the failure to pay PIK interest when due. All exercise of remedies by the holders of the New PIK Notes will be blocked until payment in full in cash of all senior debt of Reorganized GEO.

If all or virtually all of the equity of Reorganized GEO is sold for a purchase price per share that provides holders of the 10 1/8% Notes due 2008, Series A, with aggregate proceeds at least equal to the face amount of such Notes then, to the extent the New PIK Notes may be paid in full in cash at face value plus accrued interest without reducing the recovery of such Notes below such face amount, the New PIK Notes will become due and payable and be entitled to be paid at the time of such change of control in cash at such face value plus accrued interest.

(h) Class 6, Bondholder Unsecured Claims. Bondholder Unsecured Claims are Claims, other than Indenture Trustee Expenses, arising from or relating to the GEO 10 1/8% Notes.

Under the Plan, the Bondholder Unsecured Claims will be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Case. Each holder of an Allowed Bondholder Unsecured Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Bondholder Unsecured Claim, will receive on the Distribution Date its Pro Rata share of New GEO Common Stock (subject to dilution as set forth in the Plan), the principal terms of which are described in Exhibit C to the Plan.

Distributions to holders of Bondholder Unsecured Claims are conditioned on (i) the holding of the Claim as of the Distribution Record Date pursuant to Section 8.7(a) of the Plan, (ii) the surrender of the GEO 10 1/8% Notes by the holders in accordance with Section 8.8 of the Plan and (iii) the making of appropriate withholding tax and reporting arrangements as provided in Section 8.9 of the Plan.

As part of the treatment of Bondholder Unsecured Claims, the Indenture Trustee Expenses will be paid by the Debtors in Cash on the Effective Date. Upon the Effective Date, the Indenture will be deemed cancelled as permitted by Section 1123(a)(5)(F) of the Bankruptcy Code, and the rights and obligations of the Debtors and the Indenture Trustee thereunder will be discharged, except for

the Debtors' obligation to pay, reimburse and indemnify the Indenture Trustee and the rights of the Indenture Trustee to payment thereof (including any priority or lien rights); provided, however, that the Prepetition Indenture will continue in effect for the purposes of allowing the Indenture Trustee, its agent or servicer to make the distributions to be made on account of the Bondholder Unsecured Claims under the Plan.

Each holder of a Claim in Class 6 that affirmatively votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors' non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), the Indenture Trustee and their respective present agents or professionals, and (iii) any of the directors, officers and employees of the Debtors serving immediately prior to the Effective Date, those of Debtors' directors, officers and employees designated on Exhibit C, and any of the Debtors' present agents or professionals (including any professionals retained by the Debtors) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan. Each of the Claimholder Releasees will be deemed to forever release, waive and discharge any such claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, against each holder of a Claim that affirmatively votes in favor of the Plan.

(i) Class 7, Key Continuing Vendor Claims. Class 7 consists of Key Continuing Vendor Claims, which are Claims of those Persons that the Debtors designate as Key Vendors that also make the Key Continuing Vendor Election. The Key Continuing Vendor Election is defined in the Plan as the election by a Key Vendor to receive treatment in Class 7 on account of its unsecured Claim and undertake the obligations set forth in Section 4.3(d) of the Plan.

Under the Plan, each Allowed Key Continuing Vendor Claim will be Allowed in the amount set forth in the Schedule of Key Vendors attached to this Disclosure Statement as Appendix J, and only in such amount. Any other unsecured Claim that is, or otherwise could have been, asserted by the holder of such Key Continuing Vendor Claim will be disallowed. Each Key Continuing Vendor will receive payment in full of its Allowed Key Continuing Vendor Claim in twelve (12) equal monthly installments (without interest), such payments to

commence on the Distribution Date and continuing on the first Business Day of each month following the month in which the Distribution Date occurs, provided, however, that if a Key Continuing Vendor is in default of its obligations under Section 4.3(d) of the Plan and has not yet cured such default at the time a payment under Section 4.3(d) of the Plan comes due, Reorganized GEO may withhold such payment until the date that the Key Continuing Vendor cures such default (at which time the payment shall be made); provided, however, that if the Key Continuing Vendor fails to cure such default within 30 days following the date of such default, such payment shall be forfeited.

By making the Key Continuing Vendor Election, each Key Continuing Vendor is deemed to agree: (i) that the aggregate amount of its unsecured Claims against the Debtor is correctly set forth in the Schedule of Key Vendors filed as an Exhibit to this Disclosure Statement; and (ii) that for twelve (12) months following the Effective Date ("Key Vendor Program Period"), such Key Continuing Vendor will (A) provide Reorganized GEO the longer of (x) 30-day unsecured trade credit terms or (y) the normal and customary terms and conditions on which the Key Continuing Vendor provided trade credit to GEO during the one-year period preceding the Petition Date (such trade credit not to be supported by letters of credit, deposits, or other credit enhancements), and (B) offer pricing to Reorganized GEO that is at least as favorable to Reorganized GEO as pricing offered by the Key Continuing Vendor to its other customers whose purchases are similar in quantity and terms of sale.

Each holder of a Claim in Class 7 that affirmatively votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors' non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), the Indenture Trustee and their respective present agents or professionals, and (iii) any of the directors, officers and employees of the Debtors serving immediately prior to the Effective Date, those of Debtors' directors, officers and employees designated on Exhibit C, and any of the Debtors' present agents or professionals (including any professionals retained by the Debtors) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan. Each of the Claimholder Releasees will be deemed to forever release, waive and discharge any such claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case,

or the Plan, against each holder of a Claim that affirmatively votes in favor of the Plan.

(j) Class 8, General Unsecured Claims. The Plan defines a General Unsecured Claim as a Claim against GEO or GSCL that is not a Secured Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, Bondholder Unsecured Claim, Key Continuing Vendor Claim, GEO Gallium Intercompany Claim, Intercompany Claim, 15% Senior Note Unsecured Claim, or Non-Compensatory Damages Claim. The Debtors estimate that General Unsecured Claims will be Allowed in the aggregate amount of $4.4 million, although no assurances can be provided that contingent, unliquidated and disputed Claims and rejection damage Claims will not be Allowed in amounts that substantially increase the amount of Claims in Class 8.

The Plan provides that each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Claim a lump sum cash payment on the Distribution Date in an amount equal to 44% of such holder's Claim.

Distributions to holders of Allowed General Unsecured Claims are conditioned on the making of appropriate withholding tax and reporting arrangements as provided in Section 8.9 of the Plan.

Each holder of a Claim in Class 8 that affirmatively votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors' non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), the Indenture Trustee and their respective present agents or professionals, and (iii) any of the directors, officers and employees of the Debtors serving immediately prior to the Effective Date, those of Debtors' directors, officers and employees designated on Exhibit C, and any of the Debtors' present agents or professionals (including any professionals retained by the Debtors) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan. Each of the Claimholder Releasees will be deemed to forever release, waive and discharge any such claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case,

or the Plan, against each holder of a Claim that affirmatively votes n favor of the Plan.

(k) Class 9, GEO Gallium Intercompany Claims. Under the Plan, the GEO Gallium Intercompany Claim is defined as any Claim of GEO Gallium S.A. ("GEO Gallium"), a wholly owned indirect subsidiary of GEO, against GEO for sales of gallium between GEO and GEO Gallium, in the approximate amount of $2,200,000.00.

The Plan provides that in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Claim, GEO Gallium will receive a cash payment in an amount equal to fifty percent (50%) of its Allowed Claim, such amount to be recovered by Reorganized GEO as part of a reorganization of GEO Gallium.

(l) Class 10, Intercompany Claims (other than GEO Gallium Intercompany Claims). Under the Plan, an Intercompany Claim is any Claim, arising prior to the Petition Date against any of the Debtors by the other Debtor or by a non-Debtor subsidiary or affiliate of a Debtor (other than claims held by GEO Gallium), but only to the extent that such affiliate is a direct or indirect subsidiary of GEO.

Subject to the Restructuring Transactions as set forth in Section 6.3 of the Plan and except as otherwise provided in the Plan, no holder of an Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim. See Section VI.G for a description of the Restructuring Transactions.

(m) Class 11, Non-Compensatory Damages Claims. Under the Plan, a Non-Compensatory Damages Claim is any Claim against either of the Debtors for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including any such claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise).

According to the Plan, the holders of Non-Compensatory Damages Claims will not receive or retain any property under the Plan on account of such Claims. All Non-Compensatory Damages Claims will be discharged as of the Effective Date.

(n) Class 12, GEO Interests. GEO Interests consist of all equity interests in GEO, including, without limitation, the Old GEO Common Stock, the Old GEO Stock Warrants, together with any warrants, conversion rights, rights of

first refusal, causes of action, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in GEO, and any contracts, subscriptions, commitments, or agreements pursuant to which a party was or could have been entitled to receive shares, securities, or other ownership interests in GEO as of the Petition Date.

Under the Plan, all GEO Interests of any kind, including without limitation, the Old GEO Common Stock, the Old GEO Stock Warrants or any warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests.

D. Reservation of Rights Regarding Claims. Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

E. Allowed Claims, Distribution Rights and Objections to Claims.

1. Allowance Requirement. Only holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Case and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object pursuant to Section 9.1 of the Plan. An Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) (a) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

2. Date of Distribution. All Distributions to holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date.

For any Claim other than a General Unsecured Claim or Key Continuing Vendor Claim, the Distribution Date is either (a) on or as soon as practicable after the Effective Date, but no later than the first (1st) Business Day that is thirty (30) days after the

Effective Date, if the Claim is an Allowed Claim on the Effective Date or (b) fifteen (15) calendar days after the last day of the month during which the Claim becomes an Allowed Claim, if the Claim is not an Allowed Claim on the Effective Date.

For any General Unsecured Claim or Key Continuing Vendor Claim, the Distribution Date is either (a) the first (1st)Business Day that is thirty (30) days after the Effective Date if the Claim is an Allowed Claim on the Effective Date, or (b) the later of (i) the first (1st) Business Day that is thirty (30) days after the Effective Date or (ii) fifteen (15) calendar days after the last day of the month during which the Claim becomes an Allowed Claim, if the Claim is not an Allowed Claim on the Effective Date.

3. Making of Distributions. Reorganized GEO will, in its sole discretion, designate the Person to serve as the Disbursing Agent under the Plan, and will file a written notice of such designation at least five (5) days before the Confirmation Hearing. Distributions to holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address, (d) in the case of an Prepetition Secured Lender Claim, to the Prepetition Secured Lender Agent, or (e) in the case of the holder of a Bondholder Unsecured Claim, distributions will be sent to the Indenture Trustee. Distributions on account of Prepetition Secured Lender Claim will be deemed complete upon delivery of such distributions to the Prepetition Secured Lender Agent. The Indenture Trustee will make distributions on account of the Bondholder Unsecured Claims in accordance with the terms of the Prepetition Indenture. If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions will be made to such holder without interest. Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed.

All claims for undeliverable distributions must be made on or before the second (2nd) anniversary of the Distribution Date, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for an unclaimed distribution, the Reorganized Debtors will deliver the applicable unclaimed property to the Disbursing Agent for distribution pursuant to the Plan. Nothing contained in the Plan will require any Debtor, any Reorganized Debtor, any Disbursing Agent, or any Indenture Trustee to attempt to locate any holder of an Allowed Claim.

4. Reserves for Disputed Claims; Distributions on Account Thereof. No payments or distributions will be made on account of a Disputed Claim or any portion thereof until such Claim becomes an Allowed Claim. A Disputed Claim is any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed, (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order, (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed, (d) for damages based upon the rejection by the Debtors of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed, (e) that is disputed in accordance with the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Disbursing Agent will, on the applicable Distribution Date, make distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions will be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

5. Objection Procedures. All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline. Under the Plan, the Claims Objection Deadline is defined as the last day for filing objections to Claims, which day will be (a) for all Claims other than General Unsecured Claims and Key Continuing Vendor Claims, the latest of (i) the Effective Date, (ii) sixty (60) days after the applicable Proof of Claim or request for payment of an Administrative Claim is filed, or (iii) such other date ordered by the Bankruptcy Court upon motion of the Debtors or any other party; or (b) for General Unsecured Claims and Key Continuing Vendor Claims, the latest of (i) one hundred twenty (120) days after the Effective Date, (ii) sixty (60) days after the applicable Proof of Claim is filed, or (iii) such other date ordered by the Bankruptcy Court upon motion of the Debtors or any other party. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

6. Estimation of Contingent or Unliquidated Claims. The Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any

Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

F. Disposition of Executory Contracts and Unexpired Leases.

1. Contracts and Leases Deemed Assumed. The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of. Specifically, each Debtor will be deemed to have assumed, as of the Effective Date, each executory contract and unexpired lease to which it is a party unless such contract or lease (i) was previously assumed or rejected by such Debtor,(ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the contract and lease assumptions described above, as of the Effective Date.

Under the Plan, each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, operations at, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

2. Cure with Respect to Assumed Contracts and Leases. Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code by Cure as that term is defined in the Plan. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order resolving the dispute; provided however, that not less than two (2) business days prior to Confirmation, the Debtors will be authorized to reject any executory contract or

unexpired lease to the extent the Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Debtors' Estates. The Debtors anticipate that they will incur Cure costs in the approximate aggregate amount of $2.9 million in connection with the assumption of executory contracts and unexpired leases under the Plan. A Schedule of those Executory Contracts to be assumed by the Debtors which will require payment of Cure costs is attached to this Disclosure Statement as Appendix K.

3. Rejections Effected by Terms of Plan. The Debtors reserve the right, at any time up to two (2) business days prior to Confirmation, except as otherwise specifically provided herein or in the Plan, to seek to reject any executory contract or unexpired lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such executory contract or unexpired lease. Any executory contracts or unexpired leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors. A schedule of those Executory Contracts the Debtors presently intend to reject is attached to this Disclosure Statement as Appendix L.

4. Rejection Damages. If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors and counsel to the Creditors Committee, within thirty (30) days after entry of the order authorizing the rejection of such executory contract or unexpired lease.

5. Compensation and Benefit Programs. The Plan provides that except to the extent an employee compensation or benefit program of either of the Debtors (i) has been previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date, or (ii) is the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iii) has been previously terminated, or (iv) has been provided for in subsection (d) of Section 7.5 of the Plan, all other employee compensation and benefit programs of the Debtors, including all pension and retirement plans (including, without limitation, each of the Debtors' supplemental executive retirement plans, health and welfare plans, and pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended) and all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan. Nothing contained in the Plan will be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

The Final Order under 11 U.S.C. §§ 105(a) and 363(b)(1) Approving and Authorizing Key Employee Retention Program, Including Assumption of Certain Key Employment Agreements dated May 24, 2004 is incorporated by reference in the Plan.

All rights, claims, interests, entitlements and obligations of the Debtors under such Final Order and under the GEO Key Employee Retention Plan (as defined therein) approved by such Final Order will continue in full force and effect.

In accordance with the authority provided by the Final Order under 11 U.S.C. §§ 105(a) and 507(a) Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code dated March 18, 2004, the Debtors will, in the ordinary course of business, pay all valid prepetition claims, assessments and premiums arising under its workers' compensation program.

6. Indemnification Obligations. The Plan provides that in addition to Indemnification Obligations that are contained in contracts that are assumed by the Debtors and as set forth in Section 7.5(b) of the Plan, Indemnification Obligations owed to any present professionals retained by the Debtors pursuant to Sections 327 or 328 of the Bankruptcy Code, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. All other Indemnification Obligations owed to any other professionals will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless assumed or rejected by another Final Order).

In addition, the Plan provides that in satisfaction and compromise of the rights of all present and former directors, officers and employees of the Debtors (the "Indemnitees") who are entitled to assert against the Debtors any Indemnification Obligation in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitees' service (other than for willful misconduct or gross negligence) with, for, or on behalf of the Debtors (the "Indemnification Rights"): (i) all Indemnification Rights shall be released and discharged as of the Effective Date except for those Indemnification Rights held by any Indemnitee that serves as a director, officer or employee of the Reorganized Debtors immediately following the Effective Date together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date (the "Continuing Indemnification Rights") (which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Case); (ii) the Debtors or the Reorganized Debtors covenant to maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for a period of two years after the Effective Date, shall maintain tail coverage under policies in existence as of the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior

similar policy; (iii) the insurers who issue the Insurance Coverage are authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (iv) the Debtors or the Reorganized Debtors hereby indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.

G. Revesting of Assets; Release of Liens; Effective Date Restructurings. Except as otherwise provided in the Plan, the property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan will revest in the applicable Debtor on the Effective Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor will be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.

H. Post-consummation Corporate Structure, Management and Operation.

1. Continued Existence. The Plan provides that the Reorganized Debtors will continue to exist after the Effective Date as separate entities, in accordance with the applicable laws in the jurisdiction in which they are incorporated or formed. Reorganized GEO shall continue to exist after the Effective Date pursuant to its Articles of Incorporation and its Code of Regulations which were in effect prior to the Effective Date, except to the extent such Articles of Incorporation and/or Code of Regulations are amended pursuant to the Plan. Reorganized GSCL shall continue to exist after the Effective Date pursuant to its Operating Agreement, which was in effect prior to the Effective Date, except to the extent such Operating Agreement is amended pursuant to the Plan.

2. Post-Consummation Governance Documents. The Articles of Incorporation and/or Operating Agreement, and/or Code of Regulations of each Debtor, as applicable, will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code. The Articles of Incorporation and/or Operating Agreement, and/or Code of Regulations, as applicable, of Reorganized GEO and Reorganized GSCL will be in substantially the forms of such documents included in the Plan Supplement.

3. Cancellation of Old Securities and Agreements. On the Effective Date, except as otherwise provided for in the Plan, (a) the Old Securities and any other note, bond or indenture evidencing or creating any indebtedness or obligation of any Debtor will be cancelled, and (b) the obligations of the Debtors under any agreements, indentures or certificates of designations governing the Old Securities and any other note, bond or indenture evidencing or creating any indebtedness or obligation of any Debtor will be

discharged; provided, however, that the GEO 10 1/8% Notes and the Prepetition Indenture will continue in effect solely for the purposes of (i) allowing holders of the GEO 10 1/8% Notes to receive their distributions hereunder, (ii) allowing the Indenture Trustee to make distributions on account of the GEO 10 1/8% Notes, and (iii) preserving the rights of the Indenture Trustee and liens with respect to the Indenture Trustee Expenses.

4. Officers and Directors of Reorganized Debtors. The Plan provides that the existing senior officers of GEO will serve initially in the same capacities after the Effective Date for Reorganized GEO until replaced or removed in accordance with the Articles of Incorporation and/or Code of Regulations of Reorganized GEO.

Under the Plan, the initial Board of Directors of Reorganized GEO shall be comprised of George P. Ahearn, three (3) individuals to be selected by the Creditors Committee, and three (3) individuals to be selected by the Exit Lenders.

5. Senior Executive Incentive Plan. On the Effective Date, Reorganized GEO will be authorized and directed to establish and implement the New GEO Senior Executive Incentive Plan, substantially in the form included in the Plan Supplement.

6. Funding of Reorganized Debtors. On the Effective Date, the Exit Facility, as evidenced by the New Senior Credit Agreement and New Senior Notes, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed hereunder, will become effective.

7. Exemption from Certain Transfer Taxes. Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from either of the Debtors to the Reorganized Debtors or any other Person pursuant to the Plan in the United States, including any Liens granted by the Debtors to secure the Exit Facility, and the New Senior Notes, will not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

8. Corporate Action. On the Effective Date, the adoption and filing of the Articles of Incorporation of Reorganized GEO and the Regulations of Reorganized GEO, the appointment of directors and officers Reorganized GEO, the adoption of the New GEO Senior Executive Incentive Plan, and all actions contemplated hereby will be authorized and approved in all respects (subject to the provisions hereof) pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the board of directors of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name

of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan. Without limiting the foregoing, the New GEO Senior Executive Incentive Plan will be deemed to have been unanimously approved by the stockholders of GEO pursuant to the Ohio Revised Code.

9. GEO Gallium Restructuring. GEO has periodically purchased gallium from GEO Gallium for direct sale. The balances due from GEO to GEO Gallium for these purchases have remained open on intercompany account. GEO Gallium has been operating at a loss in recent times. GEO Gallium's French auditor has informed GEO that without a recovery of at least fifty percent (50%) on these intercompany balances, the auditor would have to issue an audit opinion with a qualification indicating that GEO Gallium may not be able to continue in business as a going concern. This would have serious direct negative effects on GEO Gallium and indirect negative effects on GEO. GEO intends to implement a reorganization of its French subsidiaries so that it can ultimately return the cash paid to GEO Gallium to the United States for GEO's working capital purposes.

As the sole shareholder of GEO Holdings, GEO intends to cause a reorganization to occur that will ultimately result in the repatriation of cash to both GEO and GSCL and will simplify the organizational structure of the foreign subsidiaries. GEO intends to cause GEO Gallium to reduce its share capital by buying back its own shares from its parent company GEO Holdings. GEO Holdings intends use the cash it receives to repay existing indebtedness it owes to GSCL. GEO will consummate these transactions within 60 days of the Effective Date. A prudent amount of cash will be retained in GEO Gallium after the share capital reduction. Substantially contemporaneously with these transactions, the corporate form of GEO Gallium will be converted from a Société Anonyme to a Société par Actions Simplifiée. The effect of this conversion will be to reduce the number of nominee shareholders of GEO Gallium and thus simplify the mechanics of annual meetings and other administrative procedures.

I. Confirmation and/or Consummation.

1. Requirements for Confirmation of the Plan. Before the Plan can be confirmed, the Bankruptcy Court must determine at the Hearing on confirmation of the Plan (the "Confirmation Hearing") that the following requirements for confirmation, set forth in Section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (i) the identity and affiliations of (x) any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Reorganized Debtors, (y) any affiliate of the Debtors participating in a joint plan with the Debtors or (z) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest holders and with public policy), and (ii) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such holder, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. See Section X.D.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over period not exceeding six years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the holder of any such Claim has agreed to a different treatment. See Section VI.E.1.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan. See Section X.A.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time

prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of Chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

2. Conditions to Consummation of the Plan. The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order will have been entered and will, among other things: (i) provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan; (ii) approve the Exit Facility; (iii) authorize the issuance of the New Securities; and (iv) provide that notwithstanding Bankruptcy Rule 3020(e),the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; (b) the Confirmation Order will not then be stayed, vacated, or reversed; (c) the Certificate of Incorporation of Reorganized GEO, the By-Laws of Reorganized GEO, the New Senior Notes, the New Senior Notes Credit Agreement, and any and all related documents will, to the extent any of such documents contemplates execution by one or more persons, have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document will have been satisfied or waived; (d) the Reorganized Debtors will have arranged for credit availability under the Exit Facility in amount, form and substance acceptable to the Debtors; (e) all material authorizations, consents and regulatory approvals required, if any, in connection with consummation of the Plan will have been obtained; and (f) all material actions, documents and agreements necessary to implement the Plan will have been effected or executed.

J. Releases, Discharge, Injunctions, Exculpation and Indemnification.

1. Releases by Debtors. The Plan provides for certain releases to be granted by the Debtors in favor of each other, either of the Debtors' non-Debtor subsidiaries, the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), the Indenture Trustee or any of their respective directors, officers, employees (except as limited in Section 12.9(a) of the Plan), and advisors, attorneys, and other professionals serving immediately prior to the Effective Date and those of Debtors' directors, officers and employees designated on Exhibit C to the Plan. Specifically, as of the Effective Date, the Debtors, the Reorganized Debtors and any person seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor to the Debtors and any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action

arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for willful misconduct or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder),whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors against (i) each of the Debtors and any of the Debtors' Non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), and the Indenture Trustee, (iii) any of the directors, officers, employees (except as limited herein below), and advisors of the Debtors, the Debtors' subsidiaries non-Debtor subsidiaries, the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), and the Indenture Trustee serving immediately prior to the Effective Date, and (iv) those of Debtors' directors, officers and employees designated on Exhibit C, but specifically excluding any Person identified in clauses (i) through (iv) above who has, on or before the Effective Date, asserted any claim (other than a Proof of Claim as to which the Debtors have not made any objection on or before the applicable Objection Deadline) or initiated any suit, action or similar proceeding against the Debtors that has not been waived by such Person in its entirety on or prior to the Effective Date; provided, however, that nothing in Section 12.9(a) of the Plan will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete or any other contractual or fiduciary obligation (including, without limitation, those arising under the GEO Key Employee Retention Plan) owed to the Debtors or the Reorganized Debtors.

The Debtors do not believe that there are any valid claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities that they hold against any of their directors, officers and employees, against any of their subsidiaries, or against any of the Prepetition Secured Lenders, the Prepetition Secured Lender Agent or the Creditors Committee or the Indenture Trustee.

As to the Debtors' directors, officers and employees, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Case and the need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Debtors will be hampered in their consummation efforts if their directors, officers and employees are subject to claims and potential litigation that will distract their attention from operational and other business matters. None of such individuals are currently the target of any actual claim or litigation, and the Debtors are not aware of any credible theory on which they might pursue claims and litigation against such individuals.

Under applicable law, the Debtors will have the burden at the Confirmation Hearing of justifying the releases proposed to be given by the Debtors. The Bankruptcy Court will determine whether the Debtors have met their burden or not, and any party desiring to do so may object to some or all of the releases proposed to be granted.

2. Releases by Holders of Claims and Interests. In furtherance of the release provisions of the Plan, as of the Effective Date, each holder of a Claim that affirmatively votes in favor of the Plan will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) the Debtors' non-Debtor subsidiaries, (ii) the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee (but not its members in their individual capacities), the Indenture Trustee and their respective present agents or professionals, and (iii) any of the directors, officers and employees of the Debtors serving immediately prior to the Effective Date, those of Debtors' directors, officers and employees designated on Exhibit C, and any of the Debtors' present agents or professionals (including any professionals retained by the Debtors) (the Persons identified in clauses (i) through (iii) collectively, the "Claimholder Releasees") in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, provided, however, that no such release shall be given to (A) any Person (other than the Debtors) with respect to any contractual obligation owed to the holder of a Claim, including without limitation, obligations under promissory notes, guarantees, or similar instruments, whether related to the Debtors or otherwise, and (B) Thompson Hine LLP with respect to any Claims that may be asserted by Charter Oak Partners and/or Charter Oak Capital Partners, L.P.

Each of the Claimholder Releasees will be deemed to forever release, waive and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, against each holder of a Claim that affirmatively votes in favor of the Plan.

Creditors may have independent claims against one or more of the Claimholder Releasees. The Debtors have no actual knowledge of any such claims, but cannot warrant to creditors that they do not exist. Since a vote in favor of the Plan will release whatever creditor claims do exist, if any, against Claimholder Releasees, creditors should consult their own counsel for information and advice as to whether any such claims exist and the value or merit of any such claims. If a creditor does not wish to give the releases contemplated under the Plan, then the creditor should vote to reject the Plan.

3. Discharge and Discharge Injunction. Confirmation of the Plan effects a discharge of all Claims against the Debtors. As set forth in the Plan, all consideration

distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, the Debtors, and each of them, will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502 of the Bankruptcy Code, whether or not a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or the holder of a Claim based upon such debt accepted the Plan. In addition, all GEO Interests will be terminated except as otherwise provided in the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, liabilities or equity interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all GEO Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

In addition, nothing in the Plan will release, discharge or preclude any Claim that has not arisen as of the Effective Date that the United States Environmental Protection Agency or any state environmental agency may have against the Debtors or any remedies of the United States Environmental Protection Agency or any state environmental protection agency that are not within the definition of "claim" as set forth in Section 101(5) of the Bankruptcy Code.

The discharge of the Debtors pursuant to the Plan is not intended to limit in any way the Debtors' insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or in the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold a Claim or other debtor liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award,

decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any person that does not comply with or is inconsistent with the provisions of the Plan. By accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 12.11 of the Plan.

4. Exculpation Relating to Chapter 11 Case. The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that, none of the Debtors or their respective subsidiaries, the Reorganized Debtors, the Prepetition Secured Lenders, the Prepetition Secured Lender Agent, the Creditors Committee, the Indenture Trustee, or any of their respective present or former members, officers, directors, employees, advisors, professionals and agents will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Moreover, the Plan provides that no holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns will have any right of action against any Debtor, any Reorganized Debtor, any of its subsidiaries, the Creditors Committee, the Prepetition Secured Lenders, or the Indenture Trustee or any of their respective present or former members, officers, directors, employees, advisors, professionals and agents for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.

5. Post-Effective Date Indemnifications. The Plan requires that the Articles of Incorporation, Code of Regulations and Operating Agreement, as applicable, of Reorganized GEO and GSCL contain provisions which (i) eliminate the personal liability of the Debtors' former, present and future directors and officers for monetary damages resulting from breaches of their fiduciary duties (other than for willful misconduct or

gross negligence) and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify those of the Debtors' directors, officers and other key employees (as such key employees are identified by the Chief Executive Officer of the Reorganized Debtors) serving immediately following the Effective Date for all claims and actions (other than for willful misconduct or gross negligence), including, without limitation, for pre-Effective Date acts and omissions. In addition, the Plan requires that on or as of the Effective Date, the Reorganized Debtor will enter into separate written agreements providing for the indemnification of each Person who is a director, officer or member of management of such Reorganized Debtor as of the Effective Date for all claims and actions (other than for willful misconduct or gross negligence), including, without limitation, for pre-effective date acts and omissions.

K. Preservation of Rights of Action. Litigation Rights consist of claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor will retain all of their respective Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person. Each Debtor or Reorganized Debtor will retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all such Litigation Rights. Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

Litigation Rights include potential avoidance or other bankruptcy causes of action including, without limitation, causes of action arising under sections 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code. Litigation Rights also include non-bankruptcy claims, rights of action, suits or proceedings that arise in the ordinary course of the Debtors' businesses. The Debtors currently hold certain claims or rights of action against a number of parties. The Debtors also have claims against certain parties that may ripen into litigation.

The Debtors have conducted a preliminary preference analysis in which they reviewed all payments made to creditors within 90 days of the Petition Date. After excluding (i) prepayments made to creditors in connection with the purchase of goods and services, (ii) payments made to creditors who are parties to executory contracts that the Debtors intend to assume, (iii) payments made to creditors that the Debtors have classified as Key Continuing Vendors to be treated in Class 7 of the Plan, and (iv) payments that the Debtors believe are likely to be determined to have been made in the ordinary course of business in accordance with ordinary business terms within the meaning of Section 547(c)(2) of the Bankruptcy Code, the Debtors estimate that potential preference claims could amount to approximately $2,283,000. Of that amount, approximately $860,000 represents payments of less than $1,000 which, pursuant to 28 U.S.C. § 1409, would necessitate bringing suit in the district in which the creditor resides. As to the remaining claims, the Debtors have not conducted any analysis of whether the creditors provided subsequent new value within the meaning of Section 547(c)(4) of the Bankruptcy Code. The

analysis undertaken to date is preliminary, is subject to further review and revision and is not binding on the Debtors, the Committee or any other party in interest.

The Debtors reserve the right to settle or otherwise not pursue any pending or potential claims, rights of action, suits or proceedings. Nothing contained in this Disclosure Statement should prejudice the Debtors' rights to pursue any claims, rights of action, suits or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' businesses.

L. Retention of Jurisdiction. Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4)of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising there from;

- effectuate performance of and payments under the provisions of the Plan;

- hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under or related to the Chapter 11 Case or the Litigation Rights;

- enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan, provided, however, that any dispute arising under or in connection with the New Securities will be determined in accordance with the governing law designated by the applicable document;

- consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Plan Supplement, this Disclosure Statement or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

- except as otherwise limited, recover all assets of the Debtors and property of the Estates, wherever located;

- hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 11.1 of the Plan, the provisions of

Article XI of the Plan will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

M. Amendment, Alteration and Revocation of Plan. The Debtors may alter, amend or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of either Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Debtors reserve the right to revoke or withdraw the Plan at anytime prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, either Debtor or any other Person, (ii) prejudice in any manner the rights of either Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by either Debtor or any other Person.

N. Plan Implementing Documents. The documents necessary to implement the Plan include the following:

- Articles of Incorporation of Reorganized GEO;
- Code of Regulations of Reorganized GEO;
- the Exit Facility (and any related documents, including the New Senior Credit Agreement and New Senior Notes), which documents will evidence the exit

financing obtained by GEO, and which credit facility will have the principal terms and conditions set forth on Exhibit A and Exhibit B to the Plan;

- the New GEO Senior Executive Incentive Plan, which document will set forth the senior executive equity incentive plan(s) to be adopted by Reorganized GEO pursuant to Section 6.7 of the Plan;

Such documents will be submitted as part of the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the date of the commencement of the Confirmation Hearing. Upon such filing, all documents included in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors in accordance with Section 12.16 of the Plan.

## ARTICLE VII

## CERTAIN RISK FACTORS TO BE CONSIDERED

The holders of Claims in Classes 4, 5, 6, 7, 8, 9 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

A. General Considerations. The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of certain of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities and other stakeholders.

B. Certain Bankruptcy Considerations. Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court as a court of equity may exercise substantial discretion and may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix E annexed hereto for a liquidation analysis of the Debtors.

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to obtain financing to fund their operations and their relations with their customers and suppliers may be harmed by protracted bankruptcy proceedings. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

C. Claims Estimations. There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

D. Conditions Precedent to Consummation. The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

E. Inherent Uncertainty of Financial Projections. The Projections set forth in Appendix B hereto cover the operations of the Reorganized Debtors through fiscal year 2007. These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations, exchange rates or generally accepted accounting principles; general business and economic conditions; competition; retention of key management and other key employees; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved.

F. Certain Risk Factors Relating to Securities to be Issued Under the Plan.

1. No Current Public Market. There currently is no market for the New GEO Common Stock that will be issued pursuant to the Plan. GEO does not intend to list the New GEO Common Stock on any national or regional securities exchange or qualify the New GEO Common Stock for quoting on any inter dealer quotation or other system. The New GEO Common Stock might not be eligible for any such listing and/or quotation. As a result, the New GEO Common Stock might be traded only infrequently in transactions arranged through brokers or otherwise, and reliable market quotations for the New GEO Common Stock might not be available.

Upon issuance of the New GEO Common Stock pursuant to the Plan, GEO will not be required to cause the New GEO Common Stock to be registered under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). GEO currently does not expect to voluntarily effect such registration. Therefore, GEO will not be required to file periodic reports and other information under the Exchange Act. If in the future GEO effects the registration of the New GEO Common Stock under the Exchange Act, voluntarily or otherwise, it may cause the New GEO Common Stock to be deregistered at any time that it is eligible to do so. If at any time GEO provides periodic financial or other information to the public or the holders of the New GEO Common Stock outside of the requirements of the Exchange Act, as it currently proposes to do, it will be permitted to discontinue this practice at any time. Therefore, holders of New GEO Common Stock might be unable to obtain financial and other material information about GEO, and this might inhibit their ability to trade the New GEO Common Stock.

Accordingly, there can be no assurance as to the development or liquidity of any market for the New GEO Common Stock. If a trading market does not develop or is not maintained, holders of the New GEO Common Stock might experience difficulty in reselling such securities or might be unable to sell them at all. Even if such market were to exist, the New GEO Common Stock could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, the general conditions of the economy and the markets in which GEO competes, the performance of and investor expectations for GEO and its business, the market for similar securities and prevailing interest rates.

Persons to whom the New GEO Common Stock is issued pursuant to the Plan might prefer to liquidate their investment rather than hold such securities on a long-term basis. Accordingly, any market that does develop for the New GEO Common Stock might be volatile. Other factors, such as the likelihood that GEO will not declare dividends for the foreseeable future, might further depress any market for the New GEO Common Stock.

Resales of the New GEO Common Stock by certain persons who are deemed to be "underwriters" pursuant to Section 1145(b) of the Bankruptcy Code will be restricted. For further discussion, see Section VIII.B below.

2. Dividends. GEO does not anticipate that cash dividends or other distributions will be paid with respect to the New GEO Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which GEO will be a party, including the Exit Facility, might limit the ability of GEO to pay dividends.

3. Change of Control. GEO's Articles of Incorporation and Code of Regulations, as well as the Ohio General Corporation Law, contain provisions that might have the effect of delaying, deterring or preventing a change in control of GEO. These provisions could have the effect of discouraging a potential acquirer from making an unsolicited bid for the company, including a bid that might be favorable to GEO and the holders of the New GEO Common Stock. These provisions could also have the effect of making the removal of GEO's directors and management more difficult, even when the removal might be in the best interests of GEO and the holders of the New GEO Common Stock.

G. Competition. The high degree of competition in the Debtors' businesses and the potential for new competitors to enter into those businesses could cause actual results to differ from those expected by the Debtors. The Debtors' primary competitors are listed in Section IV.C.2.

H. Raw Materials / Production. The Debtors purchase raw materials from a number of suppliers and, believe that the raw materials needed for its businesses will be available in sufficient supply on a competitive basis for the foreseeable future. However, increases in the cost of raw materials, including energy and other inputs used to make the Reorganized Debtors' products could affect future sale volumes, prices and margins for the products of the Reorganized Debtors. In addition, future technological advances may affect the Reorganized Debtors' product lines. Also, potential volatility in production schedules, delays in the introduction of new products and delays in achieving expected cost reductions may impact the Reorganized Debtors' production efficiency.

I. Market Conditions. Continued or increased price pressure and changes in domestic and international economic conditions could have an adverse effect on the Debtors' businesses.

J. [Intentionally Omitted].

K. Environmental. The potential costs related to environmental matters and their estimated impact on future operations are difficult to predict due to the uncertainties regarding the extent of any required remediation, the complexity and interpretation of applicable laws and regulations, possible modification of existing laws and regulations or the adoption of new laws or regulations in the future, and the numerous alternative remediation methods and their related varying costs.

1. Laws and Regulations. The Debtors' various manufacturing operations, which have been conducted at a number of facilities for many years, are subject to numerous laws and regulations relating to the protection of human health and the environment in the U.S. and other countries in which it operates. Modifications of

existing laws and regulations or the adoption of new laws and regulations in the future, particularly with respect to environmental and safety standards, could require capital expenditures which may be material or otherwise adversely impact the Debtors operations. Also, if environmental laws and regulations affecting the Company's operations become more stringent, costs for environmental compliance may increase above historical levels.

In addition, the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA") and similar state statutes have been construed as imposing joint and several liability, under certain circumstances, on present and former owners and operators of contaminated sites and transporters and generators of hazardous substances regardless of fault. The Debtors' facilities have been operated for many years by the Debtors or its prior owners and operators, and adverse environmental conditions of which the Debtors are not aware may exist. Although the Debtors believe that their reserves are adequate, the discovery of additional or unknown environmental contamination at any of the Debtors' current facilities could have a material adverse effect on the Debtors' financial condition or results of operation.

Accruals for environmental liabilities are recorded based on current interpretations of applicable environmental laws and regulations when it is probable that a liability has been incurred and the amount of such liability can be reasonably estimated. Estimates are established based upon information available to management to date, the nature and extent of the environmental liability, the Company's experience with similar activities undertaken, estimates obtained from outside consultants and the legal and regulatory framework in the jurisdiction in which the liability arose. The potential costs related to environmental matters and their estimated impact on future operations are difficult to predict due to the uncertainties regarding the extent of any required remediation, the complexity and interpretation of applicable laws and regulations, possible modification of existing laws and regulations or the adoption of new laws or regulations in the future, and the numerous alternative remediation methods and their related varying costs. The material components of the Company's environmental accruals include potential costs, as applicable, for investigation, monitoring, remediation and ongoing maintenance activities at any affected site. Accrued liabilities for environmental matters were $1,982,722.00 at December 31, 2003.

2. Administrative and Judicial Proceedings. As a result of its operations, the Debtors are involved from time to time in administrative and judicial proceedings and inquiries relating to environmental matters. Based on information available at this time with respect to potential liability involving these facilities, the Debtors believe that any such liability will not have a material adverse effect on their financial condition, cash flows or results of operations.

L. Reliance On Key Personnel. The Debtors operate a business that is highly dependent on skilled employees. A loss of a significant number of key professionals or skilled employees could have a material adverse effect on the Reorganized Debtors and may threaten their ability to survive as going concerns.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their officers and key employees. There can be no assurance that the Debtors will be able to retain and employ qualified management and technical personnel. The Debtors obtained Bankruptcy Court approval of the implementation of a retention plan designed to retain certain of their key employees. To date, the plans have had their intended effect, but there is no guarantee that their effectiveness will continue or that the post-restructuring environment will not introduce new risks to employee retention. See Section V.H.1.

M. Unfunded Pension Liability and Asset Rate of Return. The Company maintains several defined benefit pension plans covering certain employees at its Allentown and Cedartown facilities. Participating employee's annual post retirement pension benefit is determined by the employee's credited service and, in most plans, final average annual earnings with the Company. Vesting requirements are five (5) years. The Company's funding policy is to annually contribute the statutorily required minimum amount as actuarially determined. The Company also maintains several plans providing post retirement benefits other than pensions covering certain hourly and salaried employees. The Company funds these benefits on a pay-as-you-go basis.

The Company records pension and post retirement benefit costs on amounts developed from actuarial valuations. Inherent to these valuations are key assumptions provided by the Company to the actuaries, including the discount rate and expected long-term rate of return on plan assets. The Company believes that material changes in pension and other post retirement benefit costs may occur in the future due to changes in these assumptions, differences between actual experience and the assumptions used and changes in the benefit plans. In addition, the Company believes that if investment returns on pension assets are lower than assumed, this could result in larger cash funding requirements, which could have an adverse impact on the Reorganized Debtors.

N. Risks Related to Foreign Operations. The Debtors' international business relationships and exports to foreign markets will make the Reorganized Debtors subject to a number of special risks such as: currency exchange rate fluctuations; foreign economic conditions; trade barriers; exchange controls; national and regional labor strikes; political risks and risks of increases in duties; taxes; governmental royalties; and changes in laws and policies governing operations of foreign-based companies. The occurrence of any one or a combination of these factors may increase the costs of the Reorganized Debtors or have other negative effects.

O. Leverage. The Debtors believe that they will emerge from Chapter 11 with a reasonable level of debt that can be effectively serviced. However, they may find that they are overleveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy their obligations with respect to all of their indebtedness;

- the Reorganized Debtors may be vulnerable to a downturn in the industries in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt; and

- the ability of the Reorganized Debtors to borrow additional funds may be limited.

The covenants in the Exit Facility and the New Senior Credit Agreement may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on conditions in the global markets for their products, the global economy generally and other factors that are beyond their control. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

P. Litigation. The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

Q. Adverse Publicity. Adverse publicity relating to the Reorganized Debtors, in connection with the Debtors' Chapter 11 cases, may negatively impact the Debtor's efforts to establish and promote name recognition and a positive image.

R. Certain Tax Considerations. There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article IX regarding certain U.S. income tax consequences

of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to holders of Claims who are entitled to vote to accept or reject the Plan.

## ARTICLE VIII

## APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to the issuance or distribution of the New GEO Common Stock under the Plan or their subsequent transfer or resale. The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of such securities pursuant to the Plan and (b) subsequent transfers of such securities.

A. Offer and Sale of New Securities Pursuant to the Plan: Bankruptcy Code Exemption From Registration Requirements. Holders of certain Allowed Claims will receive New GEO Common Stock pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the New GEO Common Stock under the Plan will be exempt from registration under the Securities Act and state securities laws.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

B. Subsequent Transfers of New GEO Common Stock. Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the

holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities; and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New GEO Common Stock pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New GEO Common Stock unless such securities were registered under the Securities Act or an exemption from such registration requirements were available.

Pursuant to the Plan, certificates evidencing New GEO Common Stock received by a holder of 10% or more of the New GEO Common Stock issued under the Plan will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New GEO Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, GEO expresses no view as to whether any such person would be such an "underwriter". PERSONS WHO RECEIVE NEW GEO COMMON STOCK UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE TO THE RESALE OF SUCH SHARES.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW GEO COMMON STOCK OR THE BANKRUPTCY MATTERS DESCRIBED HEREIN. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW GEO COMMON STOCK.

## ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A. Certain U.S. Federal Income Tax Consequences of the Plan. THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO CERTAIN DEBTORS AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, LIFE INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASSTHROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN OR HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE OBTAINED BY GEO WITH RESPECT THERETO. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDER.

1. U.S. Federal Income Tax Consequences to Certain Debtors.

(a) Cancellation of Indebtedness Income. Under the Code, a U.S. taxpayer generally must include in gross income the amount of any discharged indebtedness ("COD") realized during the taxable year. COD income generally equals the difference between the "adjusted issue price" of the indebtedness discharged and the sum of the amount of cash, the "issue price" of any debt instruments and the fair market value of any other property transferred in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

The Debtors will not include such COD income in gross income, however, because (i) the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case, and (ii) the indebtedness will be discharged either by court order or pursuant to a plan approved of by the court. Instead, certain Debtors will be required to reduce certain tax attributes (e.g., net operating loss and net operating loss carryovers (collectively, "NOLs"), general business credit carryovers, foreign tax credit carryovers, minimum tax credit, and tax basis in property (collectively, "Tax Attributes")) by the amount of the COD income that would otherwise have been required to be included in gross income. Reduction of tax basis in property is limited to the excess of the aggregate tax bases of the relevant Debtor's property over the aggregate of such Debtor's liabilities immediately after the discharge. The reduction in Tax Attributes will occur on the first day of the taxable year following the realization of such COD income.

(b) Utilization of NOLs and Net Unrealized Built-in Losses. In general, when a corporation undergoes an "ownership change", which GEO will undergo as a result of the consummation of the Plan, Section 382 of the Code ("Section 382") limits the corporation's ability to utilize NOLs and, if the corporation has a net unrealized built-in loss in its assets (i.e., losses or deductions economically accrued but unrecognized as of the date of the ownership change), "recognized built-in losses" upon the sale or depreciation of such assets within

five years after the ownership change. GEO estimates that it will have $15 million of NOL carryovers available for regular tax purposes after reduction of Tax Attributes. GEO expects that it will not have a net unrealized built-in loss in its assets for regular tax purposes and, therefore, there should be no Section 382 limitation on its ability to utilize such losses for regular tax purposes upon recognition.

The Section 382 limitation is an annual limitation on the amount of Debtors' taxable income which may be reduced by NOL carryovers and certain other Tax Attributes. In general, the Section 382 limitation for any year ending after an ownership change will equal the product of (i) the value of the corporation's stock immediately before the ownership change, reduced by certain capital contributions made within the two year period ending on the change date and (ii) the long-term tax exempt rate within the meaning of Section 382(f) of the Code (4.51% for November 2004).

If a corporation is under the jurisdiction of a court in a title 11 or similar case and certain other requirements are met, the corporation will qualify for the bankruptcy exception under Section 382(1)(5) of the Code. In such case, the NOL carryovers of the corporation would be reduced by a prescribed amount, but would not become subject to an annual limitation. The Debtors may qualify for the bankruptcy exception under Section 382(1)(5) of the Code. Even if the Debtors qualify for such exception, however, they may elect not to have Section 382(1)(5) apply. In such event, the Debtors would determine the annual limitation under the provisions of Section 382(1)(6) of the Code, which provisions apply to a loss corporation that exchanges stock for debt and undergoes an ownership change in a proceeding under the jurisdiction of a court in a title 11 case.

Under Section 382(1)(6) of the Code, the amount of the Debtors' taxable income that may be offset by the Debtors' NOL carryovers in any taxable year ending after the change date should generally be limited to an amount, subject to a proration rule for the taxable year that includes the change date, equal to the product of: (A) the lesser of (1) the value of GEO's stock immediately after the ownership change and (2) the value of the Debtors' assets, determined without regard to liabilities, immediately before the ownership change, reduced by certain capital contributions made within the two year period ending on the change date; and (B) the long-term tax exempt rate within the meaning of Section 382(f) of the Code (4.51% for November, 2004).

The Debtors intend to elect not to apply Section 382(1)(5) and to determine the annual Section 382 limitation under Section 382(1)(6) if it is determined that such election would be advantageous to the Debtors.

(c) U.S. Federal Alternative Minimum Tax. For purposes of computing GEO's regular tax liability, all of its taxable income recognized in a taxable year generally may be offset by NOLs (to the extent permitted under the

Code and subject to various limitations, including Section 382, as discussed above). Even if all of GEO's regular tax liability for a given year is reduced to zero by virtue of its NOLs, GEO may still be subject to the alternative minimum tax (the "AMT"). The AMT imposes a tax equal to the amount by which 20% of a corporation's alternative minimum taxable income ("AMTI") exceeds the corporation's regular tax liability. AMTI is calculated pursuant to specific rules in the Code which change, limit or eliminate the availability of certain tax deductions (including AMT NOLs) and which include as income certain amounts not generally included in computing the corporation's regular tax liability (any COD income excluded from the Debtors' regular taxable income, as described above, would also be excluded from their AMTI).

GEO estimates that it will not have any significant AMT NOL carryovers after reduction of Tax Attributes described above in "Cancellation of Indebtedness Income." Moreover, GEO expects to have a net unrealized built-in loss in its assets for AMT purposes and, under Section 382, its ability to utilize such losses for AMT purposes would be limited, as described above in "Utilization of NOLs and Net Unrealized Built-in Losses."

2. U.S. Federal Income Tax Consequences to Certain Claim Holders.

(a) Holders of Prepetition Secured Lender Claims (Class 2). A holder of Prepetition Secured Lender Claim should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (1) the amount of Cash received in respect of its Prepetition Secured Lender Claim and (2) the holder's adjusted tax basis in its Prepetition Secured Lender Claim. Any such recognized gain or loss will generally be capital gain or loss if a holder of such Prepetition Secured Lender Claim held such claim as a capital asset for U.S. federal income tax purposes and will be long term capital gain or loss if the holder's holding period for such claim exceeded one year as of the Effective Date.

A holder of a Pre-Petition Secured Lender Claim should recognize ordinary interest income (unless previously included in the holder's gross income) for the amount of Cash received which is attributable to accrued but unpaid interest on the Pre-Petition Secured Lender Claim.

(b) Holders of Other Secured Claims (Class 4). Holders of Other Secured Claims who receive the collateral securing such Other Secured Claim upon consummation of the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes equal to the difference between such holder's adjusted tax basis, if any, in the Other Secured Claim and the fair market value of the collateral received in exchange therefore. Holders of Other Secured Claims who receive deferred cash payments may be able to report gain from such cash payments under the installment method, which generally results in the recognition of gain as the deferred cash payments are received, unless such holder affirmatively elects out of the installment method. Holders of Other Secured

Claims who receive deferred cash payments should recognize loss on the Effective Date equal to the difference between such holder's adjusted tax basis, if any, in the Other Secured Claim and the fair market value of the deferred cash payments. Holders of Other Secured Claims who receive cash deferred payments should consult their tax advisor regarding the availability and application of the installment method.

The consummation of the Plan generally should not be a taxable event for holders of Other Secured Claims whose legal, equitable and contractual rights are Reinstated pursuant to the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the Reinstatement or if the Reinstatement is considered for tax purposes to be a substantial modification of the Claim.

Consideration received by holders of Other Secured Claims will, pursuant to the Plan, be allocated first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Holders of Other Secured Claims should include the portion, if any, of the consideration received which is allocable to accrued interest as ordinary income, to the extent not previously included in income.

(c) Holders of 15% Senior Unsecured Claims (Class 5). Although not free from doubt, GEO believes that receipt of the New PIK Notes should be treated as a taxable exchange for U.S. federal income tax purposes. The New PIK Notes will be treated as issued with original issue discount ("OID") to the extent that their "stated redemption price at maturity" exceeds their "issue price."

A holder of a 15% Senior Note Unsecured Claim should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (1) the New PIK Notes received in respect of its 15% Senior Note Unsecured Claim and (2) the holder's adjusted tax basis in its 15% Senior Note Unsecured Claim. Any such recognized gain or loss will generally be capital gain or loss if a holder of such 15% Senior Note Unsecured Claim held such claim as a capital asset for U.S. federal income tax purposes and will be long term capital gain or loss if the holder's holding period for such claim exceeded one year as of the Effective Date.

OID. Subject to the discussion of Applicable High Yield Discount Obligations (“AHYDO”) below, a holder of a debt instrument that bears OID is required to include in gross income an amount equal to the sum of the daily portions of OID for each day during the taxable year in which the debt instrument is held. The daily portions of OID are determined by allocating to each day in an accrual period the pro rata portion of the OID that is considered allocable to the accrual period. The amount of OID that is allocable to an accrual period is generally equal to the product of the adjusted issue price of the New PIK Notes (including any PIK interest) at the beginning of the accrual period (the issue price of the New PIK Notes (including any PIK interest) increased by prior accruals of

OID and decreased by prior cash payments) and their yield-to-maturity (the discount rate which, when applied to all payments under the New PIK Notes, results in a present value equal to the issue price of the New PIK Notes).

The general effect of the OID rules is that holders may be required to include OID in income in advance of the receipt of cash in respect of such income.

AHYDO. The New PIK Notes may constitute "applicable high yield discount obligations", commonly referred to as AHYDOs. The New PIK Notes will constitute AHYDOs if they have a yield to maturity that is at least five percentage points above the applicable federal rate as of the Effective Date and the New PIK Notes are issued with "significant original issue discount". The New PIK Notes will be treated as having significant original issue discount if the aggregate amount that will be includible in gross income with respect to such notes for periods before the close of any accrual period ending after the date that is five years after the date of issue exceeds the sum of (1) the aggregate amount of interest to be paid in cash under the New PIK Notes before the close of the accrual period and (2) the product of the initial issue price of the New PIK Notes and their yield to maturity.

If the New PIK Notes constitute AHYDOs, the Debtors will not be allowed an interest deduction for original issue discount accrued on the New Notes until such time as they actually pay such original issue discount. For this purpose, the issuance of additional New PIK Notes will not be treated as the actual payment of original issue discount. Moreover, a portion of the interest deduction for accrued original issue discount will be permanently disallowed, if the New PIK Notes have a yield to maturity that exceeds the applicable federal rate plus six percentage points. The AHYDO rules generally do not affect the amount, timing or character of a holder's income. However, a domestic corporate holder may be treated as receiving a dividend in the amount of such disallowed portion allocable to the holder and be eligible for the dividends received deduction.

(d) Holders of Bondholder Unsecured Claims (Class 6). GEO believes that the receipt of New GEO Common Stock in respect of the Bondholder Unsecured Claims pursuant to the Plan should be treated as a "reorganization" for U.S. federal income tax purposes. As such, no gain or loss should be recognized on the receipt of New GEO Common Stock in exchange for Bondholder Unsecured Claims. In addition, a holder's aggregate tax basis in the New GEO Common Stock received pursuant to the Plan should be equal to the aggregate tax basis in its GEO 10 1/8% Notes surrendered in the exchange. Such holder's holding period for its New GEO Common Stock received pursuant to the Plan should include the holding period of its GEO 10 1/8% Notes surrendered in exchange therefore, provided that such GEO 10 1/8% Notes were held as a capital asset.

Accrued Interest. The manner in which the consideration received pursuant to the Plan is to be allocated between accrued but unpaid interest and principal for U.S. federal income tax purposes is unclear under present law. Although there can be no assurance with respect to the issue, the Plan provides, and GEO intends to take the position, that no portion of the consideration distributed to holders of Bondholder Unsecured Claims pursuant to the Plan is allocable to accrued and unpaid interest on such Claims.

Market Discount. If the holder of a Bondholder Unsecured Claim purchased a GEO 10 1/8% Note at a price less than the GEO 10 1/8% Note's principal amount, such difference would constitute "market discount" for U.S. federal income tax purposes. Any accrued but unrecognized market discount should carry over to any New GEO Common Stock received in exchange. Any gain recognized by such holder on a subsequent taxable disposition of such New GEO Common Stock would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

(e) Holders of General Unsecured Claims (Class 8). A holder of General Unsecured Claims who will receive cash under the terms of the Plan, should generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (1) the amount of cash received and (2) the holder's adjusted tax basis in such Claims. Any such recognized gain or loss will be capital or ordinary depending on the status of the Claim in the holder’s hands, including whether or not the Claim constitutes a market discount bond in the holder’s hands.

(f) Bad Debt Deduction. A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Section 166 of the Code. The rules governing the character timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

3. Information Reporting and Backup Withholding. Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest on the New Senior Notes, payments of dividends, if any, on the New GEO Common Stock and the proceeds from the sale or other taxable disposition of the New GEO Common Stock, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

4. Importance of Obtaining Professional Tax Assistance. THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE X

## FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

A. Feasibility of the Plan. In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as Appendix B.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms; realization of the Debtors' operating strategy for the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations, exchange rates or generally accepted accounting principles; general business and economic conditions; competition; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only an estimate that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other

Person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved. The Projections should be read together with the information in Article VII of this Disclosure Statement entitled "Certain Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

B. Acceptance of the Plan. As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, holders of Claims in each of Classes 4, 5, 6, 7, 8, and 9 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

C. Best Interests Test. As noted above even if a plan is accepted by each class of claims and interests the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the

Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its Chapter 11 case (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

D. Liquidation Analysis. For purposes of the Best Interest Test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisor, CIBC World Markets ("CIBC"), prepared a liquidation analysis, annexed hereto as Appendix E (the "Liquidation Analysis"), which concludes that in a Chapter 7 liquidation, holders of prepetition unsecured Claims would receive less of a recovery than the recovery they would receive under the Plan and, potentially, no recovery whatsoever. These conclusions are premised upon the assumptions set forth in Appendix E, which the Debtors and CIBC believe are reasonable.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' incomplete review of the Claims filed and the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. In preparing the liquidation analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the Chapter 7 liquidation dividend to holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

In the absence of the compromises and settlements reflected in the Plan, the Creditors Committee and the Prepetition Secured Lenders may each have different views as to the assumptions and estimates contained in the Liquidation Analysis. By supporting the Plan, neither the Prepetition Secured Lenders nor the Creditors Committee waives its right to assert alternative positions if the Plan is not consummated.

E. Valuation of the Reorganized Debtors. CIBC estimates the Estimated Reorganized Debtors Enterprise Value to be approximately $165 million to $205 million as of December 31, 2004, which is the assumed Effective Date. This reorganization enterprise value reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty today as to the achievement of the Projections.

The foregoing valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the Projections, the amount of available cash, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

In preparing the Estimated Reorganized Debtors Enterprise Value, CIBC: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors and assisted in developing financial projections relating to their businesses and prospects; (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market values of public companies that CIBC deemed generally comparable to the operating businesses of the Debtors; (e) reviewed the financial terms, to the extent publicly available, of certain acquisitions of companies that CIBC believes were comparable to the operating businesses of the Debtors; (f) considered certain economic and industry information relevant to the Debtors' operating businesses; (g) visited certain of the Debtors' facilities; and (h) reviewed certain analyses prepared by other firms retained by the Debtors and conducted such other analyses as CIBC deemed appropriate. Although CIBC conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, CIBC relied on the accuracy and completeness of all: (i) financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and (ii) publicly available information. No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

The estimates of reorganization enterprise value, including the Estimated Reorganized Debtors Enterprise Value, do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were to be sold. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the estimated reorganization enterprise value of the reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different from the amounts set forth herein. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of reorganization enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtors, CIBC, nor any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, CIBC's valuation analysis as of the Effective Date may differ from that disclosed herein.

In addition, the valuation of newly-issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holding of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Reorganization Cases or by other factors not possible to predict. Accordingly, the reorganization enterprise value estimated by CIBC does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value. Such trading value may be materially different from the reorganization enterprise value ranges associated with CIBC's valuation analysis. Indeed, there can be no assurance that a trading market will develop for the New GEO Common Stock. The value of the New GEO Common Stock is derived from the midpoint of CIBC's valuation range of $165 million to $205 million.

Furthermore, in the event that the actual distributions to Claim holders in these Chapter 11 Cases differ from those assumed by the Debtors in their recovery analysis, the actual recoveries realized by holders of Claims in the impaired Classes could be significantly higher or lower than estimated by the Debtors.

F. Financial Projections. The Debtors determined that they should estimate the post-confirmation reorganization values of the Reorganized Debtors' equity in order to equitably allocate distributions among the various Classes of Claims. Accordingly, the Debtors directed CIBC to prepare a valuation analysis of the Reorganized Debtors.

The Debtors developed a set of financial projections, summarized in Appendix B hereto (the "Projections") to support the conclusion that holders of Claims would receive a larger recovery under the Debtors' Plan than they would under a liquidation of the Debtors' estates, and to determine which Claims and Classes of Claims are Impaired. The Projections and supporting testimony thereof help establish the feasibility of the Debtors' Plan, that the Plan is in the best interests of all Holders of Claims and that the new debt obligations to be incurred upon emergence from these Chapter 11 Cases are necessary for the Debtors to continue as a viable going concern.

The recoveries and projections set forth in Appendix B are based on a number of significant assumptions including, among other things, the Debtors' successful reorganization, an assumed Effective Date of December 31, 2004, their ability to achieve the operating and financial results included in the Projections, their ability to maintain adequate liquidity to fund operations and the assumption that capital and equity market conditions remain consistent with current conditions.

THE PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE PROJECTIONS.

1. Financial Projections. As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of the Projections, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each holder of a Claim in determining whether to accept or reject the Plan.

The Debtors prepared the Projections in good faith, based upon estimates and assumptions made by the Debtors' management. These include, but are not limited to, estimates and assumptions with respect to pricing and sales volume by market, raw material pricing, product sourcing, capital spending and working capital levels. The Debtors developed the Projections over the 2nd and 3rd quarters of 2004. The Debtors believe that, as a result of current business, economic, competitive, regulatory, market and financial conditions, fiscal year 2005 EBITDA before reorganization costs, fresh start adjustments, and other unusual items may be in the range of approximately $26.5 million.

The estimates and assumptions in the Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Projections. No representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Debtors considered or consider the Projections to reliably predict future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

THE DEBTORS DID NOT PREPARE THE PROJECTIONS WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED

AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW PIK NOTES, NEW GEO COMMON STOCK OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE DEBTORS PERIODICALLY ISSUE PRESS RELEASES REPORTING FINANCIAL RESULTS AND HOLDERS OF CLAIMS ARE URGED TO REVIEW ANY SUCH PRESS RELEASES WHEN, AND AS, ISSUED.

2. Significant Assumptions. The Debtors prepared the Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors.

Although the forecasts represent the best estimates of the Debtors, for which the Debtors believe they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Debtors after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts. Consequently, the inclusion of the forecast information herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the forecast results will be achieved.

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also they have been presented in lieu of pro forma historical financial information. Reference should be made to Article VII herein - "CERTAIN RISK FACTORS TO BE CONSIDERED" for a discussion of the risks related to the Projections.

The Debtors believe that a reasonable estimate of the Effective Date is December 31, 2004. If the Debtors are able to draw upon the DIP Facility as planned, it is the Debtors' belief that the Projections will not change materially even if the Effective Date does not occur on the assumed Effective Date. Projected unaudited consolidated financial statements for the Debtors are included for each twelve-month period ending December 31, 2004, 2005, 2006, and 2007.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below.

For the purpose of providing projected financial information, the Debtors have defined its core business as the manufacturing and distribution of specialty chemicals. Within this context, the following points represent the major assumptions underlying the Projections:

(a) Effective Date and Plan Terms. The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.

(b) Total Revenue. The Projections assume that total revenue will be approximately $170.7 million in the year ending December 31, 2004. Total revenue for the years from 2005 through 2008 are expected to increase approximately 11.3% in 2005, 5.0% in 2006, and 3.8% in 2007. The assumed growth is based on an overall sustained improvement in the industrial sector of the economy during the 2005-2007 period at a normal or historical 2-3% annual GDP growth in the 2006-2007 period. Additionally, the growth in revenue from 2004 to 2007 is driven by several specific factors, the major contributors being: (i) the strengthening of the market for gallium to a point where it reaches volume and price levels achieved in 1999 prior to the "boom and subsequent bust" periods of 2000-2001 and 2001-2003; (ii) the full impact of the cumene hydroperoxide business transitioned from Sunoco during 2003; (iii) the start-up of a new plant in Savannah, Georgia in July of 2004 to supply new customers under a five year sales contract; and (iv) the continued penetration of patented AERO products technology in the North American gypsum market with additional revenue generated in Europe in 2005 predicated on successful field trials in 2004.

(c) Cost of Revenue. The Projections assume that cost of revenue as a percentage of total revenue are 53.5% in the year ending December 31, 2004. Cost of revenue for the years from 2005 through 2007 as a percentage of total revenue are expected to be 53.8% in 2005, 52.3% in 2006, and 51.8% in 2007. The assumed amounts vary as a percentage of total revenue due to changes in product mix and a return to historical relationships of variable costs to revenue for freight and raw materials after a period of rapidly increasing commodity, fuel and other energy costs.

(d) S, G & A Expense. The Projections assume that selling, general and administrative as a percentage of total revenue is 8.4% in the year ending December 31, 2004. S,G&A expense for the years from 2005 through 2007 as a percentage of total revenue are expected to be 8.6% in 2005, 8.5% in 2006, and 8.4% in 2007. The assumed amounts vary as a percentage of total revenue due mostly to the anticipated growth in revenue while holding S,G & A expenses to a 3-4% escalation rate and headcount additions to a minimum.

(e) Production & Other Expense. Similar to the S,G & A expenses, Production and Other Expenses are expected to remain relatively flat while Revenue increases. Specific increases in Production expenses are projected for the new plant in Savannah, Georgia. Otherwise, expenses are expected to escalate by approximately 3-4% annually. The Projections assume an average interest rate on the Exit Facility of 10.5% as well as customary undrawn availability fees.

(f) Income Taxes. The Projections assume a tax rate (federal and state combined) of 35% of pre-tax income.

(g) Net Capital Expenditures. Net Capital Expenditures are assumed to be approximately $5.2 million in 2004, $4.3 million per year in 2005 and 2006, and $4.5 million in 2007. The bulk of capital expenditures are for maintenance expenditures.

(h) Working Capital. Receivables, payables and other working capital accounts are projected according to historical levels with respect to total revenue.

(i) Balance Sheet Adjustments. The company's Prepetition Secured Credit Agreement, its 10 1/8% Notes, and its 15% Senior Notes are extinguished and a new $115 million term facility along with a $10 million revolving facility and a 5% subordinated PIK Note are added to the balance sheet. Common equity is written up to account for the aforementioned changes.

The foregoing valuations are based on a number of measured assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the achievement of the forecasts reflected in the Projections, the availability of certain tax attributes, the outcome of certain expectations regarding market conditions and the Plan becoming effective in accordance with its terms. The estimates of value represent hypothetical reorganization values of the Reorganized Debtors as the continuing operator of their businesses and assets and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any assets or securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of operating businesses such as the Debtors' businesses, is subject to uncertainties and contingencies that are difficult to predict, and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

In the absence of the compromises and settlements reflected in the Plan, the Creditors Committee and the Prepetition Secured Lenders may each have different views as to valuation. By supporting the Plan, neither the Creditors Committee nor the Prepetition Secured Lenders waives its right to assert alternative theories of valuation if the Plan is not consummated.

G. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation. It is impossible to determine with any specificity the value each holder of a Bondholder Unsecured Claim or 15% Senior Note Unsecured Claim will receive as a percentage of its Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a

greater or equal recovery to holders of Claims in Impaired Classes than the recovery available in a Chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

H. Confirmation Without Acceptance of All Impaired Classes: the "Cramdown" Alternative. In view of the deemed rejection by holders of Claims in Classes 10, 11, and 12, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. The Debtors further reserve the right to seek confirmation of the Plan with respect to the Claims in Classes 4, 5, 6, 7, 8, and 9 in the event the holders of such Claims vote to reject the Plan. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they will meet the "fair and equitable "requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Claims in Classes 10 and 11 and holders of Interests in Class 12 in that no holders of junior claims or interests will receive distributions under the Plan.

As to Classes 4, 5, 6, 7, 8 and 9, in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtors will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes. The fair and equitable test set forth above for unsecured claims applies to Classes 5, 6, 7, 8, and 9. The fair and equitable test for secured claims, which is applicable to the Other Secured Claims in Class 4 is that the plan provides (a) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and that the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property, (b) for

the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching the proceeds of such sale, and such liened proceeds being treated either pursuant to (a) or (b), or (c) for the realization by such holders of the indubitable equivalent of such claims. The Debtors believe that the holders of Claims in such Classes will vote to accept the Plan by the requisite amounts. As to Class 4, in the event any sub-Class thereof votes against the Plan, the treatment proposed satisfies the fair and equitable test and can be crammed down, if necessary.

## ARTICLE XI

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims in Classes 4, 5, 6, 7, 8, and 9 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

A. Alternative Plan(s) of Reorganization. If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, has the greatest chance to be confirmed and consummated.

B. Liquidation Under Chapter 7 or Chapter 11. If no plan is confirmed, the Debtors' cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, as set forth in Appendix E, conversion to a Chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most Chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization. In a liquidation under Chapter 11, the Debtors' assets could theoretically be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtors' businesses incur operating losses, the Debtors efforts to liquidate their assets over a longer period of time could theoretically result in a lower net distribution to Creditors than they would receive through a Chapter 7 liquidation. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and hire new professionals, a Chapter 11 liquidation might be less costly than a Chapter 7 liquidation and thus provide larger net distributions to Creditors than in a Chapter 7 liquidation. Any recovery in a Chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain.

Although preferable to a Chapter 7 liquidation, the Debtors believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## ARTICLE XII

## THE SOLICITATION; VOTING PROCEDURES

A. Parties in Interest Entitled to Vote. In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

B. Classes Entitled to Vote to Accept or Reject the Plan. Holders of Claims in Classes 4, 5, 6, 7, 8, and 9 are entitled to vote to accept or reject the Plan. By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1, 2, and 3 are deemed to have accepted the Plan and Classes 10, 11, and 12 are deemed to have rejected the Plan and, therefore, none of the holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

C. Solicitation Order. On or about November 22, 2004, the Bankruptcy Court entered an order that, among other things, determines the dates and procedures applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order by making written request upon the Debtors' counsel or may access a copy on the website Trumbull maintains for GEO, at www.georeorg.com.

D. Waivers of Defects, Irregularities, Etc. Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

E. Withdrawal of Ballots; Revocation. Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Agent in a timely manner at GEO Specialty Chemicals, Inc., c/o The Trumbull Group, P.O. Box 721, Windsor, CT 06095-0721 (U.S. mail delivery address), or GEO Specialty Chemicals, Inc., c/o The Trumbull Group, 4 Griffin Road North, Windsor, CT 06095 (overnight delivery address). The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

F. Special Instructions for Holders of Bondholder Unsecured Claims. If you are the holder of a Bondholder Unsecured Claim, or if you are acting on behalf of the holder of any of such claims, please carefully review the special instructions that accompany your ballot. The special instructions may not be consistent with the general instructions contained herein. In the event of an inconsistency, the special instructions that accompany your ballot should be followed.

G. Voting Rights of Disputed Claimants. Holders of Disputed Claims whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Voting Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Voting Record Date (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed with the Bankruptcy Court and served upon the Debtors' counsel and the Voting Agent by no later than December 10, 2004 at 4:00 p.m. Eastern Time (the "Rule 3018 Motion Deadline"). Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the December 15, 2004 Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Voting Record Date. With respect to any such objection, the Debtors may request that any vote cast by the holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of Section 1126(c) of the Bankruptcy Code have been met.

H. Further Information; Additional Copies. If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

By Overnight Delivery:
GEO Specialty Chemicals, Inc.
c/o The Trumbull Group
4 Griffin Road North
Windsor, CT 06095

By U.S. Mail:
GEO Specialty Chemicals, Inc.
c/o The Trumbull Group
P.O. Box 721
Windsor, CT 06095-0721

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 4, 5, 6, 7, 8, and 9 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 4:00 p.m. Eastern Time on the Voting Deadline.

Dated: November 22, 2004
Newark, New Jersey

GEO Specialty Chemicals, Inc.
By: /s/ William P. Eckman
Title: Executive Vice President and Chief Financial Officer

GEO Specialty Chemicals Limited
By: /s/ GEO Specialty Chemicals, Inc.
Title: Sole Member
Acting by: /s/ William P. Eckman
Title: Executive Vice President and Chief Financial Officer

THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
(216) 566-5500
Alan R. Lepene, Esq. (Ohio Bar #0023276)
Robert C. Folland, Esq. (Ohio Bar #0065728)
Sean A. Gordon, Esq. (Ohio Bar #0074243)

-and-

RAVIN GREENBERG PC
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 226-1500
Howard S. Greenberg, Esq. (HSG8559)
Stephen B. Ravin, Esq. (SR7074)
Brian L. Baker, Esq. (BB4569)

Co-Attorneys for Debtors and Debtors in Possession, GEO Specialty Chemicals, Inc. and GEO Specialty Chemicals Limited