**FILED**
JEANNE A. NAUGHTON, CLERK

DEC - 4 2017

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

In Re:

**GEO SPECIALTY CHEMICALS LIMITED, et al.,**

Debtors.

**Case No.: 04-19148(RG)**
(Jointly Administered)

**OPINION**

**APPEARANCES:**

**THOMPSON HINE LLP**
BY:    Alan R. Lepene, Esq.
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
*Counsel for the Reorganized Debtors, GEO Specialty*
*Chemicals, Inc. and GEO Specialty Chemicals Limited*

**THOMPSON HINE LLP**
BY:    Barry M. Kazan, Esq.
335 Madison Avenue
New York, New York 10017
*Counsel for the Reorganized Debtors, GEO Specialty*
*Chemicals, Inc. and GEO Specialty Chemicals Limited*

**CARELLA BYRNE CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
BY:    James E. Cecchi, Esq.
        Lindsey H. Taylor, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068
*Counsel for Direct Purchaser Plaintiffs*

**QUINN EMANUEL, URQUHART & SULLIVAN, L.P.**
BY:    Sami H. Rashid, Esq.
        Margaret Schmidt, Esq.
51 Madison Avenue
New York, New York 10010
*Counsel for Direct Purchaser Plaintiffs*

**QUINN EMANUEL, URQUHART & SULLIVAN, L.P.**
BY:    Eric Winston, Esq.
865 S. Ferguson Street, 10th Floor
Los Angeles, California 90017-2543
*Counsel for Direct Purchaser Plaintiffs*

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
BY:    Jay B. Shapiro, Esq.
        Drew M. Dillworth, Esq.
150 West Flagler Street, suite 2200
Miami, Florida 33130
*Counsel for Indirect Purchaser Plaintiffs*

**MILLER LAW LLC**
BY:    Marvin A. Miller, Esq.
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
*Counsel for Indirect Purchaser Plaintiffs*

**LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP**
BY:    William L. Mentlik, Esq.
        Roy H. Wepner, Esq.
        Aaron S. Eckenthal, Esq.
600 South Avenue West
Westfield, New Jersey 07090

## ROSEMARY GAMBARDELLA, BANKRUPTCY JUDGE

### MATTER BEFORE THE COURT

Before the Court is a Motion to Reopen Chapter 11 Case For The Limited Purpose of

Enforcing the Chapter 11 Plan Discharge and Injunction filed by GEO Specialty Chemical Inc.

and GEO Specialty Chemicals, Ltd. (collectively "GEO" or the "Reorganized Debtors"). GEO is

seeking an order reopening its chapter 11 case pursuant to 11 U.S.C. § 350(b), enforcing the

Chapter 11 Plan Discharge and Injunction ordered by this Court in its December 20, 2004

Confirmation Order, and directing dismissal of all claims asserted by Plaintiffs in the consolidated

antitrust action *In re: Liquid Aluminum Sulfate Antitrust Litigation*, Civil Action No. 16-md-2687

currently pending in the United States District Court for the District of New Jersey and similar claims asserted by plaintiffs in other jurisdictions which arose or are attributed to conduct or events occurring prior to December 31, 2004, the Effective Date of GEO's Plan of Reorganization. The Direct Purchaser Plaintiffs ("DP Plaintiffs") and Indirect Purchaser Plaintiffs ("IP Plaintiffs") each filed Opposition to GEO's Motion, and GEO filed a Reply. This Court conducted a Hearing on February 28, 2017, at which time the Court reserved decision. The following constitutes this Court's findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052.

# JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended September 18, 2012. This matter constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J). *See* District Court Opinion and Order Denying Motions to Withdraw the Reference, *In re GEO Specialty Chemicals, Inc., et al.*, 16-8405/16-8463 (JLL), ECF Nos. 11, 12.

# FACTUAL BACKGROUND[1]

A. <u>General Background</u>

GEO, originally founded in 1992, develops manufactures, sells, and markets specialty chemical products sold to major industrial customers for various end-use applications, including water treatment, paints and coating products, construction, industrial rubber, oil and gas

---

[1] Citations to the record reflect the electronic case filing (ECF) docket numbers in the Main Bankruptcy Proceeding, *In re GEO Specialty Chemicals, Inc., et al.*, Case No. 04-19148, unless otherwise indicated.

production, electronics, and resins used to meet health, safety and environmental regulations. (Mem. of Law in Supp. of Reorganized Debtors Mot., ECF No. 1320). On March 18, 2004, GEO along with its wholly owned subsidiary, GEO Specialty Chemicals Limited, filed voluntary petitions under chapter 11 of the Bankruptcy Code.[2] GEO confirmed a Plan of Reorganization on December 20, 2004, which became effective on December 31, 2004. GEO's Bankruptcy Case was closed on June 28, 2006, at which time GEO emerged from bankruptcy as a reorganized debtor.

In October 2015, several years after GEO emerged from bankruptcy, GEO's alleged participation in an antitrust conspiracy came to light when Frank Reichl, an employee of General Chemical Corporation ("GenChem"), one of GEO's competitors, pled guilty under the Sherman Act 15 U.S.C. § 1 for his role in a conspiracy concerning the marketing and sale of liquid aluminum sulfate ("LAS"), a water treatment chemical.[3] Shortly thereafter, GenChem and GEO, along with several other companies and individuals were named as defendants in various civil antitrust class actions lawsuits filed in jurisdictions throughout the United States. On February 4, 2016, the antitrust class actions lawsuits were consolidated by the Judicial Panel on Multidistrict Litigation in the United State District Court for the District of New Jersey ("District Court") and are now pending before the Honorable Jose L. Linares, Chief Judge, in a case captioned *In re: Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-2687 (JLL) (JAD) (the "Antitrust Action").

The Antitrust Action is brought by thirteen named plaintiffs on their own behalf, and on behalf of all entities and persons who purchased LAS from one or more of the Defendants during the period from January 1, 1997 through February 2011. In general, the Plaintiffs allege that GEO

---

[2] All references here are to the Bankruptcy code, 11 U.S.C. § 101 *et seq.*, unless stated otherwise.

[3] *See* DOJ-Office of Public Affairs, *Former Executive Admits Guilt in Conspiracy Affecting Water Treatment Chemicals* (Oct. 27, 2015), available at: https://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals.

conspired with other manufacturers of LAS to fix the price of LAS by not competing for each other's business as well as historical customers and territories. On June 16, 2017, in a related criminal proceeding before Judge Linares, GEO pled guilty to its role in the conspiracy and was sentenced to pay a $5 million fine.

The Plaintiffs in the Antitrust Action are separated into two groups. The first group, the Direct Purchaser Plaintiffs ("DP Plaintiffs"), represents a proposed class of persons and entities who purchased LAS directly from GEO, one or more of Defendants including GEO, from January 1, 1997 through at least February 2011. The named Plaintiffs and Class include public bodies and private water companies which use LAS in their water and treatment process, and paper and pulp manufacturers which use LAS to remove impurities from the water used to make paper. *See Consolidated Amended Complaint, In re: Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-2687, ECF No. 220 ("DP Complaint"). The DP Plaintiffs have asserted a single claim against Defendants pursuant to the Sherman Act. *Id.* The second group, the Indirect Purchaser Plaintiffs ("IP Plaintiffs"), represents a purported class of entities and persons who purchased LAS through intermediary distributors, resellers, retailers, wholesalers, and chemical supply companies. *See Consolidated Class Action Complaint, In re: Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-2687, ECF No. 242 ("IP Complaint"). The IP Plaintiffs have asserted claims against the Defendants pursuant to several state antitrust and consumer protection statutes. *Id.*

B. The Alleged Conspiracy[4]

The Plaintiffs allege that during the period from January 1, 1997 through at least February 2011 (the "Class Period"), Defendants and their co-conspirators entered into and engaged into a conspiracy to suppress and eliminate competition in the sale and marketing of LAS by agreeing to

---

[4] The pertinent allegations contained in the two Complaints are substantially similar and, for purposes of this Motion, the DP Plaintiffs and IP Plaintiffs will often be referred to collectively as "Plaintiffs".

allocate customers and territories and fix, stabilize and maintain the price of LAS sold to direct purchasers and distributors in the United States. IP Complaint, ¶ 5. LAS is a water treatment chemical that removes impurities and other substances from water.  DP Complaint, ¶ 53. Municipalities and private water companies routinely purchase LAS through a publically advertised bidding process. *Id.* ¶ 56. Plaintiffs allege that Defendants agreed to "stay away" from each other's "historical" customers and territories. IP Complaint, ¶ 6.  Plaintiffs allege that Defendants routinely met and communicated with each other to conspire and ensure compliance with the conspiracy: they (1) agreed to allocate customers and fix prices; (2) rigged bids to direct purchasers of LAS; and (3) actively policed each other to ensure compliance and punish cheating. *Id.* at ¶¶ 7-8.   As a result of these efforts, Defendants were able to raise or maintain the price of LAS at supra-competitive levels. *Id.* at ¶ 9.  Those artificially inflated and supra-competitive prices were passed on by Defendants through wholesalers, distributors and other resellers (DP Plaintiffs) to indirect purchasers (IP Plaintiffs), who paid higher prices for LAS than they would have absent Defendants' unlawful behavior. *Id.*

Plaintiffs allege that GEO was an active participant in the conspiracy prior to, during, and following GEO's emergence from Bankruptcy.  Plaintiffs allege that the conspiracy originated following a "price war" that occurred in the "mid-1990s" between GenChem and GEO in which each company bid aggressively for the accounts of the other company.  DP Plaintiffs' Compl., ¶ 72. However, the "price war" ended in 1997 when executives from GEO and GenChem met and came to an agreement that they would no longer fight for each other's customers. *Id.* ¶ 73. Important for purposes of this Decision, Plaintiffs assert that GEO reaffirmed and continued its participation in the conspiracy after in emerged from Bankruptcy from December 20, 2004, through at least 2011.

6

IP Plaintiffs' Complaint contains the following allegations specific to GEO:

31.     Around March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States District Court for the District of New Jersey.   Effective December 20, 2004 GEO was discharged from bankruptcy under a plan of reorganization.   GEO participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GEO's senior executives.

32.     After its discharge from bankruptcy, GEO reaffirmed its participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to LAS.   Specific post-discharge actions taken by GEO in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by GEO in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all Defendants and GEO throughout the Class Period [from January 1, 1997 to present].

33.     Regardless of whether GEO participated in the conspiracy throughout the Class Period or joined and/or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this complaint seeks to recover damages from GEO only for GEO's post-discharge conduct, and in no way seeks to violate any orders by the Bankruptcy Court.   GEO's post-discharge conduct, however, renders it jointly and severally liable for all damages resulting from the conspiracy during the entire Class Period.   Thus, by operation of law, the damages arising from GEO's post-discharge conduct includes damages incurred by Plaintiffs and the Class prior to GEO's discharge from bankruptcy.   This complaint also seeks to recover damages from the remaining Defendants for GEO's pre-discharge conspiratorial conduct.   Therefore, Plaintiffs plead only a single class period as to all Defendants, but damages as to GEO are governed by the principles of conspiracy law and joint and several liability as noted above.

IP Pls'. Compl., ¶¶ 31-33.

DP Plaintiffs' Complaint contains the following allegations specific to GEO:

31. On or about March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey. Effective December 20, 2004, GEO emerged from bankruptcy under a plan of reorganization. GEO participated in the conspiracy alleged herein throughout the Class Period through the actions of GEO's senior executives. After emerging from bankruptcy, GEO reaffirmed its participation in the conspiracy through specific post-discharge actions taken by GEO in furtherance of the conspiracy, as alleged below. GEO also reaffirmed its participation in the conspiracy in part by continuing to engage in the conduct described herein with respect to [LAS].

DP Pls'. Compl., ¶ 31.

Plaintiffs further allege that Brian C. Steppig, who held high-level executive positions at GEO, including serving as National Sales Manager from 1997 through August 2006 and as Director of Sales and Marketing from August 2006 through at least 2011 – was instrumental in the conspiracy, and on February 17, 2016 was indicted by the United States for his role in this conspiracy. IP Pls'. Compl., ¶¶ 41, 82, 92. Plaintiffs also describe the participation of Alex Avraamides, who held high-level positions at GenChem and GEO at different periods from 1994 to 2011, and Kenneth A. Ghazey, who held executive positions at GEO from early 2005 through the date the complaint was filed. IP Complaint *Id.* ¶¶ 43, 45. The Complaints also describe several alleged meetings between GEO and its competitors in 2005 and 2008, as well as numerous post-discharge communications between GEO and competitors. *Id.* ¶¶ 92-96. For example, it is alleged that in 2005, Avraamides met with an alleged co-conspirator's CEO, Milton Sundbeck, and confirmed the conspiracy by agreeing that it would "be[] better business for everyone to work together instead of competing and ruining the market price." *Id.* ¶ 92(c). In addition, Plaintiffs allege that in mid-2008, GenChem employees met with Scot Lang and Brian Steppig from GEO as a "get to know you meeting" designed to introduce Gupta to senior staff at GemChem's "friendly 'competitor'" GEO, and to discuss unlawful market and supply agreements. *Id.* ¶ 92(d). IP Plaintiffs' Complaint further alleges that GEO Defendants used internal communications and phrases therein as code for complying with the conspiracy during the Class Period. *Id.* ¶ 100-102. For example, on December 20, 2005, Ghazey sent Avraamides an email about their plans, which stated: "[L]ook forward to … having some peace in the valley." *Id.* ¶ 100. Thus, according to Plaintiffs, GEO repeatedly participated in post-discharge bid rigging and customer allocation from 2005 through at least 2011. *Id.* ¶¶ 99-116, 131-141, 146-148, 173.

<u>C. Related Criminal Proceedings</u>

On June 16, 2016, GEO plead guilty to "one count of violating 15 U.S.C. § 1 [ (the Sherman Antitrust Act)] in connection with a conspiracy to rig bids and allocate customers for, and to fix the price of, liquid aluminum sulfate supplied to municipalities and pulp and paper manufacturers in the United States from at least as early as 1997 and continuing until approximately February 2011." Plea Agreement, *In re: Liquid Aluminum Sulfate Antitrust Litigation*, No. 2:16-cr-00290, Taylor Decl. Ex. D. On that same date, Judge Linares conducted a Sentencing Hearing. *See* Hearing Transcript, Taylor Decl., Ex. A. At the Hearing Stuart Welburn, GEO's outside counsel and designated corporate representative testified that during the period from at least 1997 through February 2011 "employees of GEO, while actively engaged in the management, direction, control or transaction of the [LAS] business on behalf of GEO, knowingly and intentionally conspire[d] and agree[d] with certain employees of the co-conspirator company not to compete for each other's historical business by rigging bids, allocating customers, and fixing the price for liquid aluminum sulfate[]". Hearing Transcript, Page 15, lines 12-20. Ultimately, Judge Linares accepted GEO's guilty plea and sentenced GEO to pay a $5 million dollar fine. *Id.* at page 26.

On February 17, 2016, Brian C. Steppig, one of GEO's key executives, was indicted by the United States for criminal violations of the Sherman Act. *See* Indictment, *USA v. Opalewski, et al.*, 2:16-cr-00065 (JLL), ECF No. 1. The Indictment notes that at relevant times, from approximately 1997 to 2011 Mr. Steppig was employed by GEO and held positions in which he was responsible for the sale and marketing of water treatment chemicals, including LAS,. *Id.* The Indictment alleges that Mr. Steppig and one Vincent J. Opalewski ("Opaleweski"), who was an employee of one of GEO competitors, "entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of aluminum sulfate by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid

9

aluminum sulfate sold to municipalities and pulp and paper companies in the United States." *Id.*

¶ 14. The Indictment further alleges that Mr. Steppig "participated in the conspiracy from at least

as early as 1998 and continuing until approximately February 2011." *Id.* As of the date of the

hearing, the criminal action against Mr. Steppig remained pending before the United States District

Court for the District of New Jersey.

D. GEO's Bankruptcy

On March 18, 2004 (the "Petition Date") GEO along with its wholly owned subsidiary

GEO Specialty Chemicals Limited, filed voluntary petitions under chapter 11 of the Bankruptcy

Code. *In re GEO Specialty Chemicals Inc.*, No. 04-19148, ECF No. 1. *In re Specialty Chemicals,*

*Limited,* No. 04-19149, ECF No. 1. ("GEO or Debtors"). By order dated March 18, 2004 the

Chapter 11 cases were administratively consolidated. ECF No. 35. On May 17, 2004, GEO filed

its schedules and statements of financial affairs. ECF Nos. 237, 238, 239, 240, 241, 242, 243, 245.

GEO amended its schedules on July 6, 2004. ECF No. 427. Nowhere in GEO's disclosures did it

mention any potential conspiracy, or antitrust litigation or liability, or schedule any creditor with

respect to the same.

The bar date for filing general unsecured proofs of claim against the debtors was

September 2, 2004 (the "General Bar Date"). On April 20, 2004 and July 12, 2004, GEO through

its claims and noticing agent, Trumbull Group LLC ("Trumbull"), provided notice of the General

Bar Date to all known creditors reasonably ascertainable by GEO through a review of its books

and records. *See* Affidavit of the Trumbull Group, LLC. ECF No. 454. On July 21, 2004,

notice of the General Bar Date was published in The Wall Street Journal and the Newark

Star-Ledger. *See* Affidavit by the Trumbull Group, LLC f/k/a Trumbull Associates, LLC,

Regarding Publication of Debtor's Notice of Bar Date for Filing Proofs of Claim or Interest, ECF No. 493.

On November 22, 2004, the Debtors filed their Disclosure Statement With Respect to Third Modified Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of GEO Specialty Chemicals, Inc., and GEO Specialty Chemicals, Ltd., ECF No. 874, (the "Disclosure Statement") and Third Modified Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of GEO Specialty Chemicals, Inc., and GEO Specialty Chemicals, Ltd., Debtors. ECF No. 887 (the "Plan")[5]. On December 20, 2004, this Court by the Honorable Morris Stern, U.S.B.J. entered an Order Confirming the Third Modified Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of GEO Specialty Chemicals, Inc., and GEO Specialty Chemicals, Ltd., Debtors. ECF No. 1014 (the "Confirmation Order"). The Confirmation Order incorporated in full the terms and provisions of the Debtors' Plan of Reorganization.  Confirmation Order, ¶ 3.

Section 12.10 of the Plan discharges GEO from all claims or potential claims as follows:

(a) . . . Upon the Effective Date, the Debtors, and each of them, shall   (i)   be deemed   discharged   and   released   under   Section 1141(a)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan.

(b) As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, liabilities, or equity interests relating to the Debtors based upon any

---

[5] GEO subsequently amended, modified, and supplemented the Plan. *See* ECF Nos. 795, 869-872, 887-890, 983.

act, omission, transaction, or other activity of any nature that occurred prior to
the Effective Date.  In accordance with the foregoing, except as provided in
the Plan or the Confirmation Order, the Confirmation Order shall be a judicial
determination of discharge of all such Claims and other debts and liabilities
against the Debtors and termination of all GEO Interests, pursuant to Sections 524
and 1141 of the Bankruptcy Code, and such discharge shall void any judgment
obtained against the Debtors at any time, to the extent that such judgment relates to
a discharged Claim or terminated Interest.

Section 12.11 of the Plan provides for an injunction against any attempt to collect

the discharged claims:

(a) Except as provided in the Plan or in the Confirmation Order, as of the
Effective Date, all Persons that have held, currently hold, may hold, or allege that they
hold, a Claim or other debt or liability that is discharged . . . pursuant to the terms of the
Plan, are permanently enjoined from taking any of the following actions against the
Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on
account of any such discharged Claims, debts, or liabilities or terminated Interests or rights,
(i) commencing or continuing, in any manner or in any place, any action or other
proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment,
award, decree, or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv)
asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability
or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or
continuing any action, in each such case in any manner, in any place, or against any Person
that does not comply with or is inconsistent with the provisions of the Plan.

On January 13, 2005, GEO served notice of the Confirmation Order via U.S. Mail on

Debtors' known creditors.  ECF No. 1073.  The Notice of Confirmation included notice that

anyone asserting a claim against the Debtors that arose subsequent to March 18, 2004 (the Petition

Date) but prior to December 31, 2004 (the Effective Date of the Plan) was required to file its claim

on or before February 14, 2005 (the "Administrative Bar Date").  Notice was also published in

The Wall Street Journal on January 17, 2005 and in the Newark Star-Ledger on January 19, 2005.

ECF No. 1082. The final decree was issued and GEO's bankruptcy proceeding was closed on June

28, 2006. ECF No. 1315.  It is undisputed that GEO's Plan and other filings in the bankruptcy

case did not disclose antitrust violations or potential antitrust claimants.

12

## PROCEDURAL HISTORY

On October 21, 2016, the Reorganized Debtors filed the instant Motion to Reopen the

Chapter 11 Case for the Limited Purpose of Enforcing the Plan's Discharge and Injunction.

Motion to Reopen, *In re GEO Specialty Chemicals, Inc., et al.*, Case No. 04-19148, ECF No. 1320.

In response to the Motion, on November 8, 2016, the DP Plaintiffs filed a Motion to Withdraw the

Reference to the District Court. ECF No. 1324.[6] The IP Plaintiffs also filed a similar Motion to

Withdraw the Reference.  ECF No. 1329.  IP Plaintiffs also filed an Amended and Superseding

Memorandum in support of their Motion to Withdraw on November 14, 2016.  ECF No. 1342.

On January 6, 2017, Judge Linares issued an Opinion and Order denying both Motions.

("Withdraw Opinion") *In re Geo Specialty Chemicals, Inc.,* Case No. 04-19148, ECF No. 1350.

The District Court noted that reference withdrawal can be either mandatory or permissive. *Id.* at

*4 (citing 28 U.S.C. § 157).  With respect to mandatory withdrawal, the Court first found that the

question of whether Plaintiffs' claims are dischargeable constitutes a "core" proceeding within the

meaning of 28 U.S.C. §§ 157(b)(2)(I) and (J). *Id.* at * 4-5. The Court noted that Bankruptcy Court

is not being asked to decide whether GEO is jointly and severally liable under anticonspiracy law;

rather, "the Bankruptcy Court has only been asked to review whether the movants' claims for

damages accrued prior to the effective date of the Plan of Reorganization and therefore barred."

*Id.* at 5. Thus, the Court concluded that mandatory withdrawal did not apply. *Id.* Second, the

Court found that permissive withdrawal was not appropriate in this Case. *Id.* at 6. In reaching this

conclusion, the Court noted that "[t]he issue to be decided by the Bankruptcy court is the

---

[6] DP Plaintiffs also filed a Motion to Seal certain documents including their complaint, brief, and supporting
exhibits. Motion to Seal, *In re GEO Specialty Chemicals, Inc., et al.,* Case No. 04-19148, ECF No. 1325. The
Motion to Seal, which was unopposed, was granted by Order dated February 28, 2017. ECF No. 1361. However,
the parties later agreed that the DP Complaint would be unsealed.  In addition, a copy of the unredacted version of
the IP Complaint was filed on March 3, 2017.  ECF No. 1363.

interpretation and application of its own Discharge Order. Such a determination is a core proceeding which is best left for the Bankruptcy Court's determination." *Id.* at 8. Accordingly, the Court denied Plaintiffs' Motions to withdraw the reference. On January 18, 2017, this Court entered an Order scheduling a Hearing on GEO's Motion to Reopen. ECF No. 19.


## *GEO's Motion to Reopen and Enforce the Discharge Injunction*

GEO's Motion to Reopen seeks entry of an order (i) reopening its Chapter 11 Bankruptcy Case, (ii) enforcing the Chapter 11 plan discharge and injunction ordered by this Court in its Order Confirming the Third Modified Joint Plan of Reorganization, (iii) directing dismissal of all claims asserted by plaintiffs in the Consolidated Amended Complaint in *In re Aluminum Sulfate Antitrust Litigation,* Civil Action No. 16-md-2687 (JLL)(JAD), pending in the United States District Court for the District of New Jersey, and similar claims asserted by plaintiffs in other jurisdictions, which arose or are attributable to conduct or events occurring prior to December 31, 2004, the Effective Date of GEO's Third Modified Joint Plan of Reorganization. Motion to Reopen, *supra*, ECF No. 1320, ¶ 21.

First, GEO argues that cause exists to reopen its Chapter 11 Case pursuant to 11 U.S.C. § 350(b) of the Bankruptcy Code. *Id.* ¶ 22. GEO notes that Section 350(b) authorizes a bankruptcy court to reopen a case in order to "accord relief to the debtor, or for other cause." *Id.* GEO asserts that such relief is especially appropriate when necessary to enforce prior orders of the bankruptcy court and to resolve disputes regarding the impact of such orders. *Id.* (citing *Texaco Inc. v. Sanders (In re Texaco Inc.)*, 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995); *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 6 F. 3d 1184, 1194 (7th Cir. 1993); *Donaldson v. Bernstein*, 104 F. 3d 547, 553 (3d Cir. 1997)). GEO asserts that this Court retained exclusive jurisdiction to take

such action as necessary and appropriate to enforce the Plan and the Confirmation Order. *Id.* ¶¶ 23-24, Plan of Reorganization § 11.1 (citing *LTV Corp. v. Back (In re Chateaugay Corp.),* 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996); *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),* 304 F.3d 223, 230 (2d Cir. 2003); *In re Texaco,* 182 B.R. at 947).

Second, GEO argues that all antitrust claims that arose prior to December 31, 2004 (the "Effective Date" of GEO's Plan) were discharged by GEO's Plan and Confirmation Order. *Id.* ¶ 25 (citing Confirmation Order, ¶ 3; Plan of Reorganization, §§ 1.14 and 12.10). GEO cites to the definition of "Claim" under §101(5) of the Bankruptcy Code and as used in the Plan ("claim" means: [any] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured:) as well as the discharge provisions contained in the Confirmed Plan in accordance with Sections 524 and 1141(d)(1) of the Bankruptcy Code. *Id.* ¶¶ 26-28. GEO argues that federal antitrust claims accrue at the time the anticompetitive acts are committed. *Id.* ¶ 29 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971); *In re Penn Central Transp. Co.,* 771 F. 2d 762, 766 (3d Cir. 1985)). GEO states that at that point, the injured party is entitled "to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will periodically suffer after trial." *Id.* ¶ 30 (citing *Zenith Radio Corp., supra* at 338; *Tam Travel, Inc. v. Delta Airlines, Inc.,* 583 F. 3d 896 (6th Cir. 2009)). Thus, GEO argues that antitrust claims arising from conduct that pre-dates the effective date of a plan of reorganization, including future damages resulting from such conduct, fall within the broad definition of claim under the Bankruptcy Code; accordingly, they are subject to the discharge injunction and may not be pursued post-confirmation. *Id.* ¶ 31 (citing *In re Penn Central Transp.*

*Co.*, *supra*; *In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1998); *In re Envirodyne Indus., Inc.*, 206 B.R. 468 (Bankr. N.D. Ill. 1997) *aff'd Eisenberg Bros. v. Clear Shield Nat'l (In re Envirodyne Indus.)*, 214 B.R. 338 (N.D. Ill. 1997)). GEO notes that the Plaintiffs in the Antitrust Action seek to recover damages based upon an alleged conspiracy that began eight years prior to the Effective Date of GEO's Plan. GEO argues that because the antitrust claims arose prior to the Effective Date of the Plan, such claims have been discharged and the Confirmation Order and Section 524(a)(2) of the Bankruptcy Code preclude Plaintiffs from pursuing such claims. *Id.* ¶ 32. Further, GEO argues that Plaintiffs' allegations that GEO's participation in the conspiracy continued post-discharge do not, by themselves, give rise to new antitrust claims. *Id.* ¶ 33 (citing *In re Travel Agent Comm'n Antitrust Litig.*, Case No. 1:03 CV 30000, 2007 U.S. Dist. LEXIS 79918, at *22-23 (N.D. Ohio Oct. 29, 2007), *aff'd* 583 F. 3d 896 (6th Cir. 2009)). GEO asserts that when the final act to form a conspiracy occurs prepetition, the discharge injunction is broad enough to bar the future effects of the agreement to conspire and that such claims are required to have been asserted by the bar date in a bankruptcy proceeding. *Id.* Thus, Plaintiffs' allegations that GEO "reaffirmed" its participation in the conspiracy following its emergence from bankruptcy does not constitute an "overt act" that gives rise to a post-confirmation claim. *Id.* (citing *Tam Travel*, 583 F. 3d at 902).

Third, GEO argues that Plaintiffs do not have a basis to seek relief from this Court pursuant to Fed. R. Civ. P. 60(b) to pursue pre-confirmation claims. *Id.* ¶ 35. GEO asserts that an order confirming a plan is a "final order" and, as such, the appropriate remedy for obtaining relief from its provisions is to seek relief under Rule 60(b), which is made applicable to bankruptcy cases by Fed. R. Bankr. P. 9024. *Id.* (citing *In re Midland Utility, Inc.*, 251 B.R. 296, 301 (Bankr. D.S.C. 2000); *In re Boroff*, 189 B.R. 53, 56 (D. Vt. 1995); *In re Blanton Smoth Corp.*, 81 B.R. 440, 443

(M.D. Tenn. 1987); *Astroglass Boat Co. v. Eldrige (In re Astroglass Boat Co.)*, 32 B.R. 538, 543 (Bankr. M.D. Tenn. 1983)). GEO contends that plaintiffs seeking to proceed in this manner are first required to seek relief from the bankruptcy court that confirmed the plan. *Id.* ¶ 36 (citing *In re Penn Central Transp. Co.*, 771 F. 2d at 766-68; *Eisenberg Bros. v. Clear Shield Nat'l*, 214 B.R. 338 (N.D. Ill. 1997)). GEO argues that here Plaintiffs were required to seek relief from this Court before filing their claims because this Court retained exclusive jurisdiction to resolve matters relating to the Plan and disputes involving the existence, nature, or scope of the Debtor's discharge.. *Id.* In addition, GEO contends that Plaintiffs cannot establish a ground to obtain relief under Rule 60(b). *Id.* ¶ 38. GEO notes the extraordinary burden placed on a plaintiff proceeding under Rule 60(b)(6) which given the length of time that has elapsed since the entry of the confirmation order is the only avenue available to Plaintiffs in this case. *Id.* (citing *Gochin v. Thomas Jefferson Univ.*, No. 15-4059, 2016 U.S. App. LEXIS 13232 (3d Cir. July 20, 2016), quoting *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991)). GEO contends that requiring creditors to comply with Rule 60(b) advances Congressional intent by ensuring that a reorganized debtor is not subjected to previously discharged claims unless the claimant can meet the heavy burden for granting relief from a final order. *Id.* ¶ 39 (citing *Frost v. Subramanian (In re Subramanian)*, 2005 Bankr. LEXIS 3192, at *13 (3d Cir. Sept. 13, 2005)). GEO asserts that as Plaintiffs have not sought relief from the Confirmation Order, such Order remains effective to enjoin them from pursuing antitrust claims that arose prior to the Effective Date of GEO's Plan. *Id.* ¶ 40.

Fourth, GEO asserts that the only basis for this Court to afford Plaintiffs relief would be a finding that Plaintiffs were not provided notice of the Bar Dates for filing proofs of claim, or the existence of potential antitrust claims against GEO, thus depriving them of their constitutional right to due process. *Id.* ¶ 41 (citing *In re Grossman's Inc.*, 607 F.3d at 125-26; *In re Penn Central*

*Transp. Co.*, 771 F.2d at 767-68). GEO asserts that due process is satisfied if the notice provided to the creditor is reasonably calculated, under all the circumstances to apprise creditors of the discharge of their claims. *Id.* ¶¶ 42-43 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). GEO asserts that whether notice is reasonably calculated in the bankruptcy context depends upon whether creditors were "known" or "unknown". *Id.* ¶ 43 (citing *Chemetron Corp v. Jones*, 72 F.3d 341 (3d Cir. 1995)). GEO argues that the determination of whether a creditor is "known," and thus entitled to receive actual notice of the bar date, depends upon whether the identity of the creditor and its claim are reasonably ascertainable in the ordinary course of business by those responsible for administering the debtor's bankruptcy case. *Id.* ¶ 45 (citing *Chemetron*, 72 F. 3d at 346). GEO asserts that debtors are not required to interview every high-level employee across the company to identify potential creditors. *Id.* ¶ 47 (citing *Board v. AMP Bowling Worldwide, Inc.*, 533 B.R. 144, 150 (E.D. Va. 2015)). Rather, GEO takes that position that "so long as the persons responsible for administering a bankruptcy case do not have knowledge of potential claims, and would be unable to identify such claims through a diligent review of the debtors' books and records maintained in the ordinary course of business, such claims and the creditors holding such claims are deemed to be 'unknown'". *Id.* ¶ 48 (citing *In re Penn Central Transp. Co.*, 42 B.R. 657 (E.D. Pa. 1984), *aff'd* 771 F.2d 762 (3d Cir. 1985)).

GEO argues that here, known creditors were notified of the actual bar dates. *Id.* ¶ 52. GEO further asserts that unknown creditors received notice of the bar dates through publication sufficient under *Mullane*. *Id.* ¶¶ 45, 52-55 (citing *Mullane*, 339 U.S. 306 at 317 (1950); *Chemetron*, 72 F.3d at 346).. GEO asserts that notice by publication is sufficient to satisfy due process for unknown creditors. *Id.* ¶ 55 (citing *Wright v. Owens Corning*, 679 F.3d 101, 108 (3d Cir. 2012); *Chemetron*, 72 F. 3d at 348; *Placid Oil*, 753 F.3d at 155; *AMF Bowling*, 533 B.R. at 147; *In re*

*Circuit City Stores, Inc.*, 2010 Bankr. LEXIS 1774, at \*27-28 (Bankr. E.D. Va. May 28, 2010),

*aff'd Gentry v. Circuit City Stores, Inc. (In re Circuit City Stores, Inc.)*, 439 B.R. 652 (E.D. Va.

2010)). GEO further contends that there is no requirement that creditors are entitled to receive

notice of the existence and nature of potential claims. *Id.* at ¶ 56 (citing *In re Penn Central Transp.*

*Co*, 42 B.R. at 663; *In re Placid Oil Co.*, 753 F.3d 151, 158 (5th Cir. 2014); *In re Circuit City*,

2010 Bankr. LEXIS 1774, at \*27). Thus, GEO concludes that the actual and published notice of

the General Bar Date and the Administrative Bar Date provided all known and unknown creditors

all of the constitutionally required information necessary to file a proof of claim or otherwise

protect their rights. *Id.* ¶ 57.

*DP Plaintiffs' Opposition*

On November 8, 2016, DP Plaintiffs filed Opposition to GEO's Motion to Reopen. DP

Pls.' Opp'n Br., *In re GEO Specialty Chemicals, Inc., et al.*, Case No. 04-19148, ECF No. 1326.[7]

DP Plaintiffs' took the position that the District Court was the more proper forum to address

the Motion to Reopen because GEO had already filed a similar motion to dismiss in the District

Court based upon the discharge injunction; GEO's alleged co-conspirator, General Chemical

Corporation had also filed its own motion to dismiss based upon the same issue; and because the

District Court presided over GEO's criminal case and is presiding over other related criminal

proceedings including a criminal action against Brian Steppig , an executive of GEO. *Id.* at 8-9.

With respect to the merits, DP Plaintiffs argue that the discharge injunction does not apply

to their antitrust claims because GEO pled guilty to participating in a criminal bid-rigging and

price-fixing conspiracy involving the sale of liquid aluminum sulfate from at least as early as 1997

and continuing until approximately February 2011, more than six years after GEO emerged from

---

[7] DP Plaintiffs' Opposition Brief was originally filed under seal, but was later re-filed under the public docket.

bankruptcy. *Id.* at 1, 10. DP Plaintiffs assert that under the Sherman Act a participant in an

antitrust conspiracy is jointly and severally liable for the acts of each co-conspirator. *Id.* at 10

(citing *Wellbutrin*, 2012 WL 1657734, at *34 (E.D. P.A. May 11, 2012); *In re Linerboard Antitrust*

*Litig.*, 203 F.R.D. 197, 208 (E.D. Pa. 2001); *Polyurethane Foam*, 799 F. Supp. 2d at 800; *Paper*

*Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 634 (7th Cir. 2002)). DP Plaintiffs contend

that joint and several liability for all damages caused by the antitrust conspiracy applies regardless

of when a particular conspirator joined the conspiracy. *Id.* Thus, a party that joins the conspiracy

after it is well underway becomes jointly and severally liable for all damages caused from the

outset of the conspiracy to its conclusion. *Id.* at 10-11 (citing *In re K-Dur Antitrust Litig.*, 338 F.

Supp. 2d 517, 538-39 (D.N.J. 2004) (citing *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir.

1934)); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152, 153 (E.D. Pa. 1989)).

DP Plaintiffs further note that even if a party withdraws from a conspiracy and subsequently

rejoins, it remains jointly and severally liable for all of the conspirators' conduct. *Id.* at 11 (citing

*Hyde v. United States*, 225 U.S. 347, 370-72 (1912)). DP Plaintiffs contend that "it is well

established that a discharge from bankruptcy, such as GEO's discharge in 2004, does not alter

these basic principles of joint and several liability under antitrust law." *Id.* (citing *In re Travel*

*Agent Comm'n Antitrust Litig.*, 583 F.3d at 902). Thus, DP Plaintiffs argue that if an antitrust claim

arises after the confirmation of a plan under Sections 1129 and 1141 of the Bankruptcy Code, the

confirmation order cannot insulate the violator from liability. *Id.* at 11-12 (citing *In re Travel*

*Agent Comm'n Antitrust Litig.*, 583 F.3d at 903). DP Plaintiffs' assert that the Bankruptcy Code

does not place limitations on claims based upon "post-closing wrongful conduct." *Id.* at 12 (citing

*In re Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016)).

DP Plaintiffs argue that *Kleen Products LLC v. Int'l Paper Co.*, 306 F.R.D. 585 (N.D. Ill. 2015), is directly on point. *Id.* at 12. In that case, the court determined that holding a discharged defendant jointly and severally liable does not violate the bankruptcy discharge because the discharged defendant had rejoined the conspiracy post-discharge and could therefore be on the hook for its co-conspirators' actions. *Id.* (citing *Kleen Products LLC v. Int'l Paper Co.*, 306 F.R.D. at 608). DP Plaintiffs note that the Seventh Circuit upheld the District Court's determination with respect to this issue on appeal. *Id.* (citing *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016)). DP Plaintiffs also cite to other cases for the same principles. *Id.* (citing *Lower Lake Erie*, 710 F. Supp. at 154-55; *Polyurethane Foam*, 799 F. Supp. 2d at 800; *In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 785-86 (N.D. Ohio 2015)). DP Plaintiffs contend that the same analysis applies here because GEO pled guilty to participating in the conspiracy from 1997 until 2011, both before and after its bankruptcy discharge in 2004. *Id.* at 13. DP Plaintiffs further contend that discovery in the Antitrust Litigation has produced evidence that GEO conspired with other Defendants after it emerged from bankruptcy. *Id.* at 13-14. Thus, DP Plaintiffs conclude that even if pre-bankruptcy conduct was discharged, which Plaintiffs dispute, GEO's continued participation in the conspiracy after its discharge from bankruptcy means that it remains jointly and severally liable for its co-conspirators' conduct for the entire class period, including all pre-discharged conduct. *Id.* at 14. DP Plaintiffs asserts that "[t]o allow GEO 'to join [the] conspiracy post-bankruptcy, with the perfect knowledge and intent to continue causing damages to vast numbers of consumers' without imposing joint and several liability for pre-discharge conduct would create a 'windfall to defendants.'" *Id.* (quoting *Kleen Prods.*, 306 F.R.D. at 609).

Second, DP Plaintiffs argue that claims as to GEO's pre-bankruptcy participation in the conspiracy were not discharged because class members did not receive constitutional due process. *Id.* at 14. DP Plaintiffs assert that at no time during GEO's bankruptcy proceedings did it disclose in its bankruptcy proceedings, in its schedules of assets and liabilities, its claims bar date notice, its disclosure statement or its plan of reorganization that it had been engaged in a criminal antitrust conspiracy since 1997 and continued to engage in such conspiracy during the bankruptcy case. *Id.* DP Plaintiffs contend that because GEO failed to provide constitutionally adequate notice to the victims of its crime, it cannot use the Plan of Reorganization and the Confirmation Order to block Plaintiffs from seeking damages. *Id.* (citing *Grossman's*, 607 F.3d at 122). DP Plaintiffs assert that because Plaintiffs were "known" creditors, they were entitled to actual notice and that notice by publication was insufficient to satisfy due process. *Id.* at 15 (citing *Chemetron*, 72 F.3d at 341). DP Plaintiffs contend that while publication is generally sufficient to give notice to unknown creditors, the determination of whether a creditor is known or unknown is determined from the perspective of the debtor as a creditor is "known" if the creditor's identity is "either known or reasonably ascertainable by the debtor." *Id.* at 15 (citing *Chemetron,* 72 F. 3d at 346). DP Plaintiffs contend that the debtor is obligated to conduct a careful review to determine its liabilities, its creditors, and disclose them. *Id.* at 15-16. DP Plaintiffs allege that in this case, all of GEO's liquid aluminum sulfate customers, including the DP Plaintiffs, were "known" by GEO to be victims of GEO's misconduct. *Id.* at 16. The DP Plaintiffs argue that "GEO obviously knew the identities of its customers that purchased liquid aluminum sulfate, and the other entitles to which it submitted, as the DP Plaintiffs allege, 'throw-away bids . . . to ensure that [GEO's] competitor, the existing seller to that customer, would continue to 'win' that customer's business." *Id.* (citing the Consolidated Amended Complaint at ¶ 5). The DP Plaintiffs assert that GEO knew it had engaged

in antitrust violations for years prior to bankruptcy, and during the bankruptcy and that such conduct would cause damages. DP Plaintiffs assert that GEO's knowledge is evidenced by GEO's guilty plea, and such guilty plea estops GEO from claiming otherwise now. *Id.* (citing *Anderson v. Comm'r of Internal Revenue*, 698 F.3d 160, 164 (3d Cir. 2012); *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073, at *16 (S.D.N.Y. Jan. 26, 2004) *aff'd*, 119 Fed. Appx. 300 (2d Cir. 2004)).

DP Plaintiffs acknowledge that while a vast, open-ended investigation may not be required to ascertain known creditors, (citing *Chemetron*, 72 F. 3d at 346), here, GEO was (as it has admitted) knowingly engaged in a criminal conspiracy before, during and after the bankruptcy proceeding and Brian Steppig, who was GEO's National Sales Manager from 1997 through August 2006 and Director of Sale and Marketing from August 2006 through at least 2011 has been indicted for "knowingly enter[ing] into and participat[ing] in the conspiracy from at least as early as 1998 and continuing until approximately February 2011." *Id.* at 17 (citing Ex. J. (*United States of America v. Vincent J. Opalewski and Brian Steppig*, Criminal No. 16-cr-65 (D.N.J. Feb. 17, 2016)). DP Plaintiffs contend that Mr. Steppig was a key employee whose knowledge is imputed to GEO. *Id.* at 18 (citing *Turner Constr. Co., Inc. v. Brian Trematore Plumbing & Heating, Inc.*, 2009 WL 3334823, at *4 (D.N.J. Oct. 13, 2009) (quoting *In re Mifflin Corp.*, 123 F.2d 311, 315 (3d Cir. 1941)); *UCAR Int'l*, 2004 WL 137073, at *16)). DP Plaintiffs further contend that the limited discovery it has obtained thus far suggests that Mr. Steppig was one of a small number of GEO's key corporate employees who received incentive bonuses during GEO's Chapter 11 case. The DP Plaintiffs further contend that GEO's review of its own books and records would have revealed the irregular bidding practices GEO eventually plead guilty to. *Id.*

DP Plaintiffs contend that GEO's suggestion that those individuals actually administering the bankruptcy case had no knowledge of the antitrust conspiracy ignores the requirements under the Bankruptcy Code and applicable case law. *Id.* at 19. DP Plaintiffs contend that pursuant to 11 U.S.C. § 521 and Fed R. Bankr. P. 1007(b), the debtor is required to disclose all known liabilities, including known potential liabilities, by listing such liabilities in debtor's schedules of assets and liabilities. *Id.* at 19 (citing *DePasquale v. Morgan Stanley Smith Barney, LLC,* 2011 WL 3703110, at *3 (D.N.J. August 23, 2011). DP Plaintiffs assert that even though GEO had knowledge of the conspiracy and its potential liabilities it did not list them in its bankruptcy schedules. *Id.* (citing *Motors Liquidation*, 829 F.3d at 160). DP Plaintiffs further contend that GEO had an obligation to inquire of its employees about known potential liabilities. Similarly, DP Plaintiffs note that in order to confirm its Plan of Reorganization, GEO was required to disclose these liabilities in preparing its Disclosure Statement pursuant to 11 U.S.C. § 1125. *Id.* at 20 (citing *In re Budd Co., Inc.*, 550 B.R. 407, 412 (N.D. Ill. 2016)). DP Plaintiffs contend that GEO's participation in a criminal conspiracy for years and continuing participation during the bankruptcy case, is a material fact that should have been included in its disclosure statement. *Id.* at 20-23 (citing *Motors Liquidation*, 829 F.3d at 159).

Third, DP Plaintiffs argue that GEO's Plea Agreement judicially estops GEO from now asserting a bankruptcy defense to claims arising prior to the Effective Date of its Plan. *Id.* at 23. DP Plaintiffs assert that the "basic principle of judicial estoppel…is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* at 24 (quoting *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003)). DP Plaintiffs note that the factors governing judicial estoppel are: (1) "the party to be

estopped must have taken two positions that are irreconcilably inconsistent"; (2) "the party changed his or her position in bad faith – *i.e.,* with intent to play fast and loose with the court"; and (3) "no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Id.* at 24 (quoting *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001)). DP Plaintiffs further note that while these factors govern the analysis, the Supreme Court has made clear that judicial estoppel is not governed by "inflexible prerequisites or any exhaustive formula" and that "[a]dditional considerations may inform the doctrine's application in specific factual contests." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

DP Plaintiffs note that in the Plea Agreement GEO admitted that it violated Section 1 of the Sherman Act "from at least as early as 1997 and continuing until approximately February 2011." *Id.* at 23 (citing Plea Agreement, Ex. D ¶ 1). DP Plaintiffs state that as part of the Plea Agreement, GEO agreed to a sentencing recommendation that did not include a restitution order, even though GEO understood that the District Court could order GEO to pay restitution. *Id.* DP Plaintiffs assert that in support of that recommendation, GEO pointed to "the availability of civil causes of action, in the District Court of New Jersey and elsewhere, which potentially provided for a recovery of a multitude of actual damages." *Id* (citing Ex. D ¶ 16). DP Plaintiffs assert that the Plea Agreement did not include any reservation of rights to assert a bankruptcy discharge defense in connection with obtaining a recommendation not to impose restitution. *Id.* at 23. Further, DP Plaintiffs assert that at the Sentencing Hearing GEO did not reveal to the District Court that it intended to raise a bankruptcy discharge defense in subsequent civil litigation. *Id.* at 24. Instead, DP Plaintiffs assert that GEO's Counsel, James H. Mutchnik, Esq. of Kirkland & Ellis, LLP, represented to the District Court that the recommended sentence was designed to leave GEO

with "sufficient funds" available to "make sure that any injuries that [victims] suffered are taken care of" through civil litigation. *Id.* (citing Plea Hearing Transcript, 22:20-22). Thus, DP Plaintiffs contend that by approving a Plea Agreement that did not constitute a restitution order, the District Court and GEO understood that funds would be paid to compensate victims through civil litigation. *Id.* at 24. Therefore, DP Plaintiffs argue that GEO has taken irreconcilable positions by representing to the District Court that "any injuries that [victims] suffered" would be compensable through civil litigation, while now arguing that as a result of the bankruptcy discharge it cannot be liable for damages arising during the first seven years of the conspiracy. *Id.* at 24-25.

DP Plaintiffs further contend that there is a rebuttable presumption of bad faith on the part of GEO because it benefited from the misrepresentation to the District Court by receiving a generous sentencing involving no restitution. DP Plaintiffs assert that estoppel is appropriate here because it is narrowly tailored to GEO's misconduct. DP Plaintiffs note that in similar circumstances, courts have held that a debtor is estopped from raising a bankruptcy discharge defense to a civil claim when, in a prior criminal restitution hearing, the debtor represented that the claim was still litigable. *Id.* at 25 (*In re Duke*, 172 B.R. 575 (M.D. Tenn. 1994); *Chaffee v. Kraft Gen. Foods, Inc.*, 886 F. Supp. 1164 (D.N.J. 1995) (citing *In re Duke* with approval)).

IP Plaintiffs' Opposition

On November 8, 2016, IP Plaintiffs filed Opposition to GEO's Motion to Reopen. IP Plaintiffs' Opposition Brief, *In re GEO Specialty Chemicals, Inc., et al.*, Case No. 04-19148, ECF No. 1327. Initially, IP Plaintiffs argue that the issues raised in the instant motion were placed before Judge Linares in the Antitrust Litigation through motions to dismiss filed by both GEO and one of GEO's co-defendants, GenChem, who like GEO, went through a Chapter 11 reorganization, and seek a determination from Judge Linares that said parties are not liable for any pre-discharge

conduct.    As such, to avoid inconsistent rulings and encroachment on the District Court's

jurisdiction, this Court should exercise its broad discretion and decline to entertain GEO's motion.

*Id.* at 3.

IP Plaintiffs further argue that this Court should not reopen GEO's bankruptcy case

because GEO cannot gain any substantive relief through its Motion.  *Id.* at 11.  IP Plaintiffs

assert that the antitrust claims were not contemplated by the Plan or Confirmation Order and

have no place in the bankruptcy proceeding.    IP Plaintiffs further assert that if the antitrust claims

are pre-petition claims, which IP Plaintiffs dispute, since IP Plaintiffs were not afforded adequate

notice of the Plan or Confirmation Order, their claims cannot be enjoined.    Accordingly, GEO

cannot receive the relief it seeks – enforcement of the discharge injunction against class plaintiffs

by reopening this case. *Id* at 11.    IP Plaintiffs' state that reopening the case at this time would be

"futile." *Id.* (citing *Janocha*, No. 06-20191, 2015 WL 128152, at \*2 (Bankr. W.D. Pa. Jan. 8,

2015); *In re Frazer/Exton Dev., L.P.*, 503 B.R. 620, 635 (Bankr. E.D. Pa. 2013); *In re Otto*, 311

B.R. 43, 47 (Bankr. E.D. Pa. 2004)).    In addition, IP Plaintiffs assert that several other factors

also support denying GEO's Motion to reopen, including (1) that GEO's bankruptcy case is a

decade old; (2) Judge Linares is already seized of the very issues raised in the Motion, and well-

suited to address them; (3) reopening the case will result in no additional recovery for GEO's

former creditors; (4) reopening the case will be a waste of judicial resources and may result in

inconsistent decisions because GEO asserted that same arguments in the context of its Motion to

Dismiss filed in the District Court; and (5) IP Plaintiffs' claims in the Antitrust Action premised

on GEO's post-confirmation misconduct, not on its pre-petition conduct, do not implicate the

Plan or Confirmation Order. *Id.* at 12-14.

Second, with respect to the merits of enforcing the discharge injunction, IP Plaintiffs argue that its claims against GEO are post-confirmation claims which cannot be affected by the Plan, Confirmation Order, or bankruptcy case. *Id.* at 14. IP Plaintiffs contend that if a claim arises after confirmation of a plan in bankruptcy, that claim is not discharged. *Id.* at 15 (citing *Kleen Prods.*, 831 F.3d at 930; *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011)). IP Plaintiffs assert that an antitrust cause of action "accrues each time a defendant commits an act that injures the plaintiff's business." *Id.* (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)). Thus, a new claim under the Sherman Act arises each time a conspiring defendant, such as GEO, sells a price-fixed product or participates in acts furthering the conspiracy. *Id.* (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-89 (1997); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa*, 815 F.2d 270, 278 (3d Cir. 1987), *cert. denied*, 484 U.S. 851 (1987)). Further, IP Plaintiffs assert that "a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy." *Id.* (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152, 153-54 (E.D. Pa. 1989); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. 231, 232 (S.D. Fla. 1977)). Therefore, IP Plaintiffs argue that conspiratorial conduct by a reorganized debtor post-confirmation or post-discharge gives rise to a post-confirmation claim, and renders the reorganized debtor jointly and severally liable for all acts connected with the antitrust conspiracy – including those which occurred prior to the debtor's reorganization. *Id.* at 15-16 (citing *Havoco v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1971); *Kleen*, 831 F.3d at 930; *Polyurethane Foam*, 799 F. Supp. 2d at 800).

IP Plaintiffs argue that GEO reaffirmed its participation in the conspiracy immediately after its December 2004 bankruptcy discharge, as evidence by the allegations set forth in the Consolidated Complaint. They argue that since GEO undertook overt acts to reaffirm and reconstitute its participation in and furtherance of the conspiracy post-confirmation, the claims asserted against GEO in the Antitrust Litigation accrued post-confirmation, resulting in GEO's joint and several liability on those claims for all acts connected with the antitrust conspiracy. *Id.* at 16.

Third, IP Plaintiffs argue that GEO's argument concerning Rule 60 should be rejected and that the IP Plaintiffs do not need to seek relief under Rule 60 to proceed in the Antitrust Litigation. *Id.* at 17. IP Plaintiffs argue that they would only need to seek relief under Rule 60 if they intended to seek relief from the Confirmation Order; however, because the antitrust claims were not contemplated under the Plan and are not enjoined by the Confirmation Order, IP Plaintiffs have no need to seek such relief. *Id.*

Fourth, IP Plaintiffs argue that the publication notice by GEO was ineffective as to the Antitrust Class Plaintiffs because GEO has admitted that it knew about the conspiracy it originated, in which it actively participated, and from which it benefitted, GEO either knew or could very easily have ascertained who was injured by its conspiratorial conduct; therefore, the notices did not satisfy due process requirements. IP Plaintiffs assert that the class plaintiffs in the Antitrust Litigation were entitled to actual notice because GEO knew about their claims and notice by publication was wholly inadequate. *Id.* at 18. IP Plaintiffs note that "[i]nadequate notice [] 'precludes discharge of a claim in bankruptcy.'" *Id.* (citing *Wright v. Corning*, 679 F.3d 101, 107 (3d Cir. 2012) (quoting *Chemetron*, 72 F.3d at 346)). IP Plaintiffs assert that adequate notice "turns of what the debtor...knew about the claim or, with reasonable diligence, should have

known." *Id.* at 20 (citing *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150

(2d Cir. 2014) (citing *Chemetron*, 72 F.3d at 345-346)). IP Plaintiffs further assert that due process

does not allow a debtor who has actively concealed facts necessary to the presentation of certain

claims to notify by publication those persons adversely affected by the active concealment. *Id.* at

20 (citing *Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir.

2005); *Motors Liquidation*, 829 F.3d 135).

IP Plaintiffs contend that like the debtor in *Motors Liquidation*, 829 F.3d 135, GEO knew

throughout the pendency of its bankruptcy proceedings of the conspiracy it originated and

perpetuated, and knew about any consequent antitrust claims. *Id.* at 23. IP Plaintiffs further

allege that GEO hid that knowledge from its creditors, including the Plaintiffs, and the Court. *Id.*

GEO was required to provide them actual notice of the bankruptcy proceedings, including the

Plan and Confirmation Order because GEO knew about the class plaintiffs' claims, and knew or

could have easily ascertained the identity of all of the upstream and downstream purchasers of

LAS affected by its conspiracy. *Id.* at 22. IP Plaintiffs also contend that because GEO's highest-

level management knew about the conspiracy, this case is entirely distinguishable from *Penn*

*Central Transp. Co.*, 42 B.R. 657 (E.D. Pa. 1984), *aff'd* 771 F.2d 762 (3d Cir. 1985), a railroad

bankruptcy case decided under the Bankruptcy Act involving trustees appointed to administer the

proceedings and issues going to what the *Penn Central* trustees could have known when

administering the estate. *Id.* at 24. For example, IP Plaintiffs contend that the conspiracy

originated with GEO's Senior Vice President and General Manager, Dennis Grandle. *Id.* at 25.

Further, IP Plaintiffs note that Brian Steppig was personally indicted for the conspiracy and had

received incentive bonuses as well as key employee retention plan (KERP) payments during

GEO's bankruptcy. *Id.* IP Plaintiffs assert that if Mr. Steppig was important enough to pay to

retain within the limited protections available in bankruptcy, GEO cannot insulate itself from

Steppig's knowledge of the conspiracy. *Id.*

GEO's Reply to Plaintiffs' Opposition

On December 5, 2016, GEO filed a Reply Brief in further support of its Motion to

Reopen. Reply Brief, *In re GEO Specialty Chemicals, Inc., et al.*, Case No. 04-19148, ECF No.

1345.

First, GEO argues that the Bankruptcy Court is the appropriate forum for adjudicating the

issues concerning GEO's Plan and Confirmation Order. *Id.* at 2. GEO argues that while Plaintiffs

contend that antitrust law establishes joint and several liability for the acts of co-conspirators, and

the issue of whether their pre-confirmation damage claims were discharged should be decided by

the Antitrust Court, the issue of when Plaintiffs' claims arose based upon GEO's alleged joint and

several liability for the acts of its co-conspirators is purely one of bankruptcy law, most

appropriately decided by the Bankruptcy Court because it goes to the heart of the bankruptcy

process and policies underlying a reorganized debtor's right to a fresh start. *Id.* at 3 (citing *Lear*

*Corp. v. Lacava (In re Lear Corp.)*, No. 12 Civ.2626 (KFB), 2012 U.S. Dist. LEXIS 161374

(S.D.N.Y. Nov. 5, 2012); *LTV Steel Co., Inc. v. Union Carbide Corp. (In re Chateaugay Corp.)*,

193 B.R. 669, 673 (S.D.N.Y. 1996)) (addressing environmental claims).

Second, GEO argues that assuming Plaintiffs' interpretation of antitrust law is correct, it is

not the timing of participation in a conspiracy, but rather the fact of participation, that establishes

joint and several liability. *Id.* at 2 (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-

39 (D.N.J. 2004); *In re Nissan Motor Corp. Antitrust Litig.*, 430 F. Supp. 231, 232 (S.D. Fla.

1977)). GEO notes that Plaintiffs' respective Complaints allege that GEO's participation in a

continuing conspiracy to fix prices began in 1997, eight years prior to the Effective Date of GEO's

Plan. *Id.* at 4. Plaintiffs further contend that under well-established antitrust law, once GEO became a participant in the conspiracy, it became jointly and severally liable for all damages attributable to the acts of its co-conspirators. Thus, GEO argues that Plaintiffs claims for damages based upon GEO's joint and several liability for the actions of its co-conspirators arose prior to the effective date of GEO's Plan, when GEO first participated in the conspiracy, and were discharged by the Court's Confirmation Order and the provision of Section 1141(d) of the Bankruptcy Code. *Id.* GEO further argues that Plaintiffs' allegations in their complaint that GEO participated in a continuing conspiracy during the entire Class Period (1997-2011) undermines their argument that GEO "rejoined" the conspiracy following its emergence from bankruptcy giving rise to a post-confirmation claim for joint and several liability. *Id.* at 4. GEO further argues that the *Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 151, is distinguishable because that case is not a Bankruptcy Code case, but brought under the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701, and did not involve the expansive discharge of claims set forth in Section 1141(d) of the Bankruptcy Code. *Id.* at 5-6. Similarly, GEO contends that *In re Polyurethane Foam Antitrust Litig.* is distinguishable because that case did not involve the impact of a confirmed plan of reorganization on claims to recover pre-confirmation damages, nor did it address the scope of a discharge under Section 1141(d) of the Bankruptcy Code. *Id.* at 6-7. GEO likewise argues that this Court should not follow the *Kleen Products* case. *Id.* at 7-8. Specifically, GEO argues that the *Kleen* Court's decision hinged on a determination that, even though the defendant had engaged in a continuous course of conduct before, during, and after its chapter 11 proceedings, the defendant effectively rejoined its own conspiracy after the defendant's debts had been discharged, thus exposing it to joint and several liability for the entire duration of the conspiracy. *Id.* GEO argues that *Kleen* erred because it found that the debtor rejoined a conspiracy that it had never left. *Id.* at

8. GEO argues that in bankruptcy, where a debtor faces exposure to claims based on its separate liability and its joint and several liability at the time that its reorganization plan is confirmed, all of those claims are fully discharged. *Id.* GEO urges that events occurring post-confirmation may give rise to claims for damages incurred post-confirmation, but cannot be used to unwind the debtor's discharge. *Id.* at 8.

Third, GEO contends that the notice it provided satisfied the due process requirements as to the Antitrust Plaintiffs. *Id.* at 8. GEO asserts a claimant's right to receive actual notice of the bankruptcy bar date turns on whether the claimant is deemed to be "known" or "unknown" at the time of the bankruptcy proceeding. *Id.* at 9. GEO acknowledges that "known" claimants are entitled to receive actual notice of a proof of claim bar date, and that notice by publication is sufficient to satisfy the due process rights of "unknown" claimants. *Id.* (citing *Chemetron*, 72 F. 3d at 341). "A 'known creditor' is one whose identity is either known or reasonably ascertainable by the debtor. An 'unknown creditor' is one whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge of the debtor." *Id.* (citing *Chemetron,* 72 F.3d at 346). GEO notes that the *Chemetron* Court found that a creditor's identity is "reasonably ascertainable" if the creditor can be identified through "reasonably diligent efforts" and "reasonable diligence does not require impractical and extended searches in the name of due diligence . . . The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of those documents are generally not required." *Id.* (citing *Chemetron,* 72 F.3d at 346-47). GEO contends that here the class action plaintiffs were not "reasonably ascertainable" because there is no evidence that GEO's corporate officers and employees responsible for the administration of the company's chapter 11 case had any knowledge of Plaintiffs' potential

claims, nor is there any basis to conclude that such persons would have been able to identify such claims through a review of the company's books and records maintained in the ordinary course of business. *Id.* at 10 (citing *In re Penn Central*, 42 B.R. 657 (E.D. Pa 1984) *aff'd.* 771 F.2d 762 (3d Cir. 1985)). GEO further asserts that its guilty plea does not estop GEO from asserting that Plaintiffs' claims to recover damages prior to the Confirmation of its Plan have been discharged. *Id.* at 14. GEO contends that the record at the Sentencing Hearing indicates that the conspiracy was limited "to a very small number of individuals in one division of the company." *Id.* (citing Hearing Transcript, June 16, 2016 at 24:7-18). GEO also notes that only one individual employee – Brian Steppig – was indicted by the government for violation of the Sherman Act. GEO asserts that the record at the sentencing hearing demonstrates that GEO's participation in and knowledge of the conspiracy at most was limited to a small number of individuals in one division of the company as Judge Linares noted of GEO's three primary divisions, the water treatment chemical division was engaged in the conduct and only a fraction of the employees were involved or had knowledge of the conspiracy. *Id.* (citing Taylor Decl., Exh. B, Tr. June16, 2016 at 24:7-18). GEO further asserts that only one GEO employee, Brian C. Steppig, was indicted by the Government for violation of the Sherman Act. *Id.* (citing Taylor Decl., Exh. J). GEO argues that *Motors Liquidation* is distinguishable because in that case there was clear evidence that knowledge of the product defects involving the ignition switch pervaded old GM, whereas here GEO's knowledge of the conspiracy was limited to "just a fraction of [GEO's] employees." *Id.* at 12-13 (citing Hearing Transcript, 24:17-18). GEO further contends that *Tillman*, 408 F.3d 1300, is likewise distinguishable because the debtor in that case took precautions to prevent creditors from discovery of their claims. *Id.*

Fourth, GEO argues that this Court should reject Plaintiffs' argument that GEO is judicially estopped from asserting a bankruptcy defense to claims arising prior to the Effective Date of its Plan. *Id.* at 14. GEO contends that there is nothing in the Plea Agreement or the comments made by GEO's counsel or its corporate representative at the Sentencing Hearing that support the imposition of judicial estoppel. *Id.* Rather, GEO contends that the Provisions of the Plea Agreement, and any comments made during the Sentencing Hearing, represent nothing more that GEO's awareness of the possibility that it may face financial exposure in the instant civil antitrust cases. *Id.* GEO argues that the cases cited by the Plaintiffs are distinguishable. *Id.* at 15-16 (distinguishing *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F. 3d 314, 324 (3d Cir. 2002); *In re Dunkley*, 221 B.R. 207 (N.D. Ill. 1998); *Chaffee v. Kraft General Foods, Inc.*, 886 F. Supp. 1164 (D.N.J. 1995); *People's Bank v. Duke (In re Duke)*, 172 B.R. 575 (M.D. Tenn. 1994)). For example, GEO argues that unlike *Chaffee*, GEO was not asked to take a position on the proposed sentence. *Id.* at 16. Rather, while GEO acknowledged that it faced financial exposure in the civil cases, it never conceded the scope, amount, or viability of any civil claims. *Id.* Further, there was nothing in the Plea Agreement, or in the statements made during the Sentencing Hearing that constituted a waiver of GEO's rights under the Bankruptcy Code. *Id.* at 16-17.

Lastly, GEO disputes Plaintiffs' remaining arguments with respect to reopening the bankruptcy case. *Id.* at 17. GEO contends that the length of time the case has been closed does not prevent courts from granting relief when the relief sought is justified by the underlying facts. *Id.* (citing *e.g.*, *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009); *Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Courtyard)*, 729 F. 3d 1279 (9th Cir. 2013)). GEO further argues that Plaintiffs' suggestion that GEO's creditors will not benefit from an order enforcing the discharge

is incorrect, and states Plaintiffs are seeking to recover substantial damages that were incurred prior to confirmation of GEO's Plan. *Id.* Thus, Plaintiffs' action, if allowed to proceed, will have serious consequences for GEO's stakeholders including current creditors and former bondholders who exchanged their debt for equity under GEO's Plan in reliance upon the prospect of GEO receiving the "fresh start" envisioned by the Bankruptcy Code. *Id.* GEO states that "allowing Plaintiffs to reverse the end result of a negotiated and court sanctioned process on which parties relied not only upsets the settled expectations of GEO's constituents, but also those of chapter 11 participants in past and future cases, undermining the fundamental public policy behind the bankruptcy discharge." *Id.* at 17-18.

Finally, GEO asserts that reopening the case would not be futile because Plaintiffs' contention that they are only asserting post-confirmation claims is without merit as Plaintiffs' claims seek recovery of pre-confirmation damages arising from GEO's alleged joint and several liability for the acts of its co-conspirators, which claims existed at the time GEO's Plan was confirmed and have been fully discharged.  Reopening the Chapter 11 case will    allow the Bankruptcy Court to provide GEO with the relief which it is entitled under the Plan, Confirmation Order, and Section 524(a)(2) of the Bankruptcy Code. *Id.* at 18.

*February 28, 2017 Hearing*

This Court conducted Oral Argument on the Motion to Reopen on February 28, 2017.

i.    *GEO's Arguments*

GEO identified three main issues to be decided by this Court: (1) whether to reopen the case so that this Court can determine the scope of the 2004 discharge; (2) whether Plaintiffs' claims against GEO for pre-confirmation damages caused by pre-confirmation acts of the antitrust co-conspirators are pre-confirmation claims discharged by GEO's plan; and (3) if Plaintiffs' claims

36

are pre-petition claims, whether GEO's process for notifying creditors of the bankruptcy and the claims bar date comport with the constitutionally required principles relating to due process such that Plaintiffs' claims were, in fact, discharged by the Plan and Confirmation Order.

GEO admitted that its Plan and Disclosure Statement did not deal with any antitrust claims and that they were not addressed in any way during the course of the bankruptcy proceedings. However, GEO stated that such claims were unknown to the senior officers of GEO and those responsible for administering the bankruptcy case and the proofs of claim program. GEO asserted that appropriate notice of bar dates was provided to unknown antitrust claimants through publication notice in the Wall Street Journal and Newark Star Ledger.

GEO argued that the antitrust claims fall within the meaning of "claim" as that term is defined by the Bankruptcy Code. GEO stated that the answer to whether these claims are pre-confirmation claims is found in Plaintiffs' Antitrust Complaints, which allege that GEO participated in a "continuing conspiracy" that began in 1997 and continued until at least 2011. GEO argued that at no point during that time is it alleged in the Complaints nor is there evidence provided that GEO withdrew from that conspiracy. Thus, since the alleged conspiracy began in 1997, which was prior to the Petition Date, and prior to confirmation of the plan in 2004, Plaintiffs' claims are prepetition claims. GEO further noted that the Plaintiffs are seeking to hold GEO jointly and severally liable for acts of the co-conspirators in the antitrust litigation and for all damages from the inception of the conspiracy to its end. GEO contends that it cannot be held jointly and severally liable, however, because GEO's alleged participation in the conspiracy began in 1997, prior to confirmation of the Plan. GEO urged that *Frenville* is the controlling law in this Case because the Plan was confirmed in 2004. GEO further argued that it is not the timing of participation in the conspiracy, but the facts of participation that triggers joint and several liability.

GEO argues that the Complaints allege that GEO first participated in the conspiracy in 1997, thus the trigger for joint and several liability for all damages throughout the course of the conspiracy, such that the claims clearly arose prior to confirmation.

Next, GEO discussed the *Kleen* case. GEO conceded that *Kleen* had similar facts and that the Seventh Circuit was deciding an issue of first impression. In that case involving a class action, the Court granted a motion to certify a class, which included the holders of pre-confirmation damages claims based on the Debtor's joint and several liability for pre-confirmation acts of the Debtor's co-conspirators, based upon its finding that the debtor had rejoined the antitrust conspiracy following its emergence from chapter 11, thereby triggering joint and several liability for pre and post confirmation acts of the co-conspirators. GEO argued, however, that *Kleen* was wrongly decided and that this Court should not follow it. First, GEO stated that the decision was based on a false premise that debtor rejoined the conspiracy following its emergence from bankruptcy. GEO asserted that, as in this case, the debtor in *Kleen* could not have rejoined a conspiracy because it never withdrew from the initial conspiracy which began pre-confirmation. Second, GEO asserts that *Kleen* incorrectly determined that the debtor should not receive a "windfall" at the expense of other defendants who did not file for bankruptcy. GEO argued that this finding amounted to a "policy determination" that was not in the *Kleen* court's purview to make. GEO further argued that this determination cannot be reconciled with the definition of the term "claim" as it is used in the Bankruptcy Code. GEO stated that if Congress wanted to preclude a reorganized debtor from getting the benefit of a discharge for pre-confirmation damages based on joint and several liability, then it could have provided for such an exception to discharge in the Bankruptcy Code. GEO noted that Congress has provided several such exceptions to discharge for corporate Chapter 11 debtors in Section 1141(d)(6) of the Bankruptcy Code. GEO argued that

it is not the role of the Court to legislate, but rather to apply the plain meaning of the terms used in the Bankruptcy Code. Thus, GEO concluded that the antitrust conspiracy claims were pre-confirmation claims in the *Kleen* case and are likewise pre-confirmation claims in this case.

Next, GEO turned to its second substantive point – its notice procedures satisfied constitutionally mandated due process requirements. First, GEO claimed that the burden of persuasion rests with the Plaintiffs on this issue and that Plaintiffs must seek relief pursuant to Fed. R. Civ. P. 60(b). GEO cites to *Penn Central*, which conducted its analysis under Rule 60. GEO argues that based upon *Penn Central* and other Third Circuit case law including *Chemetron*, the question as to whether a creditor's claims are known turns on whether the creditor's claims were reasonably ascertainable through reasonable diligence in the ordinary course of the debtor's business by those responsible for administering the bankruptcy case. GEO argued that here, the people responsible for handling the bankruptcy case had no knowledge of these particular claims. GEO relies on *Penn Central* which dealt with whether the trustees in that case met the noticing requirements. GEO asserted that in *Penn Central*, as in the instant case, there were certain officers and employees of Penn Central who were aware of the potential claims, but that the trustees who were administering the bankruptcy case had no knowledge of the claims leading the District Court and Third Circuit to determine that these claims were unknown claims and due process had been afforded to the claimants. GEO argued that in this case, as in *Penn Central*, the people responsible for administering GEO's proof of claim program had no knowledge of these claims and exercised reasonable diligence in attempting to discover known claimants by a careful review of the debtor's books and records kept in the ordinary course of business. GEO asserts that William Eckman, the Executive Vice President and Chief Financial Officer of GEO who was principally responsible for administering the bankruptcy, followed the *Chemetron* standard when he, along with his

accounting staff worked to ensure every effort was made in preparing accurate bankruptcy
Schedules and the Statement of Financial Affairs from the review of GEO's books and records
maintained in the ordinary course of business, citing Declarations of William P. Eckman,
Executive Vice-President and Chief Financial Officer of GEO filed in the GEO case. (Docket Nos.
21, 244, 255). GEO further noted that at the Sentencing Hearing in GEO's criminal proceeding,
Judge Linares found that the conspiracy was limited to a very small number of employees that
were operating within one division of the company in Little Rock, Arkansas. GEO also argued
that this case is distinguishable from the *GM* case, where the court found that knowledge of the
ignition switch defect claims was pervasive within the company's entire management.
Accordingly, GEO concluded that here Plaintiffs' claims were unknown and that notice by
publication was sufficient to satisfy the requirements of due process.

Lastly, GEO addressed Plaintiffs' argument that judicial estoppel prevented GEO from
receiving the benefit of the discharge as to these claims based on statements made by
representatives of GEO to Judge Linares at the criminal Sentencing Hearing. GEO noted that
judicial estoppel requires that there be an irreconcilable conflict between statements made in a
previous proceeding and the position that is now being taken. GEO argued that there is no
irreconcilable conflict in this case because all that GEO's representative said to Judge Linares at
the sentencing hearing was that GEO had financial stress and that it was necessary for it to marshal
its resources to be able to deal with the civil litigation that had been filed at the time. GEO argues
that there was nothing in the statements made to Judge Linares to indicate that GEO was waiving
any of the rights or benefits that it had received as a result of the bankruptcy discharge. GEO also
noted that to the extent that Plaintiffs' relied upon collateral estoppel, that doctrine has no

application here because the issues involved in the criminal proceeding are not the same issues that arise here in this case.

At the February 28, 2017 hearing GEO acknowledged that with respect to post-confirmation claims for damages if in fact it is ultimately found to be liable and damages were incurred post-confirmation - that is after the Effective Date of the Plan, December 31, 2004 - such claims are not within the bankruptcy discharge.

ii.    *DP Plaintiffs' Arguments*

Counsel for DP Plaintiffs introduced the issue in this case as "Can a debtor that fails to disclose its liabilities use the discharge to claim notice to unknowing creditors adversely affected by that lack of notice?" DP Plaintiffs argue that the answer is "No." DP Plaintiffs assert that GEO, in the course of its bankruptcy, hid from this Court and its pre-confirmation creditors, its participation in an antitrust conspiracy that started in 1997, continued through the bankruptcy case, and that went on for another seven years afterwards. DP Plaintiffs assert that the policy that honest debtors are entitled to a fresh start does not apply in this case.

In their first point, DP Plaintiffs asserted that GEO is seeking an order from this Court declaring all antitrust claims which arose or are attributable to conduct or events occurring prior to the Effective Date of this Plan, have been discharged under Section 1141(d), and also seems to be suggesting that if there are damages on a joint and several liability theory, those claims are discharged even if the basis for such liability is post-confirmation conduct. DP Plaintiffs argued that under antitrust law, a claim arises when the act of the misconduct occurs and so every single time a conspirator engages in misconduct, upon every single act, a new claim is created. Therefore, DP Plaintiffs assert that each antitrust conspiratorial act committed by GEO gave rise to a new claim, and to the extent GEO continued to engage in conspiratorial conduct following

the discharge, if the injury occurred post-effective date, it is not a claim affected by the bankruptcy discharge. DP Plaintiffs also acknowledged that *Frenville* governs the analysis in this case. DP Plaintiffs noted that in *Wright v. Owens Corning*, the Third Circuit determined that if a claim was not a bankruptcy claim under *Frenville*, it is not discharged even under *Grossman*. DP Plaintiffs asserted that while it disagrees with GEO's articulation of antitrust law, the impact of post-confirmation antitrust liability and the consequences of antitrust law, these are issues properly before the District Court and that this Court is only considering the effect of the Discharge. This Court must only decide whether the discharge applies to GEO's prepetition conduct.

Next, DP Plaintiffs turned to the due process issue. First, DP Plaintiffs argued that Fed. Rule Civ. Proc. 60 does not apply here because Plaintiffs are not attempting to undo or alter the Plan; rather, they are arguing that they are not bound by the Plan because due process was not satisfied. DP Plaintiffs assert that it is GEO's burden to establish due process was satisfied in accordance with the *Mullane* case, which requires "notice reasonably calculated under the circumstances to apprise interested parties of the pendency of the action…" 339 U.S. at 314. DP Plaintiffs identify two major issues relating to GEO's failure to disclose all of its liabilities in its Chapter 11 Plan and Disclosure Statement. First, the plaintiffs with antitrust claims did not receive notice of the plan in order to vote on same. Second, there is a feasibility question because if the plan was based upon continuing antitrust misconduct, it would not have been feasible, preventing confirmation of the plan. DP Plaintiffs assert that pursuant to *Chemetron*, the liabilities need not be reflected on books and records for creditors to be known. The DP Plaintiffs urged that if a debtor does not reveal the existence of conduct giving rise to the liability, publication notice can be insufficient as set forth in *Motors Liquidation* and *Tillman*. The DP Plaintiffs ask this Court to take the guilty plea of GEO as establishing knowledge of the

antitrust violations as well as the intent to conspire because these are elements of an antitrust

claim as intent to conspire requires knowledge. Following from the fact that GEO knew or

reasonably could ascertain who their customers were – such customers are known creditors

entitled to actual notice. The DP Plaintiffs further argued that Brian Steppig, a key senior GEO

executive's knowledge should be imputed to the Debtor. The DP Plaintiffs also argued that

finding that the antitrust victims were known creditors is consistent with the Sentencing Hearing

before Judge Linares where counsel for GEO represented to the District Court that GEO would

be facing civil liabilities. DP Plaintiffs further argue that *Penn Central* is distinguishable

because that case dealt with a bankruptcy trustee and not a debtor-in-possession, and that *Penn

Central* may no longer be good law in light of *Chemetron*, *Grossman*, and *Wright*, which

confirmed that the court must take into account more than just the debtor's books and records.

DP Plaintiffs note that while a bankruptcy trustee and debtor-in-possession are generally the

same, there are some important distinctions between the two. For example, when alleging actual

fraud in a fraudulent transfer claim, a trustee's heightened scrutiny requirement is lower than a

debtor-in-possession because a trustee cannot be expected to have the same knowledge as a

debtor-in-possession. DP Plaintiffs further argue that when a debtor engages in active

concealment, notice by publications is insufficient to establish due process. DP Plaintiffs cite to

*United Air Lines*, which held that a discharge did not apply to an unknown victim of an antitrust

conspiracy even though the creditor was fully aware of the bankruptcy case and received actual

notice. *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 155-56

(E.D.N.Y. 2012). The court stated that "the due process rights of an unknown victim of a

debtor's secret unlawful conduct are not protected by the victim's receipt of notice of the

debtor's bankruptcy proceedings." *United Air Lines*, 871 F. Supp. 2d at 156. DP Plaintiffs also

note that in *Motors Liquidation*, the court expressed the premise, that in an asset sale context,

that if a debtor does not reveal claims that it is aware of, bankruptcy law cannot protect it.  DP

Plaintiffs note that these decisions are consistent with Third Circuit law. DP Plaintiffs assert that

*Wright* carved out an exception to *Grossman's* because of *Frenville*; the court recognized the

unfairness of holding that a claim was discharged when under *Frenville* they did not have a

"claim."

Third, DP Plaintiffs addressed the policy argument that GEO raised with respect to the

Bankruptcy Code's fresh start policy.  DP Plaintiffs argue that the constitutional underpinnings

of due process override the fresh start policy in this case because GEO actively concealed a

conspiracy from its creditors.  DP Plaintiffs urge that this case is the most extreme version of the

due process considerations because it is the debtor hiding the liabilities and not allowing creditors

to even have an opportunity to determine they have claims.  DP Plaintiff's cite to *Kleen*, which

identified the problem of allowing a debtor that engaged in misconduct to receive a windfall by

getting a discharge for its liabilities.  Second, DP Plaintiffs assert that there is a "moral hazard"

in permitting a debtor who is engaged in secret antitrust conspiracies to go through bankruptcy

and discharge its liabilities. Third, DP Plaintiffs argue that if this Court were to accept GEO's

position, then GEO's customers only course of action would have been to file protective proofs

of claim once GEO filed for bankruptcy.  DP Plaintiffs suggest that this would cause the

unnecessary filing of thousands of proofs of claim in a given bankruptcy case.

Lastly, DP Plaintiffs argued that judicial estoppel applies because GEO's counsel

represented to Judge Linares at the Sentencing Hearing that it should receive a smaller fine

because it needed to pay civil litigants, while now GEO asserts that half of Plaintiffs' claims are

barred by the bankruptcy discharge.

iii.    *IP Plaintiffs' Arguments*

IP Plaintiffs adopted the arguments made by the DP Plaintiffs and asserted that the IP Plaintiffs as downstream users of the products sold by GEO to the DP Plaintiffs and then repacked and sold in some form to the IP Plaintiffs, were equally harmed. Regarding notice, the IP Plaintiffs urged that GEO knew who they were selling the product to, and could determine who their purchasers were selling to, the end purchasers. The IP Plaintiffs noted that their Complaint plead that the conspiracy utilized by GEO applied not only to purchasers who bought directly but also to "resellers" of the product, citing ¶ 147 of the IP Plaintiffs' Complaint. IP Plaintiffs agreed with the DP Plaintiffs on all points, but also emphasized that GEO is attempting to utilize the discharge injunction to not just discharge pre-confirmation claims but to inoculate itself from future behavior that GEO admits was a criminal activity. IP Plaintiffs highlight the fact that GEO admitted to engaging in a criminal conspiracy before coming to the bankruptcy court and that they continued that conspiracy through the bankruptcy proceedings and post-confirmation. IP Plaintiffs asserted that even if this Court were to accept GEO's position that proper notice was given, the Court should rule that nothing in the Confirmation Order or Discharge curtails the remedies available to both direct purchasers and indirect purchasers for GEO's post-discharge criminal conduct.

*GEO's Response*

In reply, GEO first addressed IP Plaintiffs' argument that GEO is attempting to inoculate itself from post-bankruptcy misconduct. GEO clarified that it is not arguing that it should be relieved from post-confirmation damages; rather, its argument is limited to damages that were suffered as a result of actions that were taken by GEO or by co-conspirators pre-confirmation and subject to discharge. GEO stated that the "baseline" for determining which injuries fall under the discharge is the Effective Date of the confirmed plan. Second, GEO addressed the argument that

Brian Steppig's knowledge should be imputed to GEO for purposes of establishing GEO's criminal liability.  GEO argues that although Brian Steppig was covered by the Debtor's key employee retention program, he is only one employee and as such, his knowledge alone, which knowledge was not disclosed to senior management, is insufficient to cause GEO to lose the benefit of its discharge. Further, GEO asserts that there is no collateral estoppel effect here with respect to GEO's criminal liability because the issue in this case involves different issues.  The issue here is whether GEO should lose the benefit of its discharge with respect to these particular antitrust claims.  GEO urged that these claims would have a significant impact on GEO and potentially other stakeholders who relied upon GEO's Plan and fresh start. Next, GEO disagreed with the argument that subsequent decisions have implicitly overruled *Penn Central*.  For example, GEO noted that in *Grossman* the court did not even cite *Penn Central*, it simply said that for purposes of determining whether there is a discharge, courts must look to the unique facts in each case.

Next, GEO addressed DP Plaintiffs' argument that every new overt anticompetitive act gives rise to a new cause of action.  GEO argues that this principle applies to the running of the statute of limitations, which has nothing to do with the accrual of a claim for purposes of bankruptcy law.  GEO asserts that a claim for joint and several liability arises when the defendant first participates in the conspiracy. GEO also argued that *Polyurethane* does not apply to the issue of the discharge under a confirmed plan because that case dealt with a Section 363 sale.  Lastly, GEO reasserted its point that the people at GEO responsible for administering the proof of claim program went through the process of carefully reviewing GEO's books and records and did not discover the existence of these claims, so such claims are unknown claims and notice by publication satisfied the due process requirement.  GEO further noted that the IP Plaintiffs were not customers of GEO and are suggesting that GEO should have been able to determine, based on

who they sold the product to, who the direct purchasers were selling the product to, knowledge

that persons responsible for the proof of claim program at GEO did not have.

*District Court July 20, 2017 Opinion*

On July 20, 2017, while this decision was pending, the District Court issued an Opinion

and Order on several motions in the Antitrust Litigation. *In re Liquid Aluminum Sulfate Antitrust*

*Litigation*, No. 16-md-2687(JLL), 2017 WL 3131977 (D.N.J. July 20, 2017). Among the motions

considered by the court were Motions to Dismiss the DP Plaintiffs' Complaint and the IP Plaintiffs'

Complaint pursuant to Fed. R. Civ. Proc. 12(b)(6) filed by Defendants GEO and GenChem. Both

GEO and GenChem argued that they cannot be held liable for any damages that accrued prior to

the effective date of their respective bankruptcy discharge orders. *Id.* at *11. The District Court,

citing *Grossman's*, noted the Third Circuit announced a two-part test to determine whether

Plaintiffs' claims were discharged: "1) whether the claim arose prior to the confirmation of the

reorganization plan, and, if so, 2) whether Due Process has been afforded to the claimant such that

it is 'fair' to discharge his or her claim." *Id.* (citing *Grossman's*, 607 F.3d at 127). The District

Court noted that the Defendants (GEO and GenChem) both asserted that civil antitrust claims are

dischargeable in bankruptcy relying on 11 U.S.C. § 1141(d)(1)(A) and *Grossman's. Id.* The

District Court agreed that antitrust claims are potentially dischargeable, but that these specific

antitrust claims against the Defendants are not subject to the discharge orders, and therefore,

Defendants may be liable for antitrust damages that accrued prior to the dates of the discharge

orders. *Id.* First, the court determined that the first prong was satisfied for Plaintiffs' claims to be

barred by the discharge orders because "Plaintiffs' claims accrued prior to the respective 2003 and

2004 discharge orders since the alleged conspiracy must have started by 1997." *Id.* However, the

Court found that GEO and GenChem failed to satisfy the second prong because Plaintiffs' were

"known" creditors to GEO and GenChem at the time of the bankruptcy filings, and therefore notice

by publication was insufficient to satisfy due process. *Id.* at *12 (citing *Chemetron*, 72 F.3d at

345). Specifically, the Court stated:

> The Court disagrees with Movants [GEO and GenChem] that Plaintiffs'
> various complaints make allegations that would require this Court to consider
> Plaintiffs unknown creditors. Indeed, Plaintiffs have pled that any of the victims
> of the alleged conspiracies would be the purchasers of [LAS]. (DPP Compl. ¶ 5).
> Said differently, Defendants knew that Plaintiffs were creditors since Plaintiffs
> make up the [LAS] market Defendants allegedly conspired to monopolize. (Id.).
> Defendants had a duty to make a reasonable and diligent inquiry regarding all
> possible known creditors and not merely rely on their books and records. *See, e.g.,*
> *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793-94 (Bankr. S.D.N.Y. 1995)
> ("Reasonable diligence in fettering out known creditors will, of course, vary in
> different contexts … A debtor is obligated … to undertake more than a cursory
> review of its records and files to ascertain its known creditors. *Known creditors
> are defined as creditors that a debtor* knew of, *or should have known of,* when
> service notice of the bar date." (emphasis added).
>
> As discussed, Defendant Reichl has already pled guilty to his participation in
> the alleged conspiracy. (DPP Compl. ¶¶ 7, 35). Moreover, Defendants Steppig and
> Opalewski have both been indicted for their alleged participation in the alleged
> conspiracy. (*See* Cr. No. 16-65). Indeed, Plaintiffs have sufficiently pled that
> Defendant GEO and GCC Defendants were aware of their alleged conspiracy, took
> overt steps to keep the conspiracy a secret, and failed to provide all Plaintiffs with
> sufficient notice regarding their Bankruptcies consistent with due process. (DPP
> Compl. 4-6; IPP Compl. 24-31; Shreveport Compl. 26-29; Fl. Compl. 14-26). Hence,
> the Court is satisfied that Plaintiffs have all shown, at this juncture, that Defendants
> knew or should have known that Plaintiffs were known creditors. Because Plaintiffs
> fall under the definition of known creditors under the Code, they were entitled to
> actual notice. All Plaintiffs have sufficiently pled that not a single one of them was
> ever apprised of the two Bankruptcy proceedings. Thus, the Court concludes that the
> discharge orders will not bar Plaintiffs' ability to recover damages prior to the
> effective date of said orders from Defendant GEO and GCC Defendants.

*Id.*

The District Court noted that Brian Steppig was indicted for his alleged participation in the

conspiracy and that Plaintiffs "sufficiently pled that Defendant GEO and [GenChem] were aware

of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and failed to provide

all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process." *Id.*

Lastly, the District Court found that even if the Court were to conclude that due process was satisfied, "Defendants' alleged post-discharge conduct subjects them to joint and several liability for the entirety of the alleged conspiracy." *Id.* at \*13 (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39).

The Court here noted:

> Moreover, even if this Court were to conclude that due process was satisfied, which it does not, Defendant GEO and GCC Defendants' alleged post-discharge conduct subjects them to joint and several liability for the entirety of the alleged conspiracy. This is because a party is jointly and severally liable for all the damages caused from the beginning of the conspiracy until its conclusion. *In re K-Dur Antitrust Litig.* 338 F. Supp. 2d 517, 538-39) ("Although Plaintiffs' complaints allege that [defendant] joined the conspiracy ... after it was formed, a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy.")(citing *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934)). A party who withdraws from a conspiracy and later rejoins it remains jointly and severally liable for all of the conspirators' conduct. *See Hyde v. United States*, 225 U.S. 347, 370-72 (1912).
>
> Both Bankruptcy Defendants allegedly continued to be involved in the conspiracy during the Bankruptcy periods and thereafter. For example, in 2006 GCC Defendants allegedly won an account that historically belonged to Defendant GEO. Thereafter, top executives at both companies agreed to let Defendant GEO take one of GCC Defendants' accounts of the same size to "mak[e] the playing field even again." (DPP Compl. ¶ 111). Another example took place in 2009 when GCC Defendants submitted a low bid for an account held by a distributor that Defendant GEO supplied, but said bid was withdrawn when Defendant Steppig complained to Defendant Gupta. (DPP Compl. ¶ 110). The various Defendants also continued to have private meetings and conference calls far after the Bankruptcies were over. (DPP Compl. ¶¶ 76-80). Accordingly, even if the Bankruptcies precluded recovery of damages for pre-discharge conduct, the Bankruptcy Defendants' post-discharge conduct renders them jointly and severally liable for the entire conspiracy. This is because the Defendants continued to allegedly participate in the conspiracy. By doing so Defendant GEO and GCC Defendants subjected themselves to potential liability for the entire length of the conspiracy and for any and all damages supposedly caused by their co-conspirators. Thus, Defendant GEO and GCC Defendants' Motions to Partially Dismiss based on their Bankruptcies (ECF Nos. 244, 251) are hereby denied.

*Id.*

Following the issuance of the July 20, 2017 Opinion, this Court directed the parties to submit a response with respect to how the Opinion affects GEO's pending Motion to Reopen before this Court.

*IP Plaintiffs' Letter*

On August 1, 2017, IP Plaintiffs filed a Letter in response to the District Court's July 20, 2017 Opinion. ECF No. 1365. IP Plaintiffs take the position that Judge Linares's finding that Plaintiffs' claims are not subject to the discharge order obviates GEO's Motion to Reopen and that this Court should deny the motion. *Id.* at 1 (citing *In re Janocha*, 2015 WL 128152 at *2; *In re Frazer/Exton Dev.*, 503 B.R. at 635). IP Plaintiffs' state that reopening the case would be futile since the Court can no longer afford GEO the relief it seeks. *Id.* IP Plaintiffs argue that collateral estoppel applies to Judge Linares's decision with respect to the due process issue, whether the IP Plaintiffs sufficiently allege that they were "known" creditors entitled to but denied "actual notice" of the relevant bankruptcy orders, such that GEO's Plan confirmation and discharge cannot affect the IP Plaintiffs' claims in the Antitrust Litigation, and joint and several antitrust liability issues, whether irrespective of the bankruptcy proceedings, the reorganized GEO's alleged post-confirmation reaffirmation of and participation in the conspiracy renders it jointly and severally liable for its conspirator's pre-confirmation conduct. *Id.* at 2 (citing *Eason v. Linden Avionics, Inc.*, 706 F. Supp. 311, 318 (D.N.J. 1989); *Viking Commc'ns Inc. v. AT&T Corp.*, 2005 WL 2621919, at *4 (D.N.J. Oct. 14, 2005)). IP Plaintiffs' further argue that the unique posture of this Motion – where D.N.J. Local Rule 40.1 (c) requires assignment of any appeal in this case to Judge Linares – in effect renders the Order *stare decisis.* *Id.* at 3 (citing *In re Mays*, 256 B.R. 555, 559 (Bankr. D.N.J. 2000)). The IP Plaintiffs urge that absent reconsideration, Judge Linares has already ruled

on these issues and the District Court's ruling that the bankruptcy orders do not discharge the IP Plaintiffs' claims precludes a different determination by this Court on GEO's motion.

*GEO's Letter*

On August 2, 2017, GEO filed its Letter in response to the Opinion. ECF No. 1366. GEO takes the position that this Court should proceed to issue its opinion and order deciding the issues before it notwithstanding the District Court's July 20, 2017 Opinion.

First, GEO argues that the District Court' Opinion has no effect on the issues pending before this Court. GEO argues that the District Court's order denying GEO's motion to dismiss claims asserted in the Antitrust case has no preclusive effect on this Court as an order denying a motion to dismiss is an interlocutory order. *Id.* at 2 (citing *Anderson v. Comm'r*, 698 F.3d 160, 166 (3d Cir. 2012); *Deeters v. Phelan Hallinan & Schmieg, LLP,* 2013 U.S. Dist. LEXIS 173845, *2-3 (W.D. Pa. 2013) (citing *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989))). GEO also argues that the law of the case doctrine does not apply. *Id.* (citing *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017). GEO states that assumptions made, inferences drawn, and factual allegations accepted as true at the motion to dismiss stage are not binding and are routinely revisited after the presentation of evidence. *Id.* (citing *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013)). GEO notes that the District Court did not make factual findings because it had to accept as true the allegations in the Complaints. GEO states that even if the District Court did make findings, this Court would still not be bound by the Order. *Id.* GEO states that in *In re Marcus Hook Development Park, Inc.*, the Third Circuit noted that questions regarding notice of various orders required factual findings that the bankruptcy court should make in that case. *Id.* (citing 943 F.2d 261, 268 n.9 (3d Cir. 1991)).

Second, GEO argues that the District Court's Opinion did not address the issue of whether Plaintiffs are required to seek relief from the Confirmation Order under Rule 60(b). *Id.* at 3. GEO asserts that this issue was not raised before the District Court because only those affirmative defenses established from the face of the pleadings themselves may be raised on a motion to dismiss. *Id.* (citing *Rycoline Prods. V. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). GEO states that this Court's ruling on this issue is important because it goes to which party has the burden of persuasion and because the standard of review under Rule 60(b) is "abuse of discretion" as opposed to the clearly erroneous standard for findings of fact and the *de novo* standard for conclusions of law applicable to standard appeals. *Id.* (citing *S. Annville Twp. V. Kovarik*, 651 Fed. Appx. 127, 131 (3d Cir. 2016)).

Next, GEO takes the position that this Court should independently decide the issue of notice because the District Court did not make any factual findings on this issue. GEO states that because the District Court was addressing the issue on a motion to dismiss, there was no opportunity for GEO to develop the record or a need for the District Court to consider evidence of the type presented to this Court at the February 28, 2017 Hearing. For example, the District Court could not consider evidence by way of GEO presenting documents showing the efforts of those who administered its bankruptcy cases to identify all known claims, including a review and analysis of GEO's books and records; rather, the District Court was bound to accept as true the factual allegations contained in the Antitrust Complaints. GEO asserts that this Court should make factual findings regarding Plaintiffs' status as "known" or "unknown" creditors based upon what GEO considers is a "fully developed record."

GEO states that should either side file an appeal of this Court's decision on GEO's Motion to Enforce, "factual findings of this Court will form the basis of further proceedings in connection

with such an appeal." GEO contends that a District Court reviewing said findings on appeal would do so under a "clearly erroneous" standard, which is "significantly deferential to the findings of the bankruptcy court. *Id.* at 4 (citing *Concrete Pipe and Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 603 (1993); *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985); *First Western SBLC, Inc. v. Mac-Tav, Inc.*, 231 B.R. 878, 881 (D.N.J. 1999)). Likewise, it is argued the Third Circuit would also apply a "clearly erroneous" standard when reviewing the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *Id.* (citing *Marcus Hook*, 943 F.3d at 263). Thus, GEO contends that it is the factual findings of this Court that will bind the District Court and the Third Circuit absent a determination that such findings are clearly erroneous. GEO argues that the District Court's Order on the Motion to Dismiss does not change the standard of review. *Id.*

Lastly, GEO argues that the District Court's statement that GEO may be liable for previously discharged claims on the basis of joint and several liability is not binding upon this Court because it was dictum. *Id.* at 5 (citing *Friedman's Liquidating Trust v. Roth Staffing Cos. LP (In re Friedman's Inc.)*, 738 F.3d 547, 552 (3d Cir. 2013)). GEO argues that since the District Court denied the Motion to Dismiss, deciding that the respective complaints pled facts sufficient to show, for purposes of ruling on the Motion to Dismiss, that Plaintiffs were known creditors and thus entitled to actual notice of the bar date - the District Court's additional statements regarding joint and several liability were not necessary to dispose of GEO's Motion to Dismiss. GEO asserts that a court is not bound by its own prior dicta. *Id.* (citing *In re Friedman's Inc.*, 738 F.3d 547, 552 (3d Cir. 2013)). In addition, GEO argues that the doctrine of *stare decisis* does not apply to a decision issued by a single-judge court in a multi-judge district because there is no "law of the district." *Id.* (citing *In re Circle 10 Restaurant, LLC*, 519 B.R. 95, 137 (Bankr. D.N.J. 2014)

(Gambardella, J.); *In re Brown*, 244 B.R. 62, 64 (Bankr. D.N.J. 2000); *In re Raphael*, 238 B.R. 69, 77 (D.N.J. 1999)). GEO asserts that the District Court and the Third Circuit would benefit from this Court's analysis of the important bankruptcy issues raised in this case. GEO notes that there was no suggestion by the District Court that this Court should cease its deliberation or that its rulings are not a necessary part of future proceedings and that the District Court in fact recognized in its Order Denying Withdrawal of the Reference that the issues raised by GEO's Motion to Enforce are "best left for this Court's determination." *Id.*

*DP Plaintiffs' Letter*

On August 3, 2017, DP Plaintiffs filed a Letter in response to the District Court's Opinion. ECF No. 1367. DP Plaintiffs take the position that this Court should either give the Opinion preclusive effect, or at least find its holding persuasive and deny the Enforcement Motion. DP Plaintiffs note that even though GEO filed the enforcement motion in this case, GEO separately raised a similar argument concerning the effect of the plan and confirmation order in a motion to dismiss the complaint in the Antitrust Action. DP Plaintiffs assert that in denying the motion to dismiss, Judge Linares rejected the virtually identical argument that GEO raised in this case – that the order confirming GEO's plan of reorganization and the plan discharged any claims for antitrust violations arising prior to the Effective Date of the Plan. DP Plaintiffs note that Judge Linares found that the Plan and Confirmation Order did not, and could not discharge such claims because the DP Plaintiffs did not receive constitutionally adequate notice as actual creditors. DP Plaintiffs argue that this holding that GEO cannot rely on its asserted bankruptcy discharge has a preclusive effect or provides persuasive support for the argument made by the DP Plaintiffs on the instant Motion to Reopen. DP Plaintiffs note that the only possible element of collateral estoppel in question is "finality." DP Plaintiffs assert that a final judgment is not necessary for purposes of

collateral estoppel. *Id.* *(*citing *Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201, 210 (3d Cir. 2001)). Further, a denial of a motion to dismiss is sufficiently "final" for purposes of issue preclusion. *Id.* at 2-3 (citing *Gilldorn Sav. Ass'n. v. Commerce Sav. Ass'n.*, 804 F.2d 390 (7th Cir. 1986), cited with approval in *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991); *Mc Lendon Cont'l Grp. Inc.*, 660 F. Supp. 1553, 1562 (D.N.J. 1987)). DP Plaintiffs argue "[g]iven that GEO raised the same bankruptcy discharge arguments before Judge Linares at the same time as it did through the Enforcement Motion, it cannot now be heard to complain that this issue is not 'final' for collateral estoppel purposes simply because Judge Linares ruled against it." *Id.* at 3. DP Plaintiffs argue that GEO should not get "two bites at the apple by making the same motion before two judges." *Id.* DP Plaintiffs finally assert that assuming *arguendo* that the District Court Opinion is not binding under collateral estoppel principles, the District Court Opinion provides persuasive authority for this Court to deny the Motion to Enforce, that Judge Linares' decision is on-point decided precedent, and the judge to whom any appeal of this order would be appealed, absent certification by this Court or the District Court of the appeal of this Court's Order to the Third Circuit Court of Appeals. DP Plaintiffs urge that it is undisputed that GEO engaged in misconduct before and during the Chapter 11, GEO pled guilty to such conduct, GEO did not disclose to the bankruptcy court or its creditors the existence of the antitrust conspiracy, and GEO did not provide any of its victims notice that they could have asserted rights during the Chapter 11 case. The DP Plaintiffs urge that Judge Linares considered the same arguments and concluded GEO's bankruptcy discharge argument lacked merit.

### *GEO's Letter of August 7, 2017*

On August 7, 2017 GEO filed a Letter, ECF No. 1368, requesting an opportunity to respond to DP Plaintiffs' Letter:

[T]o address the mischaracterizations and misstatements in the DPPs letter, including, among other things, (i) their incorrect assertion that the issues before this Court, as reflected in the record created in this proceeding, were actually litigated in the District Court, (ii) the irrelevance of the cases they have cited on the question of finality of the District Court's order, (iii) their unwarranted "presumption" that the District Court's decision represents precedent that should be followed by this Court, and (iv) their erroneous contention that none of the conditions specified in 28 U.S.C. §158(d) would warrant a direct appeal to the United States Court of Appeals for the Third Circuit from this Court's order on GEO's Motion to Enforce.

*Id.* at 1.

*GEO's Responsive Letter*

On August 14, 2017, GEO filed a Responsive Letter. ECF No. 1370. First, GEO argues that that the due process issue was not "actually litigated" before the District Court because the District Court had no opportunity to review evidence describing GEO's claims noticing procedures. *Id.* at 1. Rather, the District Court was required to accept Plaintiffs' allegations in the DP Plaintiffs' complaint as true under a motion to dismiss standard, and the District Court merely held that "at this juncture," Plaintiffs have "sufficiently plead" that "Defendants knew or should have known that Plaintiffs were known creditors." *Id.* at 2 (citing Order Denying Motion to Dismiss at p. 28.) Second, GEO argues that the District Court's Order denying the Motion to Dismiss was not a "final order' for collateral estoppel purposes. GEO argues that the cases cited by Plaintiffs are inapposite and have no application to the facts of this case. *Id.* at 2-3. GEO asserts that the common thread in all of the cases is that an order is not final for purposes of issue preclusion unless disputed facts related to such issues have been fully adjudicated. *Id.* at 2-3 (citing *Henglein v. Colt Industries Operating Corp.,* 260 F.3d 201, 210 (3d Cir. 2001); *In re Brown,* 951 F.2d 564 (3d Cir. 1991); *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n,* 804 F.2d 390 (7th Cir. 1986); *Mc Lendon v. Cont'l Group, Inc.,* 660 F. Supp. 1553 (D.N.J. 1987)). Third, GEO argues that the District Court's Opinion is neither controlling nor persuasive authority for the resolution

of the issues before this Court. *Id.* GEO argues that there is no "law of the district" in the Third

Circuit, and thus, opinions of the District Court are not binding upon the Bankruptcy Court. *Id.*

(citing *In re Mays*, 256 B.R. at 559). GEO further argues that the District Court's Opinion is not

persuasive because in addition to the lack of any findings of fact with respect to the issue of due

process, the District Court did not address the primary question underpinning the Plaintiffs' joint

and several liability claim: "when did the claim arise?" GEO contends that as briefed and argued

before this Court on the Motion to Enforce, if as GEO maintains, the claim arose prior to

confirmation of its plan of reorganization, then damages attributable to pre-confirmation conduct

of the co-conspirators were subject to the discharge order. *Id.* at 3. Lastly, GEO disputes DP

Plaintiffs' contention that an Order by this Court would not be appealable directly to the Third

Circuit pursuant to 28 U.S.C. § 158(d). GEO asserts that "the issue of whether a corporate debtor,

on the facts of this case, can be deprived of the benefit of its chapter 11 discharge is a matter of

great public consequence, implicating important principles underlying the scope and purpose of

the Bankruptcy Code." *Id.* GEO further notes that there is no controlling Supreme Court or Third

Circuit precedent addressing the question of when an antitrust claim for joint and several liability

arising from an alleged conspiracy first accrues. *Id.* Accordingly, GEO urges this Court to issue

its decision on the merits based upon the record in this proceeding. *Id.*

## LEGAL STANDARDS

### <u>Motion to Reopen Standard</u>

Section 350(b) of the Bankruptcy Code provides that "[a] case may be reopened in the

court in which such case was closed to administer assets, to accord relief to the debtor, or for other

cause." 11 U.S.C. § 350(b); *see also* Fed. R. Bankr.P. 5010. The moving party has the burden to

demonstrate sufficient cause to reopen a bankruptcy case. *In re Winburn*, 196 B.R. 894, 897

(Bankr. N.D. Fla. 1996). The right to reopen a bankruptcy case depends upon the circumstances of the individual case and the decision whether to reopen is committed to the bankruptcy court's discretion. *In re Mattera*, 203 B.R. 565, 568 (Bankr. D.N.J. 1997).  When deciding whether to reopen an estate, "the length of time between the estate's closing and the motion to reopen it should be 'of crucial significance' to the bankruptcy court." *Stackhouse v. Plumlee (In re Plumlee)*, 236 B.R. 606, 610 (E.D. Va. 1999) (citation omitted). "'As the time between closing of the estate and its reopening increases, so must also the cause for reopening increase in weight.'" *Id.* at 610-11 (citation omitted).  The Court of Appeals for the Third Circuit has noted that "bankruptcy courts have broad discretion to reopen cases after an estate has been administered." *In re Zinchiak*, 406 F.3d 214 (3d Cir. 2005).

Here, cause would exist to reopen this Bankruptcy Case if it is determined that Plaintiffs' prosecution of their causes of action could violate the Plan's discharge injunction.  Otherwise, reopening the case is futile and the motion must be denied. *See In re Janocha*, No. 06-20191 (JAD), 2015 WL 128152, at *2 ("A case should not be reopened where it would be futile or a waste of judicial resources."); *In re Frazer/Exton Dev.*, 503 B.R. at 635 ("If a moving party cannot obtain the substantive relief which it intends to seek, then there is no reason to grant a motion to reopen.").

### *Collateral Estoppel*

According to the United States Supreme Court, collateral estoppel, like the related doctrine of res judicata, "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

The Supreme Court has also held that pursuant to the full faith and credit statute, 28 U.S.C.

§ 1738, whenever federal courts examine questions of claim or issue preclusion, they must apply

the governing law in the appropriate forum state, based on "concerns of comity and federalism."

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d

274 (1985) (citations omitted).[8]

In New Jersey, the doctrine of collateral estoppel is considered to be "that branch of the

broader law of res judicata which bars relitigation of any issue which was actually determined in

a prior action, generally between the same parties, involving a different claim or cause of action."

*Sacharow v. Sacharow*, 177 N.J. 62, 75-76 (2003) (citations omitted); *Tarus v. Borough of Pine

Hill*, 189 N.J. 497, 520 (2007). The New Jersey Supreme Court has stated that

> [t]he doctrines of collateral estoppel, issue preclusion, res judicata, and the
> like serve the important policy goals of finality and repose; prevention of
> needless litigation; avoidance of duplication; reduction of unnecessary
> burdens of time and expenses; elimination of conflicts, confusion and
> uncertainty; and basic fairness....If an issue between the parties was fairly
> litigated and determined, it should not be relitigated.

*First Union Nat'l Bank v. Penn Salem Marina, Inc.*, 190 N.J. 342, 352 (N.J. 2007) (citations

omitted).

The Third Circuit Court of Appeals has further explained that "[a] party asserting collateral

estoppel must show that

> (1) the issue to be precluded is identical to the issue decided in the prior
> proceeding; (2) the issue was actually litigated in the prior proceeding; (3)
> the court in the prior proceeding issued a final judgment on the merits; (4)
> the determination of the issue was essential to the prior judgment; and (5)
> the party against whom the doctrine is asserted was a party to or in privity
> with a party to the earlier proceeding."

---

[8] The statute states, in relevant part, that "The ... judicial proceedings of any court of any [State, Territory, or
Possession of the United States] shall have the same full faith and credit in every court within the United States and
its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from
which they are taken." 28 U.S.C. § 1738 (West 2011).

*Mullarkey v. Tamboer (In re Mullarkey)*, 536 F.3d 215, 225 (3d Cir. 2008) (citation omitted);

*Sacharow*, 177 N.J. at 76 (citing *In re Estate of Dawson*, 136 N.J. 1, 20-21 (1994)); *Twp. of*

*Middletown v. Simon*, 193 N.J. 228, 236 (2008)).

"The application of the collateral estoppel doctrine is not automatic, and should not be

applied if there are sufficient countervailing interests." *Mullarkey*, 536 F.3d at 225. "Importantly,

this doctrine precludes relitigation only of questions 'distinctly put in issue' and 'directly

determined' adversely to the party against which the estoppel is asserted." *Id.* (citations omitted).

"Moreover…if the judgment is based on one or more of several grounds, but does not expressly

rely on any of them, none is conclusively established, since a subsequent court cannot tell what

issue or issues were in fact fully adjudicated." *Id.*

For example, the principles of collateral estoppel apply in discharge proceedings in

bankruptcy court. *In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997); *see Grogan v. Garner*, 498

U.S. 279, 284-85 n.11 (1991). However, collateral estoppel and other preclusion doctrines do not

relieve a bankruptcy court from its exclusive jurisdiction over nondischargeability claims, and a

bankruptcy court is "not confined to a review of the judgment and record in the prior state-court

proceedings." *Brown v. Felsen*, 442 U.S. 127, 138, S.Ct. 2205, 60 L.Ed.2d 767 (1979); *In re*

*Hawkins, supra*, 231 B.R. at 230 ("the Bankruptcy Code contains an exception to the full faith and

credit statute in the context of the dischargeability of debts"); *see also Roesing v. Moccio (Matter*

*of Moccio)* (Stark, J.), 41 B.R. 268, 271 (Bankr. D.N.J. 1984) ("the Supreme Court held in *Brown*

[that] a pre-petition determination of liability does not have res judicata effect in a

nondischargeability action, because this would undercut a statutory policy of resolving

[dischargeability] questions in bankruptcy court, and would force state courts to decide these

questions at a stage when they are not directly in issue and neither party has a full incentive to

litigate them"). Notably, the Third Circuit has held that a default judgment may be sufficient to collaterally estop a defendant's claim that a debt is dischargeable. *See Docteroff*, 133 F.3d at 212-13 (finding that collateral estoppel prevented the defendant from claiming that the debt underlying a default judgement was dischargeable where the default judgment was a sanction for his repeated and bad-faith non-compliance with discovery requests).

**Effect of Confirmation of a Plan**

Section 1141 of the Bankruptcy Code describes the effect of confirmation of a plan in a chapter 11 case. Pursuant to § 1141(a):

> (a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141(a).

A bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect. *In re G–I Holdings, Inc.*, 514 B.R. 720, 747–48 (Bankr. D.N.J. 2014), *subsequently aff'd sub nom. In re G–I Holdings Inc.*, 654 F. App'x 571 (3d Cir. 2016) (citing *Stoll v. Gottlieb,* 305 U.S. 165, 170–71, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 138–39, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009) (holding that once an order becomes final, it is *res judicata* as to parties and those in privity with them)).

Further, section 1141 (d)(1)(A) provides

Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

(B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

11 U.S.C.A. § 1141(d)(1)

Accordingly, the confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation...." *In re Grossman's Inc.*, 607 F.3d 114, 122 (3d Cir. 2010). "Principal among the effects of the determination when a claim arises is the effect on the dischargeability of a claim." *Id.*

**The Definition of Claim Under the Bankruptcy Code**

The term "claim" is defined in the Bankruptcy Code at § 101(5):

(5) The term "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

For many years in the Third Circuit, the test for determining when a "claim" arose was governed by the test set forth in *Avellino & Bienes v. M. Frenville (Matter of M. Frenville Co.)*,

744 F.2d 332 (3d Cir.1984) ("*Frenville*"). In *Frenville*, the court held that a claim does not arise

until a right to payment accrues under applicable state law. *Id.* at 336. Thus, under the *Frenville*

accrual test, "the existence of a valid claim depend[ed] on: (1) whether the claimant possessed a

right to payment; and (2) when that right arose" under non-bankruptcy law. *Kilbarr Corp. v.*

*Gen. Servs. Admin., Office Supply & Servs. (In re Remington Rand Corp.)*, 836 F.2d 825, 830

(3d Cir. 1988) (citing *Frenville*, 744 F.2d at 336).

In 2010, the Third Circuit abandoned the *Frenville* test finding that it imposed "too narrow

an interpretation of a 'claim' under the Bankruptcy Code," and held that "a 'claim' arises when an

individual is exposed pre-petition to a product or other conduct giving rise to an injury, which

underlies a 'right to payment' under the Bankruptcy Code". *Grossman's,* 607 F.3d at 125. In that

case, Mary Van Brunt, who was remodeling her home, purchased certain products allegedly

containing asbestos from Grossman's Inc., a home improvement and lumber retailer. *Id.* at 117.

Thereafter, Grossman's filed a chapter 11 petition. It was undisputed that as of the petition date,

Grossman's was aware of the health risks associated with asbestos products and that certain

manufacturers had been sued by asbestos personal injury claimants. In connection with its

bankruptcy, Grossman's proceeded to provide notice by publication of the deadline for filing of

proofs of claim. Van Brunt did not file a proof of claim because at the time she had no symptoms

related to her asbestos exposure. *Id.* Almost ten years later, after being diagnosed with

mesothelioma, Van Brunt filed a tort action in New York against JELD-WEN, the successor-in-

interest to Grossman'. *Id.* After Van Brunt filed suit, JELD-WEN moved to reopen the Chapter

11 case, seeking a determination that their claims were discharged by Grossman's Plan of

Reorganization. *Id.* at 118. Relying upon *Frenville's* accrual test, the bankruptcy court held that

the Plan of Reorganization did not discharge Van Brunt's claims because the asbestos-related

claims arose after the Effective Date of the plan, looking to applicable New York law which

provided that a cause of action for asbestos-related injury does not accrue until the injury manifests.

*Id.* The District Court affirmed, except with respect to the breach of warranty claim, which the

court found accrued under New York law pre-petition and was thus discharged under the

bankruptcy plan. *Id.*

However, the Third Circuit reversed on appeal. Recognizing the significant authority

contrary to *Frenville* existing in other circuits, the Court acknowledge that "[t]he accrual test in

*Frenville* does not account for the fact that a 'claim' can exist under the Code before a right to

payment exists under state law." *Id.* at 121. Accordingly, the court expresses overruled the

*Frenville* accrual test, and replaced it with the following:

> We agree and hold that a "claim" arises when an individual is exposed pre-petition
> to a product or other conduct giving rise to an injury, which underlies a "right to
> payment" under the Bankruptcy Code. See 11 U.S.C. § 101(5). Applied to the Van
> Brunts, it means that their claims arose sometime in 1977, the date Mary Van Brunt
> alleged that Grossman's product exposed her to asbestos.

*Id.* at 125.

Importantly, although this holding clearly expanded the scope of what constitutes a

"claim" under the Code, the court also made clear that a debtor who fails to satisfy due process

by providing inadequate notice to potential creditors cannot received the benefit of the discharge.

*See id.* at 125-26. The court explained:

> Any application of the test to be applied cannot be divorced from fundamental
> principles of due process. Notice is "[a]n elementary and fundamental requirement
> of due process in any proceeding which is to be accorded finality...." *Mullane,* 339
> U.S. at 314, 70 S.Ct. 652. Without notice of a bankruptcy claim, the claimant will
> not have a meaningful opportunity to protect his or her claim. See 11 U.S.C. §
> 342(a) ("There shall be given such notice as is appropriate ... of an order for relief
> ... under [the Bankruptcy Code]."). Inadequate notice therefore "precludes
> discharge of a claim in bankruptcy." *Chemetron,* 72 F.3d at 346.

...

Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court.

*Id.* at 125-27 (3d Cir. 2010) (footnote omitted).

Ultimately, the court declined to decide the due process issue and thus remanded the matter to the district court for further proceedings. *Id.* at 128.

More recently, the Third Circuit revisited the *Grossman's* exposure test in *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012). In that case, the plaintiffs filed a punitive class action seeking damages related to defects in roofing shingles manufactured by Owens Corning, the debtor. *Id.* at 102. On a motion for summary judgment, debtor argued that plaintiff's claims had been discharged under the confirmed plan of Owens Corning and its subsidiaries. The debtors filed Chapter 11 bankruptcy petitions in October 2000, and confirmed a plan which became effective on September 26, 2006. *Id.* at 103. In granting the motion in favor of the debtors, the district court held that, based upon *Grossman's*, the plaintiffs held "claims" under the Bankruptcy Code, and that notice by publication of the debtors' chapter 11 bankruptcy cases afforded them due process. *Id.* Debtors had provided notices of the bankruptcy filing and applicable bar dates in The New York Times, The Wall Street Journal, USA Today, among other publications. Before the District Court, Plaintiffs argued that *Grossman's* was limited to asbestos-related cases, and did not apply retroactively and that they were not afforded due process because the notices of the bankruptcy proceedings were insufficient.

On appeal to the Third Circuit, the plaintiffs advanced two arguments. First, plaintiffs argued that the district court had applied *Grossman's* "too rigidly, creating the unworkable result that persons who did not anticipate future tort actions at the time of a bankruptcy proceeding nonetheless possess claims under the Bankruptcy Code that are discharged," and second, that

"the District Court's due process analysis fell short because it based its ruling on precedent holding that unknown claimants are entitled to notification by publication." *Id.* at 104.

Turning to the issue of whether plaintiffs' held dischargeable claims, the Third Circuit noted that the treatment of unknown future claims involves two important and competing concerns. *Id.* at 105. Importantly, these are the same concerns raised by the parties in connection with this Motion to Reopen: (1) the goal of providing a debtor with a fresh start by resolving all claims arising from the debtor's pre-petition conduct prior to its emergence from bankruptcy; and (2) the rights of individuals who may be damaged by that conduct but are unaware of the potential harm at the time of a debtor's bankruptcy. *Id.* The court noted that the test advanced in *Grossman's* "requires that a claimant be exposed to the debtor's product or conduct pre-petition" as well as "requires individuals to recognize that, by being exposed to a debtor's product or conduct, they might hold claims even if no damage is then evident." *Id.* at 106. Thus, in applying *Grossman's* to the facts before it, the court found that the Wright plaintiff held a claim because her exposure to debtors' products predated the debtors' bankruptcy. *Id.*

But that was not the end of the court's analysis. Next, the court turned to the question of satisfying the due process requirement. The court noted that while notice by publication in national newspapers supplemented by notice in local papers is generally sufficient to satisfy the requirements of due process for unknown creditors, "whether adequate notice has been provided [ultimately] depends on the circumstances of a particular case." *Id.* at 108 (citing *Grossman's*, 607 F.3d at 127). Noting that at the time the plaintiffs received their notices *Frenville* was the law in the Third Circuit, the court recognized that plaintiffs did not hold "claims" under the Bankruptcy Code; it was only after *Grossman's* created a broader definition did plaintiffs hold "claims" that could arguably fall within the scope of the discharge. *Id.* at 104, 108. By that time, however, the

bar date had passed, the Confirmation Order was entered and the Confirmation Date had occurred,

which affected the plaintiffs' rights to have their new found claims status heard. *Id.* at 108. The

court found that "[d]ue process affords a re-in these special situations to be sure all claimants have

equal rights." *Id.* Accordingly, the court disagreed with the district court's decision that notice by

publication notice satisfied plaintiffs' due process rights.[9] The court held:

> Because at the time of the Confirmation Date Frenville controlled the status of their
> "claims," the Plaintiffs were not afforded due process. Accordingly their claims
> were not discharged by the Plan and Confirmation Order, and they retained their
> cause of action against Owens Corning. In this context, the District Court correctly
> determined that the Plaintiffs held "claims" under the Bankruptcy Code. But it
> should not have held that those claims were discharged, and thereby granted
> summary judgment to Owens Corning, in the circumstances before us. We thus
> affirm in part and reverse in part the District Court's judgment, and remand the case
> to that Court for further proceedings. The shadow of Frenville fades, but more
> slowly than we would like.

*Id.* at 109.

Since *Owen's Corning* was decided, courts have had occasion to apply it to the "special

situations" involving pre-*Grossman's* bankruptcy plans and groups of claimants who held claims

under *Grossman's* but not *Frenville*.    The Third Circuit in *In re W.R. Grace & Co.* touched upon

the issue in the context of an appeal of the bankruptcy court's decision to confirm the debtors' plan

or reorganization of a manufacturer of asbestos-related products and its affiliates, which among

things, created § 524(g) channeling injunctions and trusts for certain asbestos claimants as well as

claimants with contribution and indemnification claims, 729 F.3d 311 (3d Cir. 2013). The holders

of contribution and indemnification claims challenged the plan, in part, on the basis that their

efforts to obtain such indemnification and contribution could not be channeled to a trust, and as

the plan was proposed and confirmed during the *Frenville* era, some potential claimants might

---

[9] In finding that due process was satisfied, the district court expressly relied upon the standards set forth in
*Chemetron. See Wright v. Owens Corning*, 450 B.R. 541, 556.

have received notice of the bankruptcy but failed to file a claim, claimants were being deprived of

due process. *Id.* (citing *Owens Corning).*  However, the court found that *Owens Corning* was

"inapposite" because the bankruptcy plan in that case did not involve a 11 U.S.C. § 524(g) trust

and channeling injunction. *Id.* at 320, 323. The court also clarified, in a footnote, that *Grossman's*

defines when a "claim arises", but that for certain cases, *Frenville* defines when certain claims can

be discharged for due process reasons discussed in *Owens Corning. Id.* at 324 n. 20.

The Bankruptcy Court for the District of Delaware, by the Honorable Kevin J. Carey,

succinctly described the rule emanating from *Owens Corning* as follows:

> To assuage due process concerns, the *Wright* Court also decided that the *Frenville* test should continue to apply to two groups of claimants:
>
> (1) persons who hold claims based upon exposure to a debtor's conduct or product *pre-petition*, if the reorganization plan was proposed and confirmed prior to the date *Grossman's* was decided (June 2, 2010), and
>
> (2) persons who hold claims based upon exposure to a debtor's conduct or product *post-petition*, but *pre-confirmation*, if the reorganization plan was proposed and confirmed prior to the date *Wright* was decided (May 18, 2012).

*In re New Century TRS Holdings, Inc,* No. 07-10416 (KJC), 2013 WL 5231456, at *3–4 (Bankr.

D. Del. Sept. 17, 2013) (citing *Owens Corning,* 679 F.3d at 109). Thus the *Frenville* test should

be applied to determine whether these claims arose pre-petition and are subject to the Bar Date.

*Id.*

Thus, when faced with the issue of enforcing a plan injunction under a pre-*Grossman's*

plan, a court must first look to whether the claimant's cause of action meets the definition of claim

under *Grossman's.*  If it does, then the court must determine whether due process requirements

have been met. For those "special cases" involving pre-*Grossman's* bankruptcy plans, the due

process analysis first involves an examination of whether the claim meets the *Frenville* accrual

test. In such cases, if the cause of action is not a "claim" under *Frenville,* but is a "claim" under

*Grossman's*, then due process mandates that the claimant receive actual notice of its "newfound claim status" – notice by publication may not be sufficient. *See Owens Corning*, 679 F.3d at 108. On the other hand, if the claim meets the *Frenville* accrual test, then the court must turn to traditional standards for analyzing the due process notice requirements. *See Chemetron*, 72 F.3d at 341.

## Due Process

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Owens Corning*, 679 F.3d at 108 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S., 314 (1950)). "The level of process due to a party prior to the deprivation of a property interest . . . is highly dependent on the context." *In re Mansaray-Ruffin*, 530 F.3d 230, 239 (3d Cir. 2008). In the bankruptcy context, whether notice "is reasonably calculated, under all the circumstances," to apprise creditors of the discharge of their claims depends on whether such creditors were "known" or "unknown." *Chemetron*, 72 F.3d at 341. As the Third Circuit explained:

> If claimants were "known" creditors, then due process entitled them to actual notice of the bankruptcy proceedings. Absent such notice, their suit may proceed. If claimants were "unknown" creditors, however, then notice by publication was sufficient to satisfy the requirements of due process and their claims are barred, absent some other basis for relief. . .
>
> As characterized by the Supreme Court, a "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Professional Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950).[1]
> 1314 A creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 2711 n. 4, 77 L.Ed.2d 180 (1983).

Reasonable diligence does not require "impracticable and extended searches ... in the name of due process." *Mullane,* 339 U.S. at 317, 70 S.Ct. at 659. A debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *In re Charter Co.,* 125 B.R. 650, 654 (M.D.Fla.1991). . .

The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required.[2] Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.

*Id.* at 345-47.

Therefore, the determination of the whether a creditor is "known," and thus entitled to receive actual notice of the bar date, depends on whether the identity of the creditor and its claims are reasonably ascertainable by the debtor. See *Chemetron,* 72 F.3d at 346.

## Judicial Estoppel

Judicial estoppel precludes a party from arguing a position inconsistent with a position that the party took in a previous proceeding. *In re Princeton-New York Investors, Inc.,* 255 B.R. 376, 386-87 (Bankr. D.N.J. 2000) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.1988), *cert. denied,* 488 U.S. 967 (1988)). Courts focus on the connection between the litigant and the judicial system in determining whether judicial estoppel is applicable. *Princeton-New York Investors,* 255 B.R. at 387 (citing *Oneida Motor Freight,* 848 F.2d at 419). In order for the doctrine to apply, a two-part test must be satisfied: "First, is the position of the party against whom estoppel is sought inconsistent with a position it previously asserted in the proceedings? Second, if so, did that party assert either or both of the inconsistent positions in bad faith-i.e., with intent to play fast and loose with the court?" *Princeton-New York Investors,* 255 B.R. at 387 (quoting *National Utility Serv., Inc. v. Chesapeake Corp.,* 45 F.Supp.2d 438, 445 (D.N.J.1999) (itself citing *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 361 (3d Cir. 1996))). Moreover, the party invoking judicial estoppel

must prove that any inconsistent argument was due to intentional wrongdoing. *Princeton-New York Investors*, 255 B.R. at 387 (citing *Ryan Operations*, 81 F.3d at 362 ("An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.")).

## ANALYSIS

### 1. *Collateral Estoppel* **and the Effect of the District Court's Opinion**

By way of this Motion, the Reorganized Debtors seeks to reopen the Chapter 11 Case and enforce the Chapter 11 Plan Discharge and Injunction against Plaintiffs' antitrust claims that arose prior to the Effective Date of GEO's plan, December 31, 2004, arguing that such claims arose prepetition and were thus discharged under GEO's Confirmed Plan. As a threshold matter, Plaintiffs argue that collateral estoppel applies to the District Court's July 20, 2017 Opinion as to those issues, or, alternatively, that the unique procedural posture of this Motion – where D.N.J. Local Rule 40.1 (c) requires assignment of any appeal to Judge Linares – in effect renders the District Court Order *stare decisis.*

As previously noted, collateral estoppel or issue preclusion, prevent parties from litigating an issue that has already been actually litigated. *Peloro v. U.S.*, 488 F.3d 163, 174 (3d Cir. 2007). The prerequisites of collateral estoppel are that: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issues was actually litigated in the prior proceeding; (3) it was determined by a final and valid judgment, (4) the party being precluded from relitigating the issue was fully represented in the prior action; and (5) the prior determination was essential to the prior judgment. *Id.* at 175. *Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201 (3d Cir. 2001). A denial of a motion to dismiss can be sufficiently "final" for purposes of issue preclusion. *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 393 (7th Cir. 1991) (cited with approval in *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991) *and McLendon v. Cont'l Grp., Inc.*, 660

71

F. Supp. 1553, 1562 (D.N.J. 1987). "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it be litigated again." *Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201, 210 (2001) (quoting *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961)). The *Henglein* Court went on to note:

> In *In re Brown*, 951 F.2d 564, 569 (3d Cir.1991), we made the point clearly: "[u]nlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable." We also cited section 13 of the Second Restatement of Judgments, which states that "for purposes of issue preclusion, ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Id.*; *see also Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency*, 126 F.3d 461, 474 n. 11 (3d Cir.1997); Restatement (Second) of Judgments § 27 cmt. k.

*Id.*

Here, it is clear that the issues decided by Judge Linares in the July 20, 2017 Opinion were (1) whether Plaintiffs' claims in the Antitrust Action that arose prior to confirmation of the debtors' reorganization plan constitute prepetition "claims" within the meaning of the Bankruptcy Code and GEO's Confirmed Plan; (2) whether GEO's publication notices satisfied Due Process sufficient to discharge such pre-petition and pre-confirmation claims; and (3) whether GEO's alleged post-discharge antitrust conspiratorial conduct subjects it to joint and several liable for all damages resulting from the alleged conspiracy. *In re Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-2687(JLL), 2017 WL 3131977 (D.N.J. July 20, 2017). The parties litigated all of these issues in connection with GEO's Motion to Dismiss and Judge Linares addressed and ruled upon each issue in the Court's July 20, 2017 Opinion. Specifically, the District Court found that although Plaintiffs' antitrust claims that accrued prior to the discharge order would be dischargeable in bankruptcy, the Confirmation Order did not bar such claims because Plaintiffs

were "known" creditors and thus notice by publication was insufficient to satisfy due process. *Id.* at \*13. The District Court further determined that even if Due Process was satisfied, GEO's alleged "post-discharge conduct" subjects it to joint and several liability for the entirety of the alleged conspiracy, because a party is "jointly and severally liable for all the damages caused from the beginning of the conspiracy" *Id.* (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. at 538-39).

Despite these findings, GEO argues that this Court should continue to decide the very same issues because the District Court's Opinion is not "final" for *collateral estoppel* purposes. Specifically, GEO contends that the District Court's Opinion relied upon the Complaint and that it did not make findings based upon a "complete factual record." This argument must fail. It is undisputed that GEO did not provide actual notice to potential antitrust claimants and that GEO's bankruptcy schedules, Plan, and Disclosure Statement did not reveal such potential claims, notwithstanding GEO's 2016 Guilty Plea, in which it admitted to engaging in "a conspiracy to rig bids and allocate customers for, and to fix the price of, liquid aluminum sulfate supplied to municipalities and pulp and paper manufacturers in the United States from at least as early as 1997 and continuing until approximately February 2011." Plea Agreement, *supra*, ¶ 1. These facts are well-documented in the public records including the bankruptcy docket, with which the District Court is undoubtedly familiar. Thus, GEO's suggestion that the "record" set forth before this Court puts it in a better position than the District Court to decide these issues is entirely without merit. Rather, in this Court's view, virtually all of the evidence and facts relied upon by the parties in connection with this Motion were also available to the District Court.

Debtors cite *Anderson v. Comm'r* for the notion that "an issue is conclusively established in future litigation through the doctrine of collateral estoppel only when it is determined by a final judgment." 698 F.3d 160, 166 (3d Cir. 2012) (citations omitted). This should not be read to

conflict with the Third Circuit decision stating "'finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court see no really good reason for permitting it to be litigated again." *Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201, 210 (3d Cir. 2001) (citations omitted). The cited portion of *Anderson*, 698 F.3d at 166, discussed the preclusive effect of the Tax Court's denial of a motion to sever, in which the court stated that it "takes notice of [the IRS's] concession of all tax and penalty issues for 1995, 1996, and 1997 and will reflect that concession in its eventual entry of decision in [the] case," on tax deficiency or fraud penalty in 1998 and 1999. The Third Circuit held that this was not a "final" judgment because it did not determine a substantive issue, or rather any relative issue, as the court simply "advise[d] the parties that it was taking notice of the IRS's desire not to litigate tax years 1995 through 1997 and state[d] that it would factor that position into its eventual final judgment." *Id.* The case did not otherwise discuss what constitutes a final decision for purposes of collateral estoppel. In *In re Brown*, the Third Circuit stated "[u]nlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable," and that for purposes of issue preclusion, "'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." 951 F.2d 564, 569 (3d Cir. 1991). The Court continued that "[i]n determining whether the resolution was sufficiently firm, the second court should consider whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed. *Id.*

Here, GEO has been fully heard before the District Court, and the District Court issued a reasoned extensive opinion. As stated by the District Court, "Plaintiffs have sufficiently pled

that Defendant GEO and GCC Defendants were aware of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and failed to provide all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process." *In re Liquid Aluminum Sulfate Antitrust Litig.,* No. CV 16-MD-2687 (JLL), 2017 WL 3131977, at *12 (D.N.J. July 20, 2017). This Court finds that District Court's Opinion and Order with respect to the issue of whether GEO's publication notices satisfied Due Process sufficient to discharge any pre-petition claims and pre-Plan Effective Date claims is sufficiently firm to be accorded preclusive effect and so "final" for collateral estoppel purposes. Thus all the elements of collateral estoppel are met. The issue to be decided here is identical to the issue decided in the District Court, it was litigated in the District Court, the District Court Decision is sufficiently firm to be accorded preclusive effect, that is final, the determination of the issue was essential to the District Court Judgment and the Debtor was a party in the District Court action.

Further, IPPs argue the July 20, 2017 District Court Order, considering the procedural posture of this case, and in light of U.S. District Court for the District of New Jersey, L. Civ. R. 40.1(c), which governs the "Allocation and Assignment of Cases,"[10] constitutes *stare decisis.* Based upon L. Civ. R. 40.1(c), this Court acknowledges any appeal of this Court's Order will go directly to Judge Linares, unless a direct appeal to the Third Circuit is certified in accordance with 28 U.S.C. § 158(d). However, finding the District Court Opinion satisfies the requirements of collateral estoppel to the particular issue before this Court, whether such Opinion constitutes *stare decisis* need not be addressed.

*The Merits*

---

[10]L. Civ. R. 40.1(c) provides: "[w]hen a civil action: (1) relates to any property included in a case already pending in this Court … such action shall be assigned to the same Judge to whom the pending related action is assigned".

Assuming *arguendo*, that collateral estoppel does not apply, this Court would nonetheless

concur with the District Court's finding that Plaintiffs' pre-Effective Date antitrust claims are not

barred by GEO's Plan and Confirmation Order.

The District Court succinctly described the test for applying a discharge injunction as follows:

"1) whether the claim arose prior to the confirmation of the reorganization plan, and if so, 2)

whether Due Process has been afforded to the claimant such that it is 'fair' to discharge his or her

claim". District Court Opinion at *11 (citing *Grossman's*, 607 F.3d at 127).  In this case, GEO's

Plan was confirmed prior to the *Grossman's* decision, during the so-called *"Frenville era,"* so that

the standard for enforcing the discharge injunction depends upon when Plaintiffs' claims accrued

under a *Frenville* analysis. *Owens Corning,* 679 F.3d at 109.[11]

Here, the first prong of *Grossman's* is arguably  satisfied because GEO first participated in

the alleged conspiracy prepetition, as early as January 1, 1997.  However, even if a claim arises

prepetition or pre-confirmation, "[d]ischarge of the claims of future unknown claimants raises

questions regarding due process" and ""[i]nadequate notice . . . precludes discharge of a claim in

bankruptcy. *Owens Corning*, 679 F.3d at 107. The Third Circuit explained in *Chemetron* that

whether a creditor is "known" to a debtor is a factor in determining the adequacy of due process,

72 F.3d 341.  If a creditor is "known" to the debtor, the creditor is entitled to actual notice of the

bankruptcy proceedings. *See id.* at 345-46. If a creditor is "unknown" then notice by publication

will generally suffice to satisfy the requirements of due process. *See id.* at 345-46.  A creditor is

"known" if the creditor's identity is "either known or reasonably ascertainable by the debtor." *Id.*

at 346. (internal quotation marks omitted).  In other words, adequacy of notice "turns on whether

the debtor ... knew about the claim or, with reasonable diligence, should have known." *DPWN*

---

[11] At oral argument, GEO and Plaintiffs agreed that *Frenville* governs the claim accrual analysis. *See* Feb. 20, 2017 Hearing Transcript, 16:2-25; 41:16-25; 42:1-7.

*Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (citing *Chemetron*, 72 F.3d at 345-46) (dealing with whether a plaintiff with an antitrust price-fixing claim had sufficient notice of the availability of the claim against a Chapter 11 debtor to satisfy due process requirements and render the claim discharged.)

Accordingly, "[w]hen a party conceals the necessary facts upon which a claim is about to be made, that party cannot benefit from publication by notice. Due process does not allow a debtor who has actively concealed facts necessary to the presentation of certain claims to notify by publication those persons adversely affected by the active concealment". *Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005). Or as the Supreme Court explained, "[w]e think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving the perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Grogan v. Garner,* 498 U.S. 279, 287 (1991).

The Second Circuit's decision in *Motors Liquidation* is instructive. *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016) *cert. denied sub nom. Gen. Motors LLC v. Elliott,* 137 S. Ct. 1813, 197 L. Ed. 2d 758 (2017). In that case, General Motors Corporation ("Old GM") filed a Chapter 11 case to effectuate a sale of asserts to a new entity ("New GM"). The bankruptcy court approved the sale, free and clear of any liens and claims that could have been asserted against Old GM. *Id.* at 145-46. After the sale closed, it was revealed that Old GM knew of ignition switch defects in the automobiles sold prior to the bankruptcy case. *Id.* at 150, 160. Thus, owners of automobiles and victims of injuries caused by the defects sued New GM to recover for their injuries. Like GEO, New GM argued that the bankruptcy court sale order barred the plaintiffs' claims. There, as here, "[t]he parties d[id] not dispute that plaintiffs received only publication

77

notice. The question is whether they were entitled to more." *Id.* at 159.  The Second Circuit ruled

that plaintiffs were entitled to actual notice because they were "known" creditors of Old GM. The

Second Circuit explained that the record evidence supported the bankruptcy court's finding that

Old GM knew from its development in 1997 that the ignition switch was defective and became

aware of the consequences of defect almost immediately.  The court further determined that,

"[e]ven assuming the bankruptcy court erred in concluding that Old GM *knew,* Old GM – if

reasonably diligent – surely *should have known* about the defect." *Id.* at 160 (emphasis in original).

The court explained:

> If a debtor reveals in bankruptcy the claims against it and provides potential claimants
> notice consistent with due process of law, then the Code affords vast protections. Both
> § 1141(c) and § 363(f) permit "free and clear" provisions that act as liability shield.
> These provisions provide enormous incentives for a struggling company to be
> forthright. But if a debtor does not reveal claims that it is aware of, then bankruptcy
> law cannot protect it.  Courts must "limit[] the opportunity for a completely
> unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v.
> Garner,* 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Local
> Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).
>
> ....
>
> New GM argues in response that because plaintiffs' claims were "contingent," those
> individuals were "unknown" creditors as a matter of law. But contingent claims are still
> claims, 11 U.S.C. § 101(5), and claimants are entitled to adequate notice if the debtor
> knows of the claims. Moreover, as discussed above, the only contingency was Old GM
> telling owners about the ignition switch defect-a contingency wholly in Old GM's
> control and without bearing as to *Old GM's* own knowledge. New GM essentially asks
> that we reward debtors who conceal claims against potential creditors. We decline to
> do so. *See Grogan,* 498 U.S. at 286-87, 111 S.Ct. 654.

*Id.* at 159-160.

Accordingly, the Second Circuit held that "[i]ndividuals with claims arising out of the

ignition switch defect were entitled to notice by direct mail or some equivalent, as required by

procedural due process." *Id.* at 161.

Here, like the *Motors Liquidation* debtor, GEO knew about the conspiracy it originated and knew or should have known about any contingent antitrust claims. Specifically, GEO has admitted, pleading guilty to criminal charges violating the Sherman Act, "that from at least as early as 1977 and continuing until approximately February of 2011, [GEO] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of [LAS] by agreeing to rig bids and allocate customers for, and to fix, stabilize and maintain the price of [LAS] sold to municipalities and pulp and paper companies in the United States." Plea Hearing, 8:7-15; 18:8-11.  GEO further admitted that "employees of GEO, while actively engaged in the management, direction, control or transaction of the [LAS] business on behalf of GEO, knowingly and intentionally conspire[d] and agree[d] with certain employees of the co-conspirator company not to compete for each other's historical business by rigging bids, allocating customers, and fixing prices for [LAS]. *Id.* at 15:12-20.  These facts were admitted by GEO in its Guilty Plea and at the Sentencing Hearing. *See Anderson v. Comm'r of Internal Revenue,* 698 R.3d 160, 164 (3d Cir. 2012) ("Where, as here, a conviction is the result of a guilty plea, its preclusive effect extends to all issues that are necessarily admitted in the plea").  Because GEO knew about the conspiracy, it follows that GEO knew or could have easily ascertained the identity of all of the upstream and downstream purchasers of LAS affected by its alleged conspiracy, including the DP and IP Plaintiffs in the Antitrust Action.  Accordingly, Plaintiffs were known creditors and thus entitled to actual notice of the bankruptcy proceedings. *Chemetron,* 72 F.3d at 345.  GEO failed to provide it.

This Court rejects GEO's argument that the standard for ascertaining known claimants is limited to the perspective of "the persons responsible for administering a bankruptcy case" and that all is required is a "diligent review of the debtor's books and records maintained in the

ordinary course of business." Motion, *supra,* at 21 (citing *In re Penn Central Trans. Co.,* 42 B.R.

657 (E.D. Pa. 1984), *aff'd* 771 F.2d 763 (3d Cir. 1985)).  This attempt by GEO to place a narrow

and inflexible standard on the due process requirement has been expressly rejected by the Third

Circuit in *Chemtron*:

> Although some courts have held, regardless of the circumstances, that the "reasonably
> ascertainable" standard requires <u>only</u> an examination of the debtor's books and records,
> without an analysis of the specific facts of each case, see e.g., *In re Best Products Co.,*
> 140 B.R. 353, 358 (Bankr.S.D.N.Y.1992); *In re Texaco, Inc.,* 182 B.R. 937, 955
> (Bankr.S.D.N.Y.1995), we do not construe it so narrowly.  Situations may arise when
> creditors are "reasonably ascertainable," although not identifiable through the debtor's
> books and records. *See, e.g., Tulsa Professional Collection Serv., Inc. v. Pope,* 485 U.S.
> at 491, 108 S.Ct. at 1348 (hospital's claim against deceased patient's estate possibly
> reasonably ascertainable). We need not address this possibility precisely because as we
> discuss, plaintiffs' claims in this case are so speculative that the identities of the plaintiffs
> could not be ascertained with "reasonably diligent efforts". *Mennonite,* 462 U.S. at 798
> n. 4, 103 S. Ct. at 2711, n.4.

*Chemetron,* 72 F.3d at 347 n. 2; *see also Grossman's,* 607 F.3d at 127 ("Whether a particular

claim has been discharged by a plan of reorganization depends on factors applicable to the

particular case and is best determined by the appropriate bankruptcy court or the district court.)

Accordingly, this Court finds that GEO's Plan and Confirmation Order and the Discharge

Injunction do not bar Plaintiffs' claims asserted in the Antitrust Action that arose prior to the

Effective Date of the Plan of Reorganization.

## CONCLUSION

Given this Court's determination that GEO's Plan and Confirmation Order do not bar

Plaintiffs' Claims asserted in the Antitrust Action that arose prior to the Effective Date of GEO's

Plan of Reorganization, there is no basis to find "cause" to reopen GEO's Bankruptcy Case

pursuant to 11 U.S.C. 350(b).  Accordingly, GEO's Motion to Reopen its Bankruptcy Case and

Enforce the Discharge Injunction is DENIED.

An Order shall be submitted in accordance with this Decision.[12]

DATED:  December 4, 2017

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

---

[12] In so ruling the Court does not reach or comment on the issue of the debtors' liability under applicable antitrust law or whether such liability is joint and several among the defendants.  As well, the District Court will ultimately determine whether GEO engaged in post-discharge conspiratorial conduct and the extent of GEO's liability pursuant to antitrust law, which is clearly the province of the District Court in the Consolidated Action.